# IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3-04 CV-1320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

**U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
FEB 1 1 2005
CLERK, U.S. DISTRICT COURT
By _____
Deputy**

## AFFIDAVITS OF

### JOHN P. EVANS
### JOHN P. CLEMENT, IV
### ROBERT F. KINCHEN

ORIGINAL

Charles B. Manuel, Jr.
James C. Jones
Shira Y. Rosenfeld
MANUEL & JONES, P.C
230 Park Avenue, Suite 1000
New York, New York 10169
Tel. (212) 808-6584
Fax (212) 808-3020

Carl A. Generes
4315 West Lovers Lane
Dallas, Texas 75209
Tel. (214) 352-8674
Fax (214) 352-8852
Of Counsel

Attorneys for Defendant
Conrad P. Seghers

February 10, 2005

2005 FEB 11 PM 7:56

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3-04 CV-1320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

**AFFIDAVITS OF**

**JOHN P. EVANS**
**JOHN P. CLEMENT, IV**
**ROBERT F. KINCHEN**

Charles B. Manuel, Jr.
James C. Jones
Shira Y. Rosenfeld
MANUEL & JONES, P.C.
230 Park Avenue, Suite 1000
New York, New York 10169
Tel. (212) 808-6584
Fax (212) 808-3020

Carl A. Generes
4315 West Lovers Lane
Dallas, Texas 75209
Tel. (214) 352-8674
Fax (214) 352-8852
Of Counsel

Attorneys for Defendant
Conrad P. Seghers

February 10, 2005

**Evans Affidavit**

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3-04 CV-1320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF JOHN P. EVANS

Charles B. Manuel, Jr.
James C. Jones
Shira Y. Rosenfeld
MANUEL & JONES, P.C.
230 Park Avenue, Suite 1000
New York, New York 10169
Tel. (212) 808-6584
Fax (212) 808-3020

Attorneys for Defendant
Conrad P. Seghers

Carl A. Generes
4315 West Lovers Lane
Dallas, Texas 75209
Tel. (214) 352-8674
Fax (214) 352-8852
Of Counsel

February 7, 2005

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | CIVIL ACTION No. 3:04-CV-01320-K |
| vs. | § § | |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF JOHN P. EVANS

| | |
|---|---|
| STATE OF OREGON | § |
| | § |
| COUNTY OF JOSEPHINE | § |

John P. Evans, duly sworn, hereby states:

1.        My name is John Evans. I live at 350 Naturescape, Grants Pass, Oregon 97527. I was born January 20, 1941, am of sound mind and have never been convicted of a felony.

2.        In April 2001, after I had retired, I was looking on Hedgefund.net (a source for research on alternate investments) for an investment that had comparatively low volatility and consistent returns. After doing several searches, I found information on Integral Arbitrage, L.P., which at the time had approximately 12% annual returns. I called Integral Arbitrage, L.P. to discuss their trading approach and I initially talked at length with Mr. Sam Vogel. Mr. Vogel explained that the fund returns were based on the execution of derivative arbitrage trades, such as hedged option

strategies, with the goal of making reasonably consistent returns while limiting downside risks under most market conditions. I was made aware that besides trades in the financial markets that involved equities and equity indices and options thereon, other trades were made in private transactions and in various bond and debt instruments. I was never told, and did not ever understand, that there were no risks or only nominal risks in an investment in Integral Arbitrage, L.P., Integral Hedging, L.P., or for that matter in any other hedge fund.

    3.      Through the www.hedgefund.net website introduction several emails were sent back and forth. Integral Investment Management, L.P. answered many more questions over the next few weeks, and since I was considering investing in June or July of 2001, the Offering Memorandum for Integral Arbitrage, L.P. was sent to me (Exhibit 1). The Offering Memorandum states, "Integral Arbitrage, L.P., a Texas limited partnership (the 'Partnership') (f/k/a Sum-It Investments, L.P.), is a limited partnership which seeks maximum capital appreciation from its investments consistent with reasonable risk. The Partnership invests its assets primarily in a diversified portfolio of bonds, put and call options on equities and equity indices, swap, forward and option contract transactions in the currency and interest-rate markets, using forward contracts and equities and indices and options thereon and other publicly and over-the-counter traded instruments." This to me meant that Integral Arbitrage, L.P. was allowed to invest the assets essentially in almost any combination of financial instruments.

    4.      Exhibit 1 then states, "Further information regarding this offering and the Partnership may be obtained from the fund administrator, Olympia Capital Associates L.P., 1211 Avenue of the Americas, 29th Floor, New York, NY 10036, telephone number (212) 403-9503, Attn: Larry Platoni." This showed me that Integral Arbitrage, L.P. used outside third-party independent

CS 000004

administrators to administer the hedge fund and to distribute investor correspondence, including regular investor statements.

5.      The Offering Memorandum then states, "The Partnership's main investment objectives are to exploit market inefficiencies and price discrepancies through the arbitrage of equities, indices, forwards and swap contracts, and options, as well as other liquid instruments relating to the equity, currency, and interest rate markets. The Partnership will invest its assets primarily in a diversified portfolio of equities and indices, and related put and call options and other financial instruments thereon, debt instruments and forward and swap contracts, arbitrage transactions, and other publicly and over-the-counter traded instruments." The Offering Memorandum further states, "The Partnership also frequently engages in private contractual agreements with outside entities. These may include investments in other limited partnerships not controlled by the General Partner that engage in RAPS contracts with other entities". It was clearly stated that the investments of Integral Arbitrage, L.P. may be made in any number of financial instruments, including options and outside limited partnerships. I was aware that options transactions, particularly uncovered options, carried substantial risks and that the portfolio would not be 100% hedged.

6.      Also sent to me by Integral Investment Management, L.P. in April 2001 was the "Second Amended and Restated Agreement of Limited Partnership of Integral Arbitrage, L.P" (Exhibit 2). The Agreement of Limited Partnership goes on to further explain the risk associated various structured equities. The risks appeared to be fairly disclosed, and the potential returns in exchange for various risk levels were also properly disclosed. Also disclosed were the multitude of investment instruments that were allowed to be invested in, even though in most instances there would be an effort to center the investment strategy around a smaller subset of these financial instruments and transactions. **I was willing to take the investment risks but was totally unprepared for a self-**

John Evans Affidavit                                                            Page 3 of 11

CS 000005

serving, plundering, ineffective Receiver, Mr. Jackson, assigned by the court during the Art Institute of Chicago legal proceeding against Integral Arbitrage, L.P.

7. After I had performed this research on Integral Arbitrage, L.P., on April 22, 2001 Sam Vogel, a principal of Integral Investment Management, L.P., called me. I explained that I was "very interested" and also very "close to investing," but that I wanted to read over the Offering Memorandum again to be sure I understood what I was investing in. As I reread the Offering Memorandum today, I can state that I still believe it fairly sets forth the potential risks and rewards of an investment.

8. I also wanted assurance from independent accountants as to how the profits would be classified; long-term or short term capital gains. Because of this request I was faxed a tax opinion letter, written by Whitley Penn and Associates, along with a 1099 showing the capital gains treatment that the hedge funds had received to date from their professional accounting firms. On April 30, 2001 Sam Vogel again had a detailed conversation with me and again explained the trade constructions, as well as their risks.

9. I was also sent a Power Point presentation to review (Exhibit 3). Further questions and answers regarding the hedge fund Integral Arbitrage, L.P. were done via telephone and fax, with some additional questions and discussions being triggered by what I had seen and read in the PowerPoint presentation.

10. I was then supplied with previous monthly investment letters. They are Exhibits 4, 5 and 6, and are the monthly updates for April, May and June of 2001. Furthermore, the various monthly updates that I received (Exhibits 4-6) all contained the disclosure at the bottom that stated "Certain information concerning the Partnerships and their investing philosophies are included in this letter. This document is intended to give prospective investors an overview of <u>Integral Equity, L.P.</u>,

CS 000006

Integral Hedging, L.P., and Integral Arbitrage, L.P. (the Partnerships). [underscore in original.] These monthly letters provided updates on the hedge funds' monthly performance, the general market's performance, various aspects of the hedge funds' performance, the hedge fund methodology (such as re-hedging) and so forth. Once again risks were clearly disclosed.

11.      Also included in Exhibit 2 was a section defining the different methods to be used in evaluating various types of investments. It clearly defines how illiquid investments would be valued when a mark-to-market evaluation was not available. I was and am aware that not all hedge fund valuations are done at mark-to-market prices. The ability to trade in illiquid instruments, some of which cannot be valued at mark-to-market prices, can provide opportunistic investments. It is generally not a problem for a hedge fund to not value a portion of its assets at mark-to-market prices if the assets are valued in an industry consistent manner. What I was concerned about and desire is to see third-party confirmation that what is reported is correct and not contrived.

12.      On June 22, 2001, I was sent a courtesy email from Sam Vogel to see whether we were still on track for the July 1st investment.

13.      With a reasonable understanding of Integral Arbitrage, L.P., effective July 1, 2001, I invested a significant amount of my retirement money in Integral Arbitrage, L.P.

14.      The update for June 2001 (Exhibit 6) also states, "The principals, James Dickey, Conrad Seghers and Sam Vogel, would like to announce that we have retained Spear, Leeds & Kellogg, a division of Goldman Sachs, as our Prime Broker due to their specialization in derivatives and market leading risk management systems. This development will result in even more efficient trade execution, administrative services, risk management and reporting." This means that the hedge funds had not yet moved away from Morgan Stanley at that point. Therefore, they had most likely not been able to realize yet the damages that were later shown by many independent parties, including the

John Evans Affidavit                                                                 Page 5 of 11

Receiver of Integral Arbitrage, L.P., to have occurred there as of mid-July, when Exhibit 6 was distributed.

15.     The update for July 2001 (Exhibit 7) stated, "Last month we announced that we have retained Spear, Leeds & Kellogg, a division of Goldman Sachs, as our Prime Broker due to their specialization in derivatives and market leading risk management systems.   We have since experienced much more efficient trade execution, administrative services, risk management and reporting than Morgan Stanley was ever able to provide.   We are also still in the process of resolving outstanding issues with Morgan Stanley."   These issues were also discussed with me over the telephone with both Conrad Seghers.

16.     I was sent a statement for the month of July 2001 by Olympia Capital Associates, L.P., the independent administrator.   This is shown as Exhibit 8.   It is my understanding that the valuations were not calculated by Integral Investment Management or it principals, but that instead various assets in the hedge fund portfolios had values calculated by the various institutions that held those assets.   That includes many brokerage firms, including Morgan Stanley, Bizri Capital Partners, Inc., CCL Fund, and Recovery Partners II, L.L.C., among others.   Olympia Capital Associates, L.P. simply added up these valuations that came from the independent sources, although several of them were sent to Integral Investment Management, L.P. and then forwarded to Olympia Capital Associates, L.P.   Olympia Capital Associates, L.P. double checked these various statements for accuracy in calculating the final values for the hedge funds of Integral Investment Management, L.P. These statements were then backed up by audits from such well-known firms as Deloitte and Touche.

17.     The update for August 2001 (Exhibit 9) stated, "In June we announced that we had moved from Morgan Stanley and had retained Spear, Leeds & Kellogg, a division of Goldman Sachs, as our Prime Broker.   This was in response to developments at Morgan Stanley that directly

CS 000008

contributed to negative performance in Integral's funds. This issue is now the subject of legal action and settlement against Morgan Stanley, the successful resolution of which could have a material, positive effect for current investors." This issue was discussed orally with me as well. I was well aware of the events at Morgan Stanley, and all of my calls were promptly and courteously answered. Many of the calls were also placed to me by Integral Investment Management, L.P., in their efforts to keep the investors informed of the various events surrounding their hedge fund.

18.  Exhibit 10 is the statement from Olympia Capital Associates, L.P. for August 2001.

19.  Exhibit 11 is the monthly update sent via email for Integral Arbitrage, L.P. for September 2001. Exhibit 12 is the statement from Olympia Capital Associates, L.P. for September 2001.

20.  I spoke to Conrad Seghers several times in October 2001 about the events surrounding 9/11 and the Morgan Stanley accounts that had already been referenced and discussed for many months. I had become quite concerned about Integral Arbitrage, L.P. and my investment therein due to the disclosures that had been given. On November 19, 2001 I talked to David Wuller of Integral Investment Management, L.P., after he called me. I asked if the strategies were still the same. He told me yes, with a few changes having to do with more of the portfolio now being diverted away from the public equity and equity index markets, and their options, due to the large market declines, and therefore with more of the assets now being invested in bond and debt and distressed debt products than before.

21.  I learned through hedgefund.net that on December 10, 2001 the Art Institute of Chicago filed a lawsuit against Integral Investment Management, L.P. and all of its hedge funds. I received verbal confirmation of the lawsuit from the General Partner of the hedge funds, Integral Investment Management, L.P., when I gave them a call. I had just had a conversation on December 5,

John Evans Affidavit                                                                 Page 7 of 11

CS 000009

2001 with Conrad Seghers, who informed me of routine events surrounding Integral Arbitrage, L.P. and apparently had no idea that a lawsuit was about to be filed.

22.    On January 9, 2002 I received an email from Integral Investment Management, L.P., Exhibit 13, which stated, "We have received feedback that communicating twice per month was too frequent, so we will go back to these monthly emails. If any of you need information at any time however please do not hesitate to call. Integral Investment Management, LP, 555 Republic Drive, Suite 200, Plano, Texas 75074, (972) 516-4248 phone, (972) 422-9156 fax." This was a new office number and there was no delay in informing the investors how to contact Integral Investment Management, L.P. with any questions that they had.

23.    Exhibit 14 is an email during January 2002 that I received that stated, "While our statements starting as of January 1, 2002 will now be taken care of through our new administrator, Hedge Funds Services, Ltd., for any of you that need a value for your account as of December 31, 2001 (while the account was still the responsibility of Olympia Capital Associates) please let us know. The Fund had profits for the year, which we expect to be largely reflected as a combination of long-term capital gains and interest, and we expect to have the K-1 statements ready for you all in March. If there are any other open issues please do not hesitate to contact us." Once again full investor disclosure, even during these tough times for Integral Arbitrage, L.P that involved civil litigation, a change in administrators, and the problems with Morgan Stanley, appeared to be the rule.

24.    Exhibit 15 is the 4th Quarter investor statement that I received from Integral Arbitrage, L.P. showing my account value as of December 31, 2001. It states, "The capital account balance may be subject to change by the fund's auditors after their completion of the fund's December 31, 2001 annual audit."

CS 000010

25. On January 24, 2002 David Wuller left a message with my wife, during one of the routine phone calls made by Integral Investment Management, L.P. to keep the investors informed of events. On January 28, 2002 I called back and Conrad Seghers and I spoke at length regarding the pending matters, including the 4th Quarter Statements, the new administrator, the audits for 2001, the K-1 statements for 2001, and the litigation. I even spoke to Conrad Seghers at length about kayaking and rafting on the Colorado River and in Utah, a passion we discovered we both share. I have never met Conrad Seghers and our relationship began in 2001 and was solely for business purposes.

26. Exhibit 16 is an email that I sent on March 19, 2002 in which I asked, "Has the return for February 2001 been determined?" Immediately I received a response from Conrad Seghers that included a respectable return of 1.62% that Integral Arbitrage, L.P. had increased in February 2002. This email also caused Conrad Seghers to call me and we had a nice long talk. I was satisfied with the disclosures regarding my investment in Integral Arbitrage, L.P.

27. Exhibit 17 is an email dated April 5, 2002 at 8 am that is a prompt response to an email that I sent the night before after 9 pm asking, "Although the note below indicates that the K-1's will be available in March, I have yet to receive mine. When will they be sent and can they be sent by e-mail? Also, do you have an estimate for March's return yet?" Again, even in these difficult times a prompt response to my questions was sent which stated, "They were promised to us by the accountants Bulloch, Seger, and Weaver by March 15 and they are still not ready. Every day they say they will be done by tomorrow. Now they are saying they will be in Saturday's mail. I am very frustrated as I am sure you are too. An estimate is +0.37% for March. Thanks for understanding."

28. On May 1, 2002 Conrad Seghers and I spoke for a considerable time again. Conrad Seghers explained that he was upset that the K-1 numbers were different on the two different K-1 statements that had to be issued due to the Art Institute of Chicago litigation. Apparently the Art

John Evans Affidavit

Page 9 of 11

CS 000011

Institute of Chicago was claiming under oath, which seems preposterous to me, that they had never signed a Subscription Agreement for Integral Arbitrage, L.P. and instead had given $22.5 million to Integral Arbitrage, L.P. as a gift with no documentation whatsoever. This had apparently caused the K-1 statements to have to be reissued as the Art Institute of Chicago assets had to be treated under terms different from the Offering Memorandum of Integral Arbitrage, L.P.

29.     Since I was getting no information from Dan Jackson I was happy that Conrad Seghers continued to call and give me updates. On June 12, 2002 we again spoke at length. Conrad Seghers explained the whole story about Dan Jackson, the Receiver in the Art Institute of Chicago litigation. It was obvious that Receiver Jackson would continue to delay the trial so that he could plunder the funds for his own personal gain. I therefore wanted to be bought out ASAP, if Conrad Seghers could still find a way to accomplish that, but the Administrator Dan Jackson was doing his best to prevent it from happening.

30.     On July 23, 2002 I had another conversation with Conrad Seghers about the circumstances of the Art Institute of Chicago litigation. This litigation was unnecessarily hampering and destroying my investment, together with the difficulties Integral Arbitrage, L.P. was experiencing due to that litigation and the acts and omissions of the Court Appointed Administrator. I had been urged by the Art Institute of Chicago to participate in a conference call about appointing a Receiver that I was vehemently opposed to.

31.     Exhibit 18 is an email from Conrad Seghers that states "I enjoyed our talk yesterday. If you need estimates for your June 30, 2002 value let me know. I think we are going to try and finalize them concretely through an audit and so want to have that taken care of before we release final numbers."

John Evans Affidavit                                                                 Page 10 of 11

CS 000012

32.    I have continued to speak with Conrad Seghers many times over the last several years and have received many letters from Integral Investment Management, L.P. These letters and conversations have been crucial in keeping me up-to-date on the various events that have occurred in the Art Institute of Chicago litigation. Whenever I have had a question or concern, or noticed a disputed issue between the Receiver's statements and those of Integral Investment Management, L.P., Integral Investment Management, L.P. has been very quick to send me back-up documentation showing that their statements are correct and those of the Receiver are not. The Receiver has done a horrible job of notifying investors of important facts of the case, as well as why, <u>with the litigation now in its fourth year, (1) he has paid himself and his attorneys millions of investor dollars, (2) he has lost tens of millions of dollars, and (3) he has never distributed one penny to any investors.</u>

FURTHER AFFIANT SAYETH NOT.

Dated: January 21, 2005

_John P. Evans_

John P. Evans

Signed and subscribed
Before me this 21st day of January 2005

_S. Ivey_
Notary Public

OFFICIAL SEAL
S. IVEY
NOTARY PUBLIC - OREGON
COMMISSION NO. 365460
MY COMMISSION EXPIRES MARCH 1, 2007

State of Oregon, County of Josephine

My commission expires:    3-1-07

John Evans Affidavit                                                    Page 11 of 11

Evans Exhibits

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION No. 3:04-CV-01320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § § | |
| Defendants. | § § | |

**AFFIDAVIT OF JOHN P. EVANS**

**EXHIBIT LIST**

1.      Offering Memorandum for Integral Arbitrage, L.P.

2.      Second Amended and Restated Agreement of Limited Partnership of Integral Arbitrage, L.P

3.      Power Point presentation

4.      Monthly investment letter April 2001

5.      Monthly investment letter May 2001

6.      Monthly investment letter June 2001

7.      Monthly investment letter July 2001

8.      July 2001 statement from Olympia Capital Associates, L.P

9.      The update for August 2001

10.     Statement from Olympia Capital Associates, L.P. for August 2001

CS 000014

11.        Monthly update for Integral Arbitrage, L.P. for September 2001.

12.        Statement from Olympia Capital Associates, L.P. for September 2001.

13.        Email from Integral Investment Management, L.P. January 9, 2002

14.        Email from Integral Investment Management, L.P. January 9, 2002

15.        4th Quarter investor statement from Integral Arbitrage, L.P.

16.        March 19, 2002 email

17.        April 5, 2002 email

18.        July 24, 2002 email

John Evans Affidavit Exhibits

| Name: | |

| Memorandum No.: | |

# INTEGRAL ARBITRAGE, L.P.

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

January 1, 2001

<u>Fund Administrator</u>:
Olympia Capital Associates L.P.
29th Floor
1211 Avenue of the Americas
New York, NY 10036
Phone: (212) 403-9503
Facsimile: (212) 403-9550

CS 000016

# INTEGRAL ARBITRAGE, L.P.

Limited Partnership Interests

Minimum Initial Investment: $1,000,000

Integral Arbitrage, L.P., a Texas limited partnership (the "Partnership") (f/k/a Sum-It Investments, L.P.), is a limited partnership which seeks maximum capital appreciation from its investments consistent with reasonable risk. The Partnership invests its assets primarily in a diversified portfolio of bonds, put and call options on equities and equity indices, swap, forward and option contract transactions in the currency and interest-rate markets, using forward contracts and equities and indices and options thereon and other publicly and over-the-counter traded instruments. Current income is a secondary objective. The Partnership may use leverage as an investment technique. See "The Partnership -- Investment Objectives".

Following the first anniversary of an investment in the Partnership, a Limited Partner will be entitled to withdraw all or a portion of its investment quarterly, subject to certain limitations. See "Summary of the Partnership Agreement".

The General Partner of the Partnership is Integral Investment Management, L.P., a Texas limited partnership (the "General Partner"), of which Integral Management, LLC, a Texas limited liability company ("Integral Management") (f/k/a Genesis Management, LLC), is the general partner. Integral Management, in its capacity as general partner of the General Partner of the Partnership, implements the Partnership's investment strategy.

Limited partnership interests ("Interests") are being offered solely to "accredited investors" as defined in Section 501(a) of Regulation D promulgated under the Securities Act of 1933. Accredited investors are generally persons that have either (i) a gross income (exclusive of spouse's income) of at least $200,000 in the prior two years or joint income with spouse in excess of $300,000 in each of those years and a reasonable expectation of achieving the same income level in the present year, or (ii) a net worth of at least $1,000,000. The minimum investment is $1,000,000, although the General Partner may accept subscriptions for less. Interests will continue to be offered for an indefinite period, and additional limited partners may be admitted from time to time, provided that at no time will there be more than 100 partners in the Partnership. There is no maximum dollar amount of Interests that the Partnership may sell. See "Terms of the Offering".

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM – PAGE i

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE INTERESTS (AS HEREINAFTER DEFINED) IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE REGULATORY AUTHORITY, NOR HAS SUCH COMMISSION OR ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS OFFERING IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS PROMULGATED THEREUNDER, AND CERTAIN STATE SECURITIES LAWS. NO PUBLIC OR OTHER MARKET IS EXPECTED TO DEVELOP FOR THE INTERESTS OFFERED HEREBY. THE INTERESTS OFFERED HEREBY MAY BE SOLD, TRANSFERRED, HYPOTHECATED OR OTHERWISE DISPOSED OF ONLY UNDER CERTAIN LIMITED CIRCUMSTANCES UPON THE CONSENT OF THE GENERAL PARTNER OF THE PARTNERSHIP.

INVESTMENT IN THE PARTNERSHIP INVOLVES SPECIAL RISKS, AND PURCHASE OF THE INTERESTS SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN BEAR THE ECONOMIC RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD AND AFFORD A TOTAL LOSS OF THEIR INVESTMENT (SEE "RISK FACTORS"). THIS OFFERING IS BEING MADE ONLY TO INVESTORS WHO MEET THE PARTNERSHIP SUITABILITY REQUIREMENTS. (SEE "INVESTOR SUITABILITY.")

THE GENERAL PARTNER RESERVES THE RIGHT TO MODIFY, WITHDRAW OR CANCEL THE OFFERING AT ANY TIME PRIOR TO CONSUMMATION OF THIS OFFERING AND TO REJECT ANY SUBSCRIPTION, IN WHOLE OR IN PART, IN ITS SOLE DISCRETION.

NO OFFERING MATERIALS WILL OR MAY BE EMPLOYED IN THE OFFERING OF THE INTERESTS EXCEPT FOR THIS MEMORANDUM (INCLUDING EXHIBITS, AMENDMENTS AND SUPPLEMENTS HERETO) AND DOCUMENTS SUMMARIZED HEREIN. NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS OR GIVE ANY INFORMATION WITH RESPECT TO THE PARTNERSHIP OR THE INTERESTS EXCEPT FOR INFORMATION CONTAINED HEREIN. INVESTORS SHOULD NOT RELY ON INFORMATION NOT CONTAINED IN THIS MEMORANDUM OR THE EXHIBITS HERETO OR DOCUMENTS SUMMARIZED HEREIN.

THIS MEMORANDUM IS INTENDED SOLELY FOR USE ON A CONFIDENTIAL BASIS BY THOSE PERSONS TO WHOM IT IS TRANSMITTED BY THE GENERAL PARTNER IN CONNECTION WITH THE CONTEMPLATED PRIVATE PLACEMENT OF THE INTERESTS. RECIPIENTS, BY THEIR ACCEPTANCE AND RETENTION OF THIS MEMORANDUM, ACKNOWLEDGE AND AGREE TO PRESERVE THE CONFIDENTIALITY OF THE CONTENTS OF THIS MEMORANDUM AND ALL ACCOMPANYING DOCUMENTS AND TO RETURN THIS MEMORANDUM AND ALL SUCH DOCUMENTS TO THE GENERAL PARTNER IF THE RECIPIENT DOES NOT PURCHASE ANY INTERESTS. NEITHER THIS MEMORANDUM NOR ANY OF THE ACCOMPANYING DOCUMENTS MAY BE REPRODUCED, IN WHOLE OR IN PART, NOR MAY THEY BE USED FOR ANY PURPOSE OTHER THAN THAT FOR WHICH THEY HAVE BEEN SUBMITTED, WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER.

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM HAS BEEN PREPARED FOR USE IN CONNECTION WITH A PRIVATE OFFERING OF SECURITIES TO A LIMITED GROUP OF

CS 000018

SOPHISTICATED AND ACCREDITED INVESTORS. THIS OFFERING IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION PROMULGATED UNDER REGULATION D, RULE 506, OF THE SECURITIES ACT OF 1933 AND CERTAIN STATE SECURITIES LAWS. NO PUBLIC OR OTHER MARKET IS EXPECTED TO DEVELOP FOR THE UNITS OFFERED HEREBY.

THE SHARES HAVE NOT BEEN REGISTERED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR WITH ANY STATE SECURITIES COMMISSIONER OR AUTHORITY. RATHER, THE SHARES ARE BEING OFFERED AND SOLD HEREUNDER AS A "PRIVATE OFFERING" PURSUANT TO APPLICABLE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF FEDERAL AND STATE LAW. THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PROVIDED UNDER THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS, PURSUANT TO AN EFFECTIVE REGISTRATION THEREOF OR PURSUANT TO AN APPLICABLE EXEMPTION THEREFROM.

NEITHER THE PARTNERSHIP NOR THE GENERAL PARTNER IS MAKING ANY REPRESENTATION TO ANY OFFEREE OR INVESTOR IN THE INTERESTS REGARDING THE LEGALITY OF INVESTMENT BY SUCH OFFEREE OR INVESTOR UNDER APPLICABLE LEGAL, INVESTMENT OR SIMILAR LAWS.

THE MATTERS DISCUSSED IN THIS MEMORANDUM MAY INCLUDE FORWARD-LOOKING STATEMENTS REGARDING THE PARTNERSHIP'S BUSINESS AND FINANCIAL CONDITION THAT INVOLVE RISKS AND UNCERTAINTIES. SUCH STATEMENTS ARE BASED ON AN ASSESSMENT OF A VARIETY OF FACTORS, CONTINGENCIES AND UNCERTAINTIES DEEMED RELEVANT BY THE GENERAL PARTNER, INCLUDING THE PARTNERSHIP'S LACK OF HISTORICAL OPERATIONS AND OTHER RISKS DESCRIBED IN THIS MEMORANDUM. SHOULD ONE OR MORE OF THESE RISKS MATERIALIZE, THE PARTNERSHIP'S ACTUAL RESULTS MAY VARY SIGNIFICANTLY FROM THOSE EXPECTED. FURTHER, THE RESULTS OBTAINED BY THE AFFILIATES OF THE GENERAL PARTNER DESCRIBED IN THIS MEMORANDUM ARE NOT NECESSARILY INDICATIVE OF THE RESULTS WHICH MAY BE ACHIEVED BY THE PARTNERSHIP. WORDS OR PHRASES SUCH AS "WILL CONTINUE", "ANTICIPATE", "EXPECT", "BELIEVE", "INTEND", "ESTIMATE", "PROJECT", "PLAN" OR SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. INVESTORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE PRIOR RESULT ACHIEVED BY THE AFFILIATES OF THE GENERAL PARTNER OR ON FORWARD-LOOKING STATEMENTS MADE IN THIS MEMORANDUM OR EXHIBITS ATTACHED HERETO OR INCORPORATED HEREIN BY THIS REFERENCE.

THIS CONFIDENTIAL MEMORANDUM HAS BEEN PREPARED BY THE PARTNERSHIP FOR PRESENTATION TO QUALIFIED INVESTORS. ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, IS PROHIBITED.

PROSPECTIVE INVESTORS SHOULD NOT CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN COUNSEL, ACCOUNTANTS AND BUSINESS ADVISORS AS TO THE LEGAL, TAX AND BUSINESS IMPLICATIONS OF AN INVESTMENT IN THE PARTNERSHIP.

PRIOR TO THE SALE OF AN INTEREST TO ANY PROSPECTIVE INVESTOR, THE PROSPECTIVE INVESTOR AND ITS REPRESENTATIVES, IF ANY, WILL HAVE AN OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, OFFICERS OF INTEGRAL

CS 000019

MANAGEMENT, LLC CONCERNING ANY ASPECT OF THIS OFFERING AND TO OBTAIN FROM THEM ANY ADDITIONAL INFORMATION NECESSARY TO VERIFY THE INFORMATION SET FORTH IN THIS MEMORANDUM TO THE EXTENT THAT THEY POSSESS SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

FOR ALL INVESTORS

THE LP INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATES, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND/OR SUCH LAWS. THE LP INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THE LP INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

NOTICE TO FLORIDA OFFEREES

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE FLORIDA SECURITIES ACT. EACH OFFEREE WHO IS A FLORIDA RESIDENT SHOULD BE AWARE THAT SECTION 517.061 (11)(a)(5) OF THE FLORIDA SECURITIES ACT PROVIDES, IN RELEVANT PART, AS FOLLOWS: "WHEN SALES ARE MADE TO FIVE OR MORE PERSONS IN (FLORIDA), ANY SALE IN (FLORIDA) MADE PURSUANT TO ... 517.061 (11) SHALL BE VOIDABLE BY THE PURCHASER IN SUCH SALE EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PURCHASER TO THE ISSUER, AN AGENT OF THE ISSUER OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH PURCHASER, WHICHEVER OCCURS LATER."

THE AVAILABILITY OF THE PRIVILEGE TO VOID SALES PURSUANT TO SECTION 517.061(11) IS HEREBY COMMUNICATED TO EACH FLORIDA OFFEREE. EACH PERSON ENTITLED TO EXERCISE THE PRIVILEGE TO VOID SALES GRANTED BY SECTION 517.061(11)(a)(5) AND WHO WISHES TO EXERCISE SUCH RIGHT MUST, WITHIN THREE DAYS AFTER THE TENDER OF THE FIRST INSTALLMENT OF HIS CAPITAL CONTRIBUTION TO THE PARTNERSHIP OR TO ANY AGENT OF THE PARTNERSHIP (INCLUDING ANY DEALER ACTING ON BEHALF OF THE PARTNERSHIP OR ANY SALESMAN OF SUCH DEALER) OR AN ESCROW AGENT CAUSE A WRITTEN NOTICE OR TELEGRAM TO BE SENT TO THE PARTNERSHIP AT THE ADDRESS PROVIDED IN THE CONFIDENTIAL MEMORANDUM. SUCH LETTER OR TELEGRAM MUST BE SENT AND, IF POSTMARKED, POSTMARKED ON OR PRIOR TO THE END OF THE AFOREMENTIONED THIRD DAY. WITH RESPECT TO THE VOIDING OF A SALE, IT IS PRUDENT TO SEND ANY LETTER BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ASSURE THAT IT IS RECEIVED AND ALSO TO EVIDENCE THE TIME IT WAS MAILED. ANY PERSON MAKING AN ORAL REQUEST TO VOID SALES MUST ASK FOR WRITTEN CONFIRMATION THAT HIS REQUEST HAS BEEN RECEIVED.

NOTICE TO NEW HAMPSHIRE INVESTORS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM – PAGE iv

LICENSE HAS BEEN FILED UNDER A 421-B WITH THE STATE OF NEW HAMPSHIRE, NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE, CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER A 421-B IS TRUE, COMPLETE, AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

CS 000021

# TABLE OF CONTENTS

Page

<u>PART I</u>

I. THE OFFERING ........................................................................................................... 1

II. THE INVESTOR SUITABILITY ................................................................................ 3

III. THE PARTNERSHIP .................................................................................................. 6
    General ........................................................................................................................... 6
    Investments .................................................................................................................... 6
    Investment Policies ........................................................................................................ 9
    Management .................................................................................................................. 13
    Past Performance of General Partner and the Partnership ........................................... 17
    Additional Funds Management by the General Partner or Affiliates ............................ 17

IV. USE OF PROCEEDS .................................................................................................. 18

V. RISK FACTORS ......................................................................................................... 18
    General ......................................................................................................................... 18
    Diversification; Unspecified Investments ................................................................... 18
    Reliance on the General Partner and Integral Management ......................................... 18
    Investment in Unlisted or Restricted Securities .......................................................... 19
    Limited Liquidity ........................................................................................................ 19
    Conflicts of Interest .................................................................................................... 19
    Trading Strategy .......................................................................................................... 20
    Margin and Leverage .................................................................................................. 20
    Trading in Options Is Speculative ............................................................................... 21
    Execution of Orders .................................................................................................... 21
    Counterparty Creditworthiness ................................................................................... 21

VI. TERMS OF THE OFFERING .................................................................................... 21
    General ......................................................................................................................... 21
    Manner of Subscribing ................................................................................................ 22
    Private Placement ........................................................................................................ 22

VII. SUMMARY OF THE PARTNERSHIP AGREEMENT .............................................. 23
    Responsibilities of the General Partner ........................................................................ 23
    Partnership Finances .................................................................................................... 23
    Withdrawals ................................................................................................................. 24
    Optional Redemptions ................................................................................................. 24
    Reports ......................................................................................................................... 25
    Exculpation and Indemnification of the General Partner and its Affiliates ................. 25
    Term and Dissolution .................................................................................................. 25
    Amendments ................................................................................................................ 26
    Restrictions on Transfer .............................................................................................. 26
    Limited Liability .......................................................................................................... 26

CS 000022

VIII.  TAX CONSIDERATIONS...................................................................................................26
    General..........................................................................................................................26
    Qualification as a Partnership ......................................................................................27
    General Tax Treatment of the Partnership and the Limited Partners................................28
    Trading or Investing......................................................................................................28
    Limits on Deductibility.................................................................................................29
    Additional Tax Considerations .....................................................................................30
    Unrelated Business Income Tax....................................................................................30
    Foreign Taxes ..............................................................................................................31
    State and Local Taxes ..................................................................................................31

IX.  ERISA CONSIDERATIONS .............................................................................................32
    General Fiduciary Requirements ...................................................................................32
    Plan Assets ..................................................................................................................33
    Pre-Existing Relationships............................................................................................33

X.  REGULATORY CONSIDERATIONS...................................................................................33
    The Securities Act ........................................................................................................33
    Investment Company Act..............................................................................................34
    Investment Advisers Act...............................................................................................34

XI.  PROFESSIONALS...........................................................................................................34

XII.  ADDITIONAL  INFORMATION.......................................................................................34

## Exhibits

EXHIBIT "A" Agreement of Limited Partnership

EXHIBIT "B" Subscription Agreement

EXHIBIT "C" Confidential Offeree Questionnaire

CS 000023

## I. THE OFFERING

Integral Arbitrage, L.P., is a Texas limited partnership (the "Partnership") (f/k/a Sum-It Investments, L.P.) organized on or about December 1, 1998, under the laws of the state of Texas, in which Integral Investment Management, L.P., a Texas limited partnership (f/k/a Genesis Market Neutral Partners, L.P.) is the sole general partner of the Partnership (the "General Partner"), which General Partner is controlled by Integral Management, LLC, a Texas limited liability company ("Integral Management"), (f/k/a Genesis Management, LLC). Conrad P. Seghers is the Chief Executive Officer, James Dickey is the President and Sam Vogel is the Chairman of Integral Management. Investors admitted from time to time will be limited partners of the Partnership.

The Partnership's main investment objective is to exploit market inefficiencies and price discrepancies through arbitraged and hedged positions, and earn profits in other liquid instruments. The Partnership will invest its assets primarily in a diversified portfolio of put and call options, forwards and swap contracts, index, equity, bond, and currency arbitrage transactions, and other publicly and over-the-counter traded instruments. In connection with this objective, the Partnership is authorized to acquire by purchase, subscription or otherwise, and to invest or trade in, on margin or otherwise, receive, hold, own, deal in, sell, sell short, exchange, transfer, assign, encumber, pledge or otherwise dispose of all forms of securities which are traded on a securities exchange or in the over-the-counter markets, including, but not limited to, the purchase and sale of put and call options, equities, indexes, forwards and swaps.

Further information regarding this offering and the Partnership may be obtained from the fund administrator, Olympia Capital Associates L.P., 1211 Avenue of the Americas, 29th Floor, New York, NY 10036, telephone number (212) 403-9503, Attn: Larry Platoni. The address of the General Partner of the Partnership is 5720 LBJ Freeway, Suite 470, Dallas, Texas 75240-6330, telephone number (972) 238-9531. No person other than the General Partner or its designees, including the fund administrator, is authorized to supply such information.

The offering of interests is being made only to investors who meet the Partnership suitability requirements. (See "Investor Suitability."). The minimum investment in the offering is $1,000,000. The General Partner reserves the right to change this minimum participation requirement at any time in its sole and absolute discretion for subscriptions.

To subscribe for interests, each prospective investor must complete, execute and return the subscription documents, including the Subscription Agreement and Confidential Offeree Questionnaire, to the General Partner prior to the termination of the subscription period, together with a check or wire transfer in the amount subscribed. Wire transfers shall be made as follows: State Street Bank & Trust Co., Boston, MA; ABA #: 011000028; Attn: Mutual Funds Division; A/C #: 9904-6153; Ref: Winchester Reserves Limited - US Dollar Money Market Series; FBO: Integral Arbitrage LP; A/C #: 06-7100530938.

CS 000024

After the initial closing of this offering, the Partnership will be continuously opened and offered on a monthly basis (1st business day of each month) for additional capital contributions from existing or new Limited Partners.

This Confidential Private Placement Memorandum has been prepared for use in connection with a private offering of securities to a limited group of sophisticated and accredited investors. This offering is being made in reliance upon an exemption from registration promulgated under Regulation D, Rule 506, of the Securities Act of 1933 and certain state securities laws. No public or other market is expected to develop for the units offered hereby.

The shares have not been registered with the SEC under the Securities Act of 1933, as amended (the "Securities Act"), or with any state securities commissioner or authority. Rather, the interests are being offered and sold hereunder as a "private offering" pursuant to applicable exemptions from the registration requirements of federal and state law. The interests are subject to restrictions on transferability and resale and may not be transferred or resold except as provided under the securities act and all applicable state securities laws, pursuant to an effective registration thereof or pursuant to an applicable exemption.

CS 000025

## II. INVESTOR SUITABILITY

### THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK.

THE INVESTMENT IS ONLY SUITABLE FOR PERSONS OF SUBSTANTIAL MEANS WHO:

1. HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT, AND
2. CAN AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT.

THIS INVESTMENT IS ONLY SUITABLE FOR PERSONS WHO ARE "ACCREDITED INVESTORS" AS THAT TERM IS DEFINED IN RULE 501(a) OF SECURITIES AND EXCHANGE COMMISSION REGULATION "D" PROMULGATED UNDER THE SECURITIES ACT OF 1933. Accredited Investors who are individuals must generally have either (a) gross income (exclusive of spouse's income) of at least $200,000 in the prior two years or joint income with the spouse in excess of $300,000 in each of those years, and a reasonable expectation of reaching the same income level in the present year, or (b) net worth (excluding home, home furnishings, and automobiles) of at least $1,000,000. THE PARTNERSHIP WILL NOT MAKE EXCEPTIONS TO THIS GENERAL SUITABILITY STANDARD AND PERMIT SALES TO PERSONS WHO ARE NOT ACCREDITED INVESTORS.

Pursuant to the requirements of Rule 501 of Regulation D, as promulgated by the Securities and Exchange Commission, the Partnership will offer and sell Interests to persons whom the Partnership believes have the knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of this investment. The Partnership will sell Interests only if, immediately prior to each sale, the Partnership, after making reasonable inquiry, believes:

1. The investor has the requisite knowledge and experience to be capable of evaluating the merits and risks of this investment; or

2. The investor, together with his Purchaser Representative, has the requisite knowledge and experience to be capable of evaluating the merits and risks of this investment, and that the investor is capable of bearing the economic risk of this investment.

Prior to purchase of an Interest in the Partnership, each prospective investor will be required to represent, among other things, that he or she:

1. Is an Accredited Investor;

2. Has adequate net worth and means of providing for his or her current needs and personal contingencies and has no need for liquidity in the investment in the Interest in the Partnership;

CS 000026

3.    Has substantial experience in making investment decisions of this type or is relying on his own tax advisor or other qualified Purchaser Representative in making this decision;

4.    Is acquiring the Interest in the Partnership for investment and not with a view to the resale or distribution thereof;

5.    Is the sole and true party in interest and is not purchasing the shares for the benefit of any other person (or that he/she is purchasing the shares for another person who meets all of the conditions set forth herein); and

6.    Is aware that transfer rights are restricted by The Securities Act of 1933, and applicable state securities laws.

Prospective investors will be required to complete a Confidential Offeree Questionnaire and other documents in the Subscription Booklet that provide information necessary to verify the foregoing representations. In addition, the General Partner of the Partnership will require prospective investors to provide additional information or documentation to verify such representations. The acceptance of subscriptions from any prospective investor will be in the sole discretion of the General Partner of the Partnership and will also be based upon compliance with any other applicable state security law standards.

For purposes of this Memorandum, an "accredited investor" includes all of the following:

(1)    Any bank as defined in section 3(a)(2) of the Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such Act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

CS 000027

(2)    Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(3)    Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)    Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)    Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his purchase exceeds $1,000,000;

(6)    Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)    Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii); or

(8)    Any entity in which all of the equity owners are accredited investors.

Prior to the purchase of Interests, each prospective investor will be required to represent, among other things, that (i) his financial commitment to all investments (including his investment in the Partnership and other investments) is reasonable in relation to his net worth; (ii) he is acquiring the Interests for his own account for investment and not with a view to resell or distribution thereof; and (iii) he and his own counsel and/or accountants and/or purchaser representatives have received all the information that was requested by them in connection with the Partnership and the purchase of Interests.

The suitability standards referred to above represent minimum suitability requirements for prospective investors and the satisfaction of the suitability standards by a prospective investor does not necessarily mean that the Interests are a suitable investment for the particular prospective investor. The General Partner reserves the right to reject subscriptions to purchase Interests from a prospective investor even though the prospective investor satisfies the above-stated suitability standards.

CS 000028

## III. THE PARTNERSHIP

### General

Integral Arbitrage, L.P. (the "Partnership") (f/k/a Sum-It Investments, L.P.) is a Texas limited partnership which seeks maximum capital appreciation from its investments consistent with reasonable risk. The Partnership's main investment objective is to exploit market inefficiencies and price discrepancies through the arbitrage of options, forwards and swap contracts, as well as other liquid instruments. The Partnership will invest its assets primarily in a diversified portfolio of put and call options, forwards and swap contracts, index and various equity, bond and currency arbitrage transactions, and other publicly and over-the-counter traded instruments. The General Partner of the Partnership is Integral Investment Management, L.P., a Texas limited partnership (the "General Partner")(f/k/a Genesis Market Neutral Partners, L.P.), of which Integral Management, LLC(f/k/a Genesis Management, LLC), a Texas limited liability company ("Integral Management"), is the general partner. The General Partner selects and manages the Partnership's investments and administers the business and affairs of the Partnership. Conrad P. Seghers is the Chief Executive Officer of Integral Management. James Dickey is the President and Sam Vogel is the Chairman of Integral Management. Integral Management has developed and implemented the Partnership's investment strategy on behalf of the General Partner. The Partnership began operations on December 1, 1998 and expects to continue its business until December 31, 2040, at which time it will dissolve and liquidate, unless the General Partner and a majority in interest of the Limited Partners determine otherwise.

As of the date of this Offering Memorandum, the principals of Integral Management shall make aggregate capital contributions to the capital of the Partnership such that, as of the first day of each Fiscal Quarter, the General Partner's aggregate Capital Account balance will be not less than the lesser of $500,000 or 1% of the sums of the Capital Account balances of all Partners, as well as any additional amounts it may, in its exclusive discretion, elect to make. See "Management".

The Partnership is offering limited partnership interests ("Interests") for sale solely to accredited investors. The minimum investment is $1,000,000, although the General Partner may accept subscriptions for less. See "Terms of the Offering". Purchasers of Interests become limited partners of the Partnership. A copy of the Agreement of Limited Partnership of the Partnership (the "Partnership Agreement") is an exhibit to this Memorandum.

### Investments

**General.** The Partnership's main investment objectives are to exploit market inefficiencies and price discrepancies through the arbitrage of equities, indices, forwards and swap contracts, and options, as well as other liquid instruments relating to the equity, currency, and interest rate markets. The Partnership will invest its assets primarily in a diversified portfolio of equities and indices, and related put and call options and other financial instruments thereon, debt instruments and forward and swap contracts, arbitrage transactions, and other publicly and over-the-counter traded instruments. The

CS 000029

Partnership will invest its assets primarily in a diversified portfolio of arbitrage transactions, interest generating hedged transactions and hedged directional transactions, using forward contracts, swaps and publicly traded instruments such as equities and equity options among others. To a lesser extent, the Partnership may also invest in preferred stocks and securities convertible or exercisable into common stock, including notes, debentures, preferred stock and warrants, in order to obtain current income or when, in the opinion of the General Partner, such securities may be purchased at favorable prices in relation to the underlying instruments. The Partnership may also engage in the trading of options on and combinations of stocks, forwards, swap contracts and indices included in its portfolio. With regard to options, this includes options both on securities owned by the Partnership ("covered options"), as well as other securities not owned by the Partnership ("uncovered options").

To fulfill the Partnership's objectives, the General Partner monitors a variety of economic, monetary and market data in order to identify and analyze broad economic, industry and market trends so that the Partnership's investment strategy is kept consistent with such trends which may lead to substantial market moves. In broad terms, the General Partner attempts to use this data so that the Partnership is invested with sufficient hedging during downtrends and uptrends in the market, and invested both in long and short combinations of positions during flat market periods, so as to be able to generate a consistent profit through the arbitrage and directional movements of its various market positions. The General Partner uses a proprietary hedging technique ("Risk Adaptive Portfolio Structures – RAPS") in evaluating and determining the market positions necessary to achieve the Partnership's objectives in terms of safety and appreciation in value.

The General Partner also bases its investment decisions in small part on technical analysis. Technical analysis attempts to ascertain the relative market strengths of stocks, industries, and markets, their price support and resistance levels, various moving averages and historical price activity. Technical analysis is used for safety reasons to forecast possible sharp market moves.

The financial markets react in a volatile manner to changes in the economic, political, and social landscapes. Market volatility, illiquidity, crashes and credit crunches, are just a few of the market risks attempted to be diminished by the Partnership. Controlling exposure to risk, before taking advantage of an opportunity, is how the best performers in the investment world have survived and thrived through the best and worst times of financial markets. It is a simple philosophy that allows asset managers to avoid having years of outstanding results nullified in just months of irrational volatility.

The Partnership's philosophies focus not just on how much money can be made in a certain opportunity, but also on how the opportunity can be structured to survive and see it flourish regardless of market directions and volatility. Risk is controlled through equity, option, index, bond, currency and forward contract trading strategies, with very close monitoring of the financial holdings. Whatever decisions are triggered, the objective remains constant: to establish and maintain portfolios with the potential for substantial capital appreciation but limited risk (an attractive risk/reward ratio).

CS 000030

Regarding the investment objectives, systems and strategies of the Partnership, the General Partner has formulated a unique set of option arbitrage procedures that have consistently captured price inefficiencies in the global (G-5) currency, bond and equity markets, while providing synthetic hedges that protect realized profits. A major component in the Partnership's success is its implementation of the proprietary Risk Adaptive Portfolio Structures (RAPS) trading strategy.

The Risk Adaptive Portfolio Structures (RAPS) strategy utilizes proprietary risk management methods to identify, quantify, and react to any financial market risk by continually adapting to market directions, rather than "predicting" future market swings utilizing historical data. To exploit these enormous financial markets, the General Partner employs a very unique set of option arbitrage procedures that should consistently capture price inefficiencies in the market.

The mathematical equity and option pricing models that the General Partner utilizes allow a complex strategy to be implemented. The Partnership can go long or short the financial markets, protected by "synthetic hedges" should the markets move in the opposite direction. In addition, after purchasing the "synthetic" puts and portfolio protection at substantial discounts, the portfolio can sell open market premiums for significantly higher prices, thereby generating profits. The Partnership captures its statistical arbitrage from whichever global markets at the time are providing the best profit margins for the least risk.

By capturing price inefficiencies in this manner, the Partnership is essentially a quantitative statistical arbitrage trading strategy that is based on fundamental correlations and inter-relationships between the financial markets. This linking of the fixed income (bonds and debt), foreign exchange (currency), and equity markets between the G-5 nations and economies allows the consistent opportunities for arbitrage to exist. Each position is then hedged through the proprietary Risk Adaptive Portfolio Structures (RAPS).

In addition to these types of quantitative fundamental correlations, the Partnership also takes positions that are based on momentum arbitrage. Such market neutral positions are based on price behavior correlations between different baskets of securities. They have their downsides hedged, but require market movements in order to generate capital appreciation.

To fulfill the Partnership's objectives regarding directional-hedged positions, the General Partner monitors a variety of economic, monetary and market data in order to identify and analyze broad economic, industry and market trends so that the Partnership's investment strategy is kept consistent with such trends which may lead to substantial market moves. These objectives allow the Partnership to generally achieve consistent monthly returns with low volatility, low standard deviations, and high Sharpe ratios. In broad terms, the General Partner attempts to use this data so that the Partnership is invested with sufficient hedging during downtrends and uptrends in the market so as to be able to generate a consistent profit both through market movements and the arbitrage of its various market positions. The General Partner uses a proprietary hedging technique in evaluating and determining the market positions necessary to achieve the Partnership's objectives in terms of safety and appreciation in value.

CS 000031

The Partnership provides investors the opportunity to participate in a fund that trades around a diverse portfolio of financial instruments, while continuously providing downside protection on any position the Partnership implements. Through the General Partner's disciplined implementation of the RAPS strategy, the objective is to minimize volatility while producing superior returns that should consistently outperform the major market indices.

The Partnership's investment approach will be flexible and the General Partner will not utilize a formula or percentage limitations in determining how the Partnership's assets are allocated among different types of investments.

The Partnership also frequently engages in private contractual agreements with outside entities. These may include investments in other limited partnerships not controlled by the General Partner that engage in RAPS contracts with other entities. Such RAPS contracts allow such entities to capitalize on the value of investments as they move and to lock in profits through the exchange of a fixed insured return versus a floating value of stocks and securities. The fixed insured returns are dependent on the stocks and indices and securities remaining in set price bands upon expiration, though these bands may be adjusted to the new market prices during the interim between initiation and expiration. The stability of the return stream through investments in such entities generally makes such investments in both other limited partnerships not controlled by the General Partner and RAPS agreements, beneficial in the opinion of the General Partner.

## Investment Policies

**General.**   Consistent with the general investment objectives discussed above, the General Partner has full discretion to carry out the investment program of the Partnership. The Partnership shall have no obligation to disclose its particular holdings or trades to the Limited Partners. The Partnership seeks to achieve an attractive return on investment with controlled risks. Generally, the Partnership will invest its assets primarily in a diversified portfolio of equities and put and call options and bonds, forward contract arbitrage transactions and swap contracts, and other publicly and over-the-counter traded instruments.

The Partnership may invest in any listed or over-the-counter companies whose securities are listed on a nationally recognized securities exchange or on the NASDAQ National Market System. In addition, the Partnership may also invest in unlisted securities, or in unregistered securities, which are subject to resale restrictions for portfolio hedging purposes. Diversification of investments among different industries is not a primary goal of the Partnership.

The Partnership may also engage in (i) purchasing or writing options on equities and indices and purchasing or writing currency, interest rate and swap and forward contracts and related options, (ii) interest rate hedging transactions, and (iii) derivatives trading.   A significant portion of these

CS 000032

engagements may be conducted through other partnerships and corporations in which the Partnership is invested.

**Foreign Securities.** In attempting to achieve its investment objectives, the Partnership may invest in foreign publicly traded instruments, although the Partnership may invest in options and directly in foreign securities or indirectly by acquiring sponsored or unsponsored American Depositary Receipts, Global Depositary Receipts, WEBs and other types of depositary receipts traded in United States or international securities markets. While investments in foreign securities may reduce overall risk by providing further diversification, such investments involve certain risks which would not necessarily be associated with investments in the securities of domestic issuers. These risks include those resulting from fluctuations in foreign currency exchange rates, the possible imposition of currency controls and repatriation restrictions, political and economic instability and adverse developments (including the implementation of confiscatory or other laws or regulations unfavorable to foreign investors in particular), a reduced level of availability of public information about foreign issuers, and a lack of accounting, auditing and financial reporting standards or other regulatory requirements or practices comparable to those applicable to domestic issuers. In addition, given the lack of development of many foreign markets, some foreign securities may be less liquid or more volatile than domestic securities.

**Other Investment Strategies.** The Partnership may use certain investment strategies and techniques to hedge against market risks and to enhance its performance. These strategies and techniques include (i) purchasing and selling or writing put and call options on securities, (ii) purchasing securities on a when-issued or delayed delivery basis, (iii) selling securities on a "short-sale" basis and (iv) "day-trading".

**Options.** An option contract entitles the purchaser to purchase ("call") or sell ("put") a security at a particular price within a specific period of time. The Partnership engages in the trading of covered and uncovered put and call options and participates in the options markets both for speculative purposes and to hedge against adverse market fluctuations in its portfolio of investments.

The Partnership may also attempt to take advantage of discrepancies in pricing among related issues by engaging in spread trading of put and call options and swap and forward contracts against one another on the same security at various strike prices or months of expiration. The Partnership will attempt to purchase the undervalued side of the spread and to simultaneously sell short the overvalued side, with the goal of capturing the price discrepancy over time.

Participation in the options markets involves certain investment risks and transaction costs. The correlation between the option prices and the prices of the underlying securities may be imperfect and the market for any particular option may be illiquid at any particular time. Options transactions are normally highly leveraged and, accordingly, gains and losses are magnified. If the Partnership writes or sells an uncovered option, its losses, theoretically, could be unlimited.

CS 000033

**Other Funds, Investment Partnerships and Advisors.** In attempting to achieve its investment objectives, the Partnership may from time to time invest in other private or public investment funds or partnerships, or place monies with or utilize the services of advisors selected by the General Partner who have similar strategies and philosophies as the Partnership and the General Partner. Further, the General Partner may utilize the services of advisors to implement the Partnership's trading strategies and construction of hedges, all at the expense of the Partnership, as determined by the General Partner in its sole and absolute discretion.

**When-Issued and Delayed Delivery Securities.** The Partnership may purchase securities on a when-issued or delayed delivery basis, for payment and delivery at a specified, later date. The securities' price and yield are generally fixed on the date of the commitment to purchase. During the period between purchase and settlement, no interest will accrue to the Partnership. At the time of settlement, the market value of the security may be more or less than the purchase price and, accordingly, the Partnership may realize an immediate gain, but also bears the risk of having an unrealized loss at the time of delivery.

**Short-Selling.** Short-selling involves the sale of a security or a contract which the Partnership does not own, at a specific price, in the expectation of covering the sale by purchasing the security in the open market at a later date at a price lower than the specified price. At the time a short sale is effected, the Partnership borrows the securities from a third party "lender" and delivers them to the buyer. At the same time, it incurs an obligation to replace the borrowed security at the market price prevailing at the time the Partnership purchases it for delivery to the lender. At such time the market price can be more or less than the price at which the Partnership sold the security to the buyer. Since short selling can result in profits during a period of declining prices, the Partnership can, to an extent, use short selling to hedge against market risks. However, the Partnership would incur losses to the extent that securities sold short increase in value. The Partnership may also make short sales "against the box" where it would borrow securities identical to securities that it already owns.

Short-selling is a form of leverage. The profit realized by the Partnership on a short sale will be the difference between the price received on the sale and the cost of the securities purchased to cover the sale. If the securities sold short increase in value, the Partnership will incur a loss. Such losses can be, in theory, unlimited, while losses on cash purchases of securities are limited to the amount of cash invested. Short selling is also subject to certain restrictions imposed under the federal securities laws and the rules of the various national and regional securities exchanges. Further, it is likely that the lenders of the securities borrowed by the Partnership for short sales will require the Partnership to collateralize its obligation to replace the borrowed securities with deposits of cash or governmental obligations, thus increasing the costs of such transactions to the Partnership.

**Day-Trading.** Day-trading involves the purchase and sale of securities with the intention of closing out the position within a short period of time, usually on the same day. The Partnership can use day-trading to take advantage of, or to protect against, short term price fluctuations. Because day-

CS 000034

trading involves an increased volume of transactions, the Partnership's brokerage expenses can sometimes be higher than would otherwise be the case.

Investors should be aware that, while these kinds of investments may generate higher returns than traditional investments, losses associated with them may be greater than losses from traditional investments. The use of such techniques is designed to decrease the usual market risks associated with traditional, underlying investments. To the extent, however, that the Partnership uses hedging techniques and the underlying investments increase in value, the Partnership's return on the underlying investments may not be as great as it would have been if the Partnership had not hedged its portfolio. If the General Partner were to apply a hedge at an inappropriate time or evaluate market conditions incorrectly, such strategies could lower the Partnership's return more than if they had not been used or even result in losses.

**Interim Investments.** The Partnership will, from time to time, invest its cash in short term money market instruments, such as high yield corporate debt instruments, short-term U.S. Treasury obligations, dollar-denominated treasury obligations of foreign governments, bank certificates of deposit and other notes and bonds having short maturities or call features that the General Partner believes will be exercised in the short term. On a short-term basis, funds may also be allocated to outside entities whose specialization is in the field of earning slightly higher returns on short-term insured interest bearing notes. Such investments will be made pending application of Partnership funds to its investment program, or for temporary defensive purposes, during any periods in which the General Partner believes that economic or market conditions are unfavorable or suitable equity securities are not available, or to provide short-term liquidity.

**Leverage; Margin.** Under the Partnership Agreement, the Partnership is authorized to borrow to finance its investments. The General Partner may cause the Partnership to leverage its investments in circumstances in which borrowing would enable the Partnership to obtain a greater return on its capital than would otherwise be possible. Any such transactions would be subject to applicable credit and margin regulations. If gains realized on securities purchased with borrowed funds exceed the interest paid on the borrowing, the net asset value of the Partnership will rise more quickly than would otherwise be the case. On the other hand, if investment gains fail to cover interest costs, or if there are losses, the net asset value of the Partnership would decline faster than would otherwise be the case.

The Partnership will satisfy its margin requirements with cash deposits, treasury bills and other governmental debt obligations. All income derived from such cash deposits, treasury bills and governmental debt obligations shall be income of the Partnership and shall be allocated in accordance with the terms and conditions set forth in the Partnership Agreement.

**Prime Broker.** The Partnership shall generally use Morgan Stanley Dean Witter & Co. as its Prime Broker, but shall be permitted to use the services of such other brokers and open other and additional prime brokerage, brokerage and trading accounts as determined by the General Partner in its sole and absolute discretion.

CS 000035

## Management

**The General Partner.** Integral Investment Management, L.P., as General Partner, and with the assistance of Integral Management, LLC, will make all investment decisions and effect the purchase and disposition of securities on behalf of the Partnership. The General Partner will act with full discretion, but in accordance with the investment objectives and policies set forth in this Memorandum. The General Partner is a Texas limited partnership organized in April 1998 to serve as a general partner of the Partnership. Integral Management is a Texas limited liability company and serves as general partner of the General Partner.

The address of the General Partner is 5720 LBJ Freeway, Suite 470, Dallas, Texas 75240-6330 and the address of the fund administrator, Olympia Capital Assciates L.P., is 1211 Avenue of the Americas, 29th Floor, New York, NY 10036, telephone number (212) 403-9503, Attn: Larry Platoni.

**Conrad P. Seghers, M.B.A., Ph.D.** Dr. Seghers is the Chief Executive Officer of Integral Management, which is the general partner of the General Partner that serves three (3) funds open to outside investment, including the Partnership. Dr. Seghers has over ten years experience in investment and financial analysis, acquisition analysis, corporate development, marketing and investor relations. A summary of the performance of the three (3) funds is hereinafter set forth in this Memorandum. See "Past Performance of General Partner."

Dr. Seghers has been involved in the acquisition of institutional, private and federal investment funding for small corporations and partnerships that retain him as a consultant and partner. He has actively participated in road show presentations and financing negotiations with institutional and private investors. He has also performed company analysis and due diligence for venture capital firms and partnerships, offering him the opportunity for several seats on the boards of high-growth corporations.

Dr. Seghers worked at the University of Texas Southwestern Medical Center and the Howard Hughes Institute from 1986 to 1993, where by working with four Nobel Laureates he acquired expertise in the areas of health-care, biotechnology and emerging technologies, while being active in mergers and acquisitions and management consulting for the health-care and pharmaceutical industries.

Dr. Seghers received B.S. and M.S. Degrees from Texas A&M University, a Ph.D. from the University of Texas, and an Executive M.B.A. Degree from Baylor University.

**James Dickey** is the President of Integral Management. He brings to the Partnership over 12 years of experience in financial product design, implementation and sale, including four years as the Vice President of Product Development for Associates Financial Services.

From 1992 to 1995, Mr. Dickey was head of product development for Republic Financial Services, Inc., where his responsibilities included establishing marketing and pricing strategies. Prior to that, he was Assistant Product Manager with Great American Insurance, a subsidiary of American

CS 000036

Financial Corporation, where his duties included product strategy and design, and market and firm analysis. Each of his positions has included significant involvement in compliance and regulatory issues at both the state and federal level.

Mr. Dickey has extensive experience with compliance and regulatory issues at both the state and federal level. He holds a BA from Stanford and an MBA from Baylor University.

**Sam Vogel** is the Chairman of Integral Management. He has extensive experience within the international equity, commodity, energy and derivative markets. A substantial part of this experience was gained from 1988 until 1995 when Mr. Vogel was in charge of the equity and equity derivative trading departments for two of the largest banks in South Africa, Nedbank and Finansbank and international bank, West Merchant Bank. From 1995 to 1997 he consulted to South African institutions on asset allocations, portfolio structuring, and derivative strategies.

Mr. Vogel moved to the USA in 1997 and in a position of Executive Vice President assisted in establishing the broker-dealer for the Oxford Financial Group in Houston, Texas, followed by his involvement with Amerex Energy within the Institutional Power and Gas Derivative Markets.

Mr. Vogel received his Bachelor of Commerce from the University of the Witwatersrand in South Africa. He holds the Series 7, 63, 4 and 3 Securities Licenses, as well as Option Principal and Commodity Licenses.

**Interest of the General Partner.** The General Partner has directly contributed capital to the Partnership and will, accordingly, be allocated a percentage of the Partnership's income, gains, losses, credits and deductions at least equal to its equity interest in the Partnership. The General Partner's aggregate Capital Account balance will be not less than the lesser of $500,000 or 1% of the sums of the Capital Account balances of all Partners, as well as any additional amounts it may, in its exclusive discretion, elect to make.

The General Partner bears most of the expenses of operating the Partnership, including expenses for personnel and overhead. The Partnership bears any taxes or governmental charges assessed on the Partnership, brokerage and similar costs and fees, legal and accounting expenses associated with investment transactions, the costs of preparing the Partnership's tax returns and financial statements and reports, legal expenses incurred in connection with any litigation involving the Partnership, and any judgments or amounts paid in settlement. The Limited Partners will reimburse the General Partner for organizational and legal expenses incurred in the organization and maintenance of the Partnership and the sale of Interests, by contributing a maximum of $10,000 per year to the General Partner, and will deduct the amount to be reimbursed pro rata among all Limited Partners in accordance with their respective Contributions.

CS 000037

**Management Fees.**    For its services to the Partnership, the General Partner is paid a quarterly management fee, in advance, equal to 0.25% (approximately 1% per annum) of the net assets of the Partnership. The management fee is an expense of the Partnership chargeable to the capital accounts of the Limited Partners.

**Allocation of Net Gain.**    The General Partner will receive an allocation of a portion of the Partnership's net gain, if any, for a period that would otherwise be allocated to each Limited Partner. Such an allocation will only be made for a particular period, however, if the cumulative net gain allocated to a Limited Partner through the end of such period (after taking into account any such allocations to the General Partner for prior periods) exceeds the highest amount of cumulative net gain allocated to such Limited Partner as of the end of any prior period (the "High Watermark"). In such event, the General Partner will be allocated 20% of the net gain for such period otherwise allocable to such Limited Partner (exclusive of any portion of such net gain which must be counted towards cumulative net gain in order for it to exceed the High Watermark), payable quarterly.

Net gain is the amount by which all allocations to a Limited Partner of income and gain exceed all allocations to him of loss. The determination of the General Partner's allocation of net gain takes into account both realized capital gains and losses of, and the unrealized appreciation and depreciation in, the Partnership's investments, as well as dividends and other types of income and all related expenses. The Limited Partners will be affected by any allocation of net gain to the General Partner in proportion to the amount of net gain allocated to them for the quarter. Limited Partners who make initial or additional capital contributions, or completely or partially withdraw from the Partnership, as of any date other than the last day of a calendar quarter, will be subject to a similar allocation to the General Partner of net gain otherwise allocable to them for the partial period following their contribution or prior to their withdrawal solely with respect to the amount so contributed or withdrawn. If a partial withdrawal is effectuated at a time when the withdrawing Limited Partner's capital interest has a net loss position, such net loss shall be reduced pro rata on account of the partial withdrawal.

Prospective investors in the Partnership should be aware that:

(a)    the General Partner's right to receive an allocation of net gain may create an incentive for the General Partner to make investments on behalf of the Partnership that are riskier or more speculative than would be the case in the absence of such performance allocation;

(b)    the allocation of net gain will be based on the unrealized appreciation of the Partnership's investments as well as its realized gains;

(c)    the allocation of net gain will be determined quarterly with reference to the preceding period (or, as noted above, a shorter period in the case of the first allocation with respect to a Limited Partner who makes his or her initial investment in the Partnership at any time other than the first day of a quarter) and will be measured by the amount of net gain allocable to the Limited Partners with respect to such period; provided, however, that an allocation will be effected for such period only if the

CS 000038

cumulative net gain allocated to the Limited Partners through the end of such period (after taking into account any allocations to the General Partner for prior periods) exceeds the High Watermark.

(d)     securities held by the Partnership for which market quotations are not readily available will be valued by the General Partner in the manner set forth in the Partnership Agreement; and

(e)     the General Partner's allocation of net gain may be greater or less than compensation charged by other investment advisors for comparable services.

**Custody and Brokerage Arrangements.**     The Partnership's securities and other assets will be held in the custody of such custodians or depositaries as the General Partner may select from time to time.  In addition, the General Partner will select such brokers or clearing agents to act for the Partnership as it deems necessary or desirable.  The General Partner will attempt to obtain from any broker the lowest net price and best execution available, consistent with the Partnership's investment objectives and good practice.  In any event, fees and commissions paid by the Partnership to any broker or custodian shall be reasonable in relation to the services provided and comparable to fees and commissions charged by other brokers or custodians to unaffiliated institutional customers for similar transactions at the time, although they may not necessarily be the lowest charges obtainable.  In selecting any broker or custodian, the General Partner may take into account the fact that the broker has furnished the General Partner with statistical, research or other information or services which may enhance the General Partner's services generally, whether or not such services are of any benefit to the Partnership.

CS 000039

## Past Performance of General Partner and the Partnership

The following is a summary of the performance of three (3) funds managed by Integral Management for 1998, 1999, and 2000, which summary is net of all fees and allocations to the General Partner:

### Past Performance of Partnership

**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**

| | Integral Arbitrage, L.P. (f/k/a Sum-It Investments, L.P.) | | | Integral Hedging, L.P. | | | Integral Equity, L.P. (f/k/a Genesis Market Neutral Index Fund, L.P.) | | |
|---|---|---|---|---|---|---|---|---|---|

**Rate of Return (Net of Fees)**

| | 1998 | 1999 | 2000 | 1998 | 1999 | 2000 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|
| Jan | | 1.59% | 1.79% | | 1.83% | 1.46% | | 2.26% | 0.55% |
| Feb | | 1.71% | 1.53% | | 2.54% | 1.51% | | 2.83% | 1.07% |
| Mar | | 1.72% | 1.57% | | 2.60% | 1.72% | | 2.73% | 0.57% |
| Apr | | 1.49% | 1.10% | | 2.23% | 1.11% | | 2.36% | 0.44% |
| May | | 0.94% | 1.48% | | 1.94% | 1.44% | | 1.51% | 0.12% |
| Jun | | 1.63% | 1.02% | | 2.04% | 1.01% | | 2.26% | 0.34% |
| Jul | | 1.53% | 1.99% | | 2.23% | 1.32% | | 1.82% | 1.86% |
| Aug | | 2.13% | 1.43% | | 2.27% | 1.36% | | 1.39% | 1.36% |
| Sep | | 2.08% | 1.42% | | 1.29% | -1.21% | | 3.19% | -0.44% |
| Oct | | 1.38% | 1.15% | | 1.60% | 0.80% | | 3.17% | 0.88% |
| Nov | 2.09% | 1.53% | 1.22% | | 1.50% | 0.88% | 1.22% | 2.28% | 1.22% |
| Dec | 2.11% | 1.14% | 1.15% | 2.10% | 1.14% | 0.92% | 2.90% | 2.94% | 1.10% |
| Annualized(Year-to-Date) | 28.30% | 20.60% | 18.27% | 28.30% | 25.80% | 13.00% | 27.67% | 32.82% | 9.47% |

## Additional Funds Management by the General Partner or Affiliates

The General Partner also manages another private investment partnership known as Pinnacle Option Fund, L.P., a Texas limited partnership ("Pinnacle"), and Conrad Seghers, manages Exponential Returns, L.P., a Texas limited partnership ("Exponential") through his control of its General Partner, Exponential Returns Management, L.P.   Pinnacle and Exponential generally invest in a combination of venture capital investments and private investment partnerships. At all times, at least two-thirds (2/3) of the capital of Pinnacle and Exponential is invested in venture capital private placements.

CS 000040

## IV. USE OF PROCEEDS

All of the proceeds of this Offering, less organizational, ongoing legal, and selling expenses reimbursable to the General Partner (reimbursable at a maximum of $10,000 per year), will be utilized for the investment program of the Partnership, less whatever reserves for Partnership expenses are deemed appropriate by the General Partner.

## V. RISK FACTORS

A prospective investor should carefully consider, in addition to the factors discussed elsewhere in this Memorandum, the following risk factors before subscribing for an Interest:

### General

As a Partnership investing primarily in currency, bond and equity markets and their indices, the Partnership will be subject to normal market risks, such as the risk that prices in general may decline over short or extended periods. A large portion of this risk is offset by the Partnership's hedges, which consist of complex matrices of equities, indexes, swap contracts, forwards and call and put options thereon. The financial markets tend to be cyclical, with periods in which stock prices generally rise or decline. There is no assurance that the investment objectives of the Partnership will be achieved. In addition, the Partnership does not expect to make cash distributions. Accordingly, an investment in the Partnership may not be suitable for investors with a need for current income. Further, an investment in the Partnership should not be considered as a complete investment program.

### Diversification; Unspecified Investments

The ability of the Partnership to diversify its investments will depend in part on the aggregate amount invested in the Partnership by the Limited Partners. The smaller the number of subscriptions received, the more difficult diversification of the Partnership's investments may be to achieve. Prospective investors have only limited information as to the specific assets of the Partnership or other relevant economic and financial information, which, if available, would assist them in evaluating the merits of investing in the Partnership. Investors must depend on the ability of the General Partner with respect to the selection of investments.

### Reliance on the General Partner and Integral Management

The Limited Partners will have no right or power to take part in or direct the management of the Partnership. All decisions with respect to the Partnership's management and investments are made by the General Partner and Integral Management. Although Integral Management has substantial experience in securities investment and finance, this is the first time that it has operated a limited partnership with the size and objectives of this Partnership. Further, at least initially, the ability of the Partnership to attain its objectives will depend almost entirely on the General Partner and the principals

CS 000041

thereof. Should their services no longer be available, the impact on the Partnership would be adverse and it is unclear whether or not the Partnership could continue to operate in such event.

### Investment in Unlisted or Restricted Securities

The Partnership can invest in unlisted securities or contractual agreements (such as forwards and swaps and repos, which may involve a high degree of business and financial risk) or other limited partnerships. In addition, the Partnership may invest in other private or public funds or have the Partnership's funds managed by advisors having similar trading strategies and philosophies as the General Partner, all at the expense of the Partnership. Because of the absence of any substantial trading market for these investments, and, as to unregistered securities, the imposition of restrictions on resale, the Partnership might take longer to liquidate these positions than would be the case for publicly traded securities. Although these securities may be resold in privately negotiated transactions, the prices on these sales could be less than those originally paid by the Partnership. Further, issuers whose securities are not publicly traded may not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities.

### Limited Liquidity

There is no public trading market for the Interests and none is expected to develop. Further, the Partnership Agreement restricts the transferability of the Interests. While a Limited Partner will have the right to withdraw its investment in the Partnership after one year, any such withdrawal may only be made as of the end of a fiscal quarter of the Partnership, there can be no assurance that the value of a Limited Partner's interest in the Partnership may not decrease between the time such Limited Partner determines to withdraw and the effective date of such withdrawal. Further, the Partnership Agreement provides that, under certain conditions (such as prevailing market conditions which make the determination of the value of an interest in the Partnership impossible or impracticable), the General Partner may, in its sole discretion, suspend the right of Limited Partners to withdraw or may limit withdrawals to a portion of a Limited Partner's then current Capital Interest, if the General Partner deems such limitation to be appropriate under the circumstances to effect an orderly liquidation of Partnership assets or otherwise to protect the interests of non-withdrawing Partners. All realized losses, break-up fees and other costs relating to liquidating assets of the Partnership to effect a Limited Partner's withdrawal of all or a portion of its Capital Interest in the Partnership shall be borne by such withdrawing Limited Partner and shall be withheld from the proceeds delivered to such withdrawing Limited Partner.

Execution of trades may be difficult or impossible in markets that lack liquidity because of insufficient trading activity and exchange price limits. The Partnership assumes the risk that there may not at all times be a liquid offset market on an exchange or over-the-counter market due to, among other things, insufficient trading interest, exchange imposed restrictions or trading halts or restrictions.

### Conflicts of Interest

CS 000042

The General Partner does not believe that it will encounter significant conflicts of interest in fulfilling its duties to the Partnership. In the event of such conflicts, certain provisions of the Partnership Agreement are designed to protect the interests of the Limited Partners. In addition, the General Partner is accountable to each Limited Partner as a fiduciary and consequently must exercise good faith and integrity in handling Partnership affairs. There can be no assurance, however, that possible conflicts of interest will not arise, including:

**Competition for Management Services.** The General Partner, Integral Management, LLC, Dr. Seghers, Mr. Vogel and Mr. Dickey will devote as much of their time to the business of the Partnership as in their judgment is reasonably required. They may have conflicts of interest in allocating management time, services and functions among the Partnership and any other partnerships or other ventures, which may be organized by the General Partner or its affiliates.

**Competition for Investments.** The General Partner and its affiliates are engaged for their own accounts, and for the accounts of others, in investing in equity, currency and debt securities. The General Partner and its affiliates may organize other limited partnerships with investment objectives similar to those of the Partnership. The Partnership Agreement generally provides that the General Partner will not be obligated to present any particular investment opportunity to the Partnership, even if such opportunity is of a character that, if presented to the Partnership, could be taken by it. The General Partner will attempt to resolve any conflicts of interest between the Partnership and others by exercising the good faith required of a fiduciary, and the General Partner believes that it generally will be able to resolve any conflicts on an equitable basis. The General Partner shall have no obligation to disclose the holdings or trading records of the Partnership of other investment funds managed by the General Partner or its affiliates.

### Trading Strategy

The Partnership's investment strategy depends on the profitability of the market positions selected by the General Partner. Although the trading strategy employed by the General Partner has, in the past, been able to successfully identify and exploit relative mispricings in the various markets, such past success is not necessarily indicative of the future success of the Partnership's trading activities.

### Margin and Leverage

The Partnership may acquire and maintain its positions "on margin". To hold an open position on margin, the Partnership must maintain, in a "margin account" with its brokerage firm, a margin deposit at a certain specified level. This margin deposit serves as a security to protect the brokerage firm against declines in the value of the position. Should the value of the position move adversely so that the margin falls below its required level, additional amounts of margin deposit will be required. Should the Partnership be unable to pay such additional amounts where required, the brokerage firm could liquidate

CS 000043

the Partnership's positions in the Partnership's account at the brokerage firm and cause the Partnership to realize a significant loss.

### Trading in Options Is Speculative

Prices of most, if not all, equities, bonds, options and similar contracts are highly volatile. Price movements for options contracts, for example, which may fluctuate substantially during a short period of time, are influenced by numerous factors that affect the markets, including, but not limited to, changing supply and demand relationships, government programs and policies, national and international political and economic events, and changes in interest rates.

### Execution of Orders

The Partnership's trading strategy depends on its ability to establish and maintain an overall market position as determined by the General Partner. Should the Partnership's trading orders not be executed in a timely and efficient manner, the Partnership might not be able to achieve the market position selected by the General Partner and might incur a loss in liquidating its position.

### Counterparty Creditworthiness

The Partnership's trading strategy and success depend upon the Partnership's ability to successfully enter into transactions with counterparties. Transactions with counterparties may cause the Partnership to incur substantial risk because the counterparties may be unable or unwilling to satisfy their contractual obligations under agreements with the Partnership because the counterparty's losses may exceed the net worth of the counterparty.

### VI.    TERMS OF THE OFFERING

### General

The Partnership is offering Interests solely to "accredited investors" who have no need for liquidity in their investments. See "Risk Factors - Limited Liquidity".

The Interests are being offered subject to the General Partner's right to reject any subscription, in whole or in part, or to withdrawal of this Offering, in whole or in part, at any time. The Partnership expects to continue to offer Interests, and may admit additional Limited Partners from time to time, for an indefinite period. There is no maximum dollar amount of Interests that the Partnership may sell; provided, however, that the Partnership may not have more than 100 partners.

The minimum investment is $1,000,000, although the General Partner may accept subscriptions for less. After any full quarter of a Limited Partner's initial Capital Contribution has passed, the General Partner will have the right to redeem and repurchase the Interest of any Limited Partner for any reason

CS 000044

whatsoever, regardless of the then current value of such Limited Partner's Capital Account. See "Summary of the Partnership Agreement - Partnership Finances" and "Optional Redemptions".

Subscriptions are fully payable at one or more closings of this Offering. Subscriptions are payable by certified or bank check or by wire transfer to the Partnership's account. Closings will continuously occur from time to time as of the end of any month.

Investors should understand that an Interest does not represent a fixed percentage of the Partnership or entitle a Limited Partner to a fixed share of the Partnership's income. Rather, an Interest consists primarily of such Limited Partner's Capital Account and Unrealized Profit and Loss Account and is determined with reference to such accounts and the total capital of the Partnership. See "Summary of the Partnership - Partnership Finances".

## Manner of Subscribing

Each investor who wishes to subscribe for an Interest is required to (i) complete, execute and deliver to the General Partner the Subscription Agreement (with triplicate original counterpart signature pages), which signature pages shall also be used as the signature page for the Partnership Agreement, together with any information requested therein, (ii) complete, execute, and deliver to the General Partner a Confidential Offeree Questionnaire, and (iii) pay, by certified or bank check or by wire transfer, to the Partnership's account an amount equal to the full subscription price for the Interest subscribed. Subscription payments will be accepted at one or more closings. Forms of the Subscription Agreement and Confidential Offeree Questionnaire are attached as exhibits to this Agreement.

## Private Placement

The Interests have not been registered under any federal or state securities law. The offering and sale of the Interests is being made solely to investors who qualify as "accredited investors" (1) in reliance on the "private placement" exemption from registration provided in Section 4(2) of the Securities Act of 1933 (the "1933 Act") and Rule 506 of Regulation D promulgated thereunder and (2) in reliance on appropriate exemptions from state registration and qualification requirements where available. See the Subscription Agreement and Confidential Offeree Questionnaire attached as exhibits to this Memorandum.

CS 000045

## VII. SUMMARY OF THE PARTNERSHIP AGREEMENT

The rights and obligations of the Partners are governed by the Partnership Agreement which is set forth in Exhibit "A" to this Memorandum. Prospective investors should read the Partnership Agreement carefully before executing the Subscription Agreement. The following discussion of the Partnership Agreement and related matters is intended to be a summary only, does not purport to be complete, and is qualified by reference to the Partnership Agreement in its entirety.

### Responsibilities of the General Partner

The General Partner has the exclusive management and control of all aspects of the business of the Partnership, including the management of the Partnership's investment portfolio. In the course of its portfolio management, the General Partner may, in its absolute discretion, but in accordance with the Partnership's investment objectives and policies, buy, sell and otherwise deal in investments, when and on such terms as it determines to be in the best interests of the Partnership. With the consent of a majority in interest of the Limited Partners, the General Partner may transfer its interest in the Partnership to any person or entity. See Article Ten of the Partnership Agreement.

### Partnership Finances

A Partner's interest in the Partnership consists of the Capital Account and Unrealized Profit and Loss Account maintained for the Partner on the books of the Partnership, the value of each of which will be calculated not less frequently than as of the end of each Fiscal Month of the Partnership. The Unrealized Profit and Loss Account is credited and charged with the unrealized appreciation and depreciation in the value of the Partnership's investments. Such valuations will be made by the General Partner in accordance with the procedures described below. The Capital Account is credited with a Partner's contributions to the Partnership as well as the amount of the Partnership's net income allocable to the Partner, and charged with the amount of the Partnership's distributions to the Partner and the amount of the Partnership's net losses allocable to the Partner. After taking into effect the one percent (1%) management fee and the twenty percent (20%) incentive fee payable to the General Partner, as more particularly described herein (see "Management"), allocations and distributions are made among the Partners in proportion to their respective capital interests. See Sections 306, 501 and 602 of the Partnership Agreement.

The Partnership does not intend to make any or substantial distributions of cash to the Partners prior to the dissolution of the Partnership, although the General Partner has the right to make distributions of cash to Partners in its discretion, and will, from time to time, distribute amounts allocated to the General Partner's capital account to cover its expenses incurred in managing the Partnership. See Section 505 of the Partnership Agreement.

The General Partner will value the Partnership's investments in the manner set forth in Section 306 of the Partnership Agreement.

CS 000046

## Withdrawals

Subject to certain restrictions, following the first one year anniversary date of its initial investment in the Partnership, a Limited Partner may withdraw all or part of its interest in the Partnership quarterly, upon delivery of at least 30 days' prior written notice to the Partnership. The Partnership will, as soon as possible, pay the value of any Partnership interest withdrawn (determined as of the fiscal quarter end); provided, however, that in the case of complete withdrawals only, the Partnership may elect to pay only 90% of the value of the Partnership interest withdrawn. The remaining 10% will be retained by the Partnership until the completion of the audit of the Partnership's financial statements for the fiscal year in which such withdrawal occurs, for the purpose of effecting any adjustments with respect to the value of the withdrawn Partnership interest shown to be appropriate by such audited financial statements. Further, all realized losses, break-up fees and other costs relating to liquidating assets of the Partnership to effect a Limited Partner's withdrawal of all or a portion of its Capital Interest in the Partnership shall be borne by such withdrawing Limited Partner and shall be withheld from the proceeds delivered to such withdrawing Limited Partner. Amounts payable on withdrawal will also be reduced to the extent of any net gain allocations owed to the General Partner (see "Management - Allocation of Net Gain").

Withdrawals will be paid in cash or, at the discretion of the General Partner, in securities selected by the General Partner or by a combination of cash and such securities. Notwithstanding any provision herein or in the Partnership Agreement to the contrary, the right of withdrawal may be suspended by the General Partner, in whole or in part, during any period in which it determines that interests may not be fairly valued, if the Partnership does not have sufficient liquidity to effectuate such withdrawal or if such withdrawal would, in the General Partner's sole discretion, be detrimental to the value of the Interests of the other partners of the Partnership. See Sections 305 and 306 of the Partnership Agreement.

Provided that the General Partner, and/or its affiliates, have aggregate Capital Account balances of not less than the lesser of $500,000 or 1% of the sums of the Capital Account balances of all Limited Partners, the General Partner, and/or its affiliates, as the case may be, shall be permitted to withdraw a portion of its Capital Account on any Valuation Date(as defined in the Partnership Agreement) of the Partnership; provided, that such withdrawal does not have an adverse impact on the other partners in the Partnership.

## Optional Redemptions

After any Fiscal Quarter of investment, the General Partner will have the right to cause the Partnership to redeem and repurchase all or any portion of the Interest of any Limited Partner for any reason whatsoever, regardless of the balance of such Limited Partner's Capital Account at that time. The Partnership will redeem the Interest at a price equal to the amount of the Capital Account and Unrealized Profit and Loss Account maintained for such Limited Partner, less the amount of any net gain

CS 000047

allocation owed to the General Partner (see "Management -- Allocation of Net Gain"). Any such redemption would be made as of the end of a calendar quarter and would only be effected if, at the time, the redemption price would be in excess of all amounts previously contributed by such Limited Partner to the Partnership, less the amount of any distributions previously made by the Partnership to such Limited Partner. The General Partner will maintain the 99-Limited Partner limit imposed on the Partnership in order to maintain itS exemption from registration as an investment company under the Investment Company Act of 1940.

## Reports

Limited Partners will receive (i) quarterly reports stating (a) the net asset value and changes in the net asset value of the Partnership from the prior Fiscal Quarter, and (b) the increase or the decrease in their Limited Partner Capital Account and Unrealized Profit and Loss Account, together with the present value of such account after allocation of all Partnership expenses, management fee and incentive fee, and (iii) annual reports, including audited financial statements, together with calculations allocating profits and losses (realized and unrealized) to each Partner's Capital Interest. See Section 602 of the Partnership Agreement.

## Exculpation and Indemnification of the General Partner and its Affiliates

The Partnership Agreement exculpates the General Partner, to the fullest extent permitted by law, from liability for any act, omission or error of judgment in performing its duties to the Partnership if it acts in good faith and in a manner it reasonably believes to be within the scope of authority granted to it and in or not opposed to the best interests of the Partnership, unless such liability arises out of the gross negligence or willful misconduct of the General Partner in the performance of its fiduciary duty to the Limited Partners. The Partnership Agreement also provides for indemnification by the Partnership of the General Partner and its affiliates, to the fullest extent permitted by law, for liabilities incurred in its capacity as General Partner of the Partnership, except for acts of gross negligence or willful misconduct. As a result of such exculpation and indemnification provisions, a Limited Partner may have a more limited right of action than he would otherwise have in the absence of such provisions. Limited Partners will be notified if any indemnification is made and of the reasons therefore. See Sections 802 and 803 of the Partnership Agreement.

The investment advisory agreement between the Partnership and Integral Management provides for similar exculpation and indemnification of Integral Management in its capacity of general partner of the General Partner of the Partnership.

## Term and Dissolution

The Partnership will continue until December 31, 2040, at which time it will be dissolved, unless the General Partner and a majority in interest of the Limited Partners determines otherwise. The Partnership may be dissolved at an earlier date if certain contingencies occur. On dissolution of the

CS 000048

Partnership, it will be liquidated and the proceeds thereof will be distributed to the Partners in proportion to their interests in the Partnership. A final accounting will be made by the General Partner and furnished to all Limited Partners. See Sections 901 and 902 of the Partnership Agreement.

## Amendments

The Partnership Agreement may not be modified or amended except with the written consent of the General Partner and a majority in interest of the Limited Partners (as calculated by financial assets), except that, for certain limited purposes relating to administrative matters, the General Partner, without the consent of the Limited Partners, may amend the Partnership Agreement. Any amendment which would have a material adverse effect on the rights or interest of any Limited Partner would also require the consent of such Limited Partner. See Sections 1206 and 1207 of the Partnership Agreement.

## Restrictions on Transfer

A Limited Partner may not transfer any portion of its Interest without (i) the prior written consent of the General Partner (except on the death of an individual Limited Partner or by operation of law pursuant to the reorganization of a Limited Partner), which consent may be withheld in the General Partner's sole and absolute discretion, and (ii) receipt by the General Partner of an opinion of counsel that such transfer would not result in a violation of any federal or any applicable state securities laws, the Partnership being required to register as an investment company under the Investment Company Act of 1940, or the termination of the Partnership for tax purposes. See Sections 1101-1107 of the Partnership Agreement.

## Limited Liability

Pursuant to the Texas Revised Limited Partnership Act and Section 206 of the Partnership Agreement, no Limited Partner of the Partnership shall be liable for the obligations of the Partnership in excess of each Limited Partner's Interest in the Partnership.

## VIII. TAX CONSIDERATIONS

## General

This is a summary of certain United States federal income tax considerations that may be relevant to prospective investors, based on the Internal Revenue Code of 1986, as amended (the "Code"), administrative regulations and rulings of the Department of the Treasury, and judicial decisions, all of which are subject to change. This summary is not intended as a substitute for careful tax planning. The applicability of Code provisions to individual investors will vary. Accordingly, prospective investors are urged to consult with their own tax advisors with specific reference to their own tax situations and potential changes in applicable law.

CS 000049

### Qualification as a Partnership

In connection with the preparation of this Memorandum and the Partnership Agreement, the counsel to the Partnership has rendered an opinion that the Partnership will be classified as a partnership, rather than as an association taxable as a corporation, for federal income tax purposes. The opinion is based on a number of assumptions, which are set forth in the opinion. The opinion is not binding on the Internal Revenue Service (the "IRS"). Moreover, the IRS adopted regulations that became effective in January 1997 which allow each Partnership to elect to be treated as a partnership, rather than as an association taxable as a corporation, for federal income tax purposes. Accordingly, the Partnership will file an appropriate election to be treated as a partnership for such purposes.

If the Partnership were treated as an association taxable as a corporation for federal income tax purposes, it would itself be taxed on its taxable income at corporate rates. In such case, the amount of the Partnership's cash otherwise available for distribution to the Limited Partners would be reduced by the amount of such tax. Cash distributions would be treated as dividends in the hands of the Limited Partners, subject to tax as ordinary income to the extent of Partnership earnings and profits. Further, any losses incurred by the Partnership would only be allowed as deductions for the Partnership, rather than being passed through to the Limited Partners.

Certain partnerships are treated as corporations for federal income tax purposes if they are deemed to be "publicly-traded partnerships". A partnership can be found to be publicly-traded if interests therein are traded on an established securities market or are readily tradable on a secondary market or the substantial equivalent thereof. The IRS has stated that partnership interests will not be considered readily tradable on a secondary market (or substantial equivalent) if (i) such interests are issued in transactions that are not registered under the Securities Act of 1933, and (ii) the partnership does not have more than 100 partners.

In determining the number of partners, the beneficial owners of grantor trusts, partnerships and S corporations ("flow-through entities") which are partners in a partnership will be counted if substantially all of the value of the beneficial owners' interest in the flow-through entity is attributable to the flow-through entity's interest, direct or indirect, in the partnership and the "principal purpose test" is violated. This test is violated if a principal purpose of the use of the flow-through entity is to permit a partnership to satisfy the 100-partner limitation.

Inasmuch as, among other things, the Partnership may not have more than 99 Limited Partners, and, based on information requested of investors, the Partnership intends to limit its Limited Partners so as to satisfy the 100-partner limitation, the Partnership should not be treated as a publicly traded partnership for federal income tax purposes.

CS 000050