# IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3-04 CV-1320-K |
| CONRAD P. SEGHERS and JAMES R DICKEY, | § § § | |
| Defendants. | § § | |

**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FILED**

FEB 11 2005

CLERK, U.S. DISTRICT COURT
By _____
                    Deputy

# ORIGINAL

## AFFIDAVIT OF
## WILLIAM J. MURPHY, III

Charles B Manuel, Jr.
James C. Jones
Shira Y. Rosenfeld
MANUEL & JONES, P.C.
230 Park Avenue, Suite 1000
New York, New York 10169
Tel. (212) 808-6584
Fax (212) 808-3020

**Attorneys for Defendant**
**Conrad P. Seghers**

Carl A. Generes
4315 West Lovers Lane
Dallas, Texas 75209
Tel (214) 352-8674
Fax (214) 352-8852
Of Counsel

February 10, 2005

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3-04 CV-1320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF JOHN P. CLEMENT IV

Charles B. Manuel, Jr.
James C. Jones
Shira Y. Rosenfeld
MANUEL & JONES, P.C.
230 Park Avenue, Suite 1000
New York, New York 10169
Tel. (212) 808-6584
Fax (212) 808-3020

Carl A. Generes
4315 West Lovers Lane
Dallas, Texas 75209
Tel. (214) 352-8674
Fax (214) 352-8852
Of Counsel

Attorneys for Defendant
Conrad P. Seghers

February 7, 2005

CS 000352

**Murphy Affidavit**

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | CIVIL ACTION No. 3:04-CV-01320-K |
| vs. | § § § | |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

## AFFIDAVIT OF WILLIAM J. MURPHY III

| | |
|---|---|
| STATE OF GEORGIA | § |
| | § |
| COUNTY OF FULTON | § |

**BEFORE ME,** the undersigned Notary Public, personally appeared Bill Murphy, who after being duly sworn did hereby upon his oath state:

1.    My name is Bill Murphy. My address is 1097 Roxboro Point, Atlanta, GA 30324. I am the Trustee of the William J. Murphy III Testamentary Trust. The Trust was created upon the death of my father, William J. Murphy III. I am 52 years old. I am of sound mind and have never been convicted of a felony.

2.    I am filing this affidavit so that the Court and the public can be made aware of the

Bill Murphy Affidavit                                                    Page 1 of 53

CS 000353

many documents and other contacts I had with Conrad Seghers and the other Principals and Agents of Exponential Returns, L.P. and Integral Hedging, L.P., and other related hedge funds of Integral Investment Management, L.P. Please be aware that while there may be many Exhibits in this affidavit, the principals of Integral Investment Management, L.P. actually sent many more documents and updates and newsletters and had many more conversations and in-person visits with me than what is described herein. I now begin the chronology of events.

3.       I first became acquainted with Conrad Seghers through our mutual investment in an oil company venture nine to ten years ago. Through Conrad Seghers I learned about the trading strategy used by him in his initial hedge fund, Exponential Returns, L.P., whose principals and managing partners were and are both Conrad Seghers and James Dickey. In 1997, I requested and subsequently received marketing materials concerning Exponential Returns, L.P. Exhibit 1 is an 11-page bound set of marketing documents concerning Exponential Returns, L.P., with a cover letter dated June 2, 1997, explaining how the core strategy of Exponential Returns, L.P. centered around the purchasing of equities outright, together with the trading of options to generate income and returns, together with selling covered calls and entering covered call positions to reduce risk for the portfolio.

4.       Because I was very attracted to the investing strategy and the credibility and background of the principals of Exponential Returns, L.P., who were Conrad Seghers and James Dickey, I requested and received an Offering Memorandum for Exponential Returns, L.P. (Exhibit 2). This package containing the Offering Memorandum is dated December 2, 1996 and actually consists of an Offering Memorandum that is 21 pages long, followed by an agreement of Limited Partnership that is 32 pages long, followed by additional Exhibits to the Offering Memorandum of Exponential Returns, L.P., which are a Subscription Agreement as well as an

Bill Murphy Affidavit                                                          Page 2 of 53

Investor Questionnaire.

5.    As the Trustee of the William J. Murphy III Testamentary Trust, I directed that $25,000 be invested in Exponential Returns, L.P. on July 1, 1997. My trust and belief in the investing strategy and principles and integrity of both Conrad Seghers and James Dickey continues to this day and obviously existed in 1997 as well.

6.    A large part of this feeling comes from the fact that Conrad Seghers, James Dickey, Integral Investment Management, L.P., and Integral Hedging, L.P. are not responsible for, or the cause of, the losses experienced by Integral Hedging, L.P. in 2001. They have been tested under duress and have performed admirably, given the circumstances wherein the State Court has refused to give them the resources for legal defense that they are legally entitled to. Rather, full disclosure was given of the events in 2001, which centered around a series of serious errors committed by Morgan Stanley, on assets and accounts that were not even under the control of Conrad Seghers, James Dickey, Integral Investment Management, L.P., or Integral Hedging, L.P.

7.    At the time, in 1997, there were many places to invest where these other strategies were based on earning income from an equity market that in 1997 appeared to be going up 20% per year forever. Since I knew that that was not going to happen, and not only that this trend would eventually stop but also that large declines could easily follow, I was excited about finding a very smart man in Conrad Seghers who invested with a hedged portfolio whose goal was to generate returns, regardless of whether the market went up or down. As was clearly explained in the marketing materials, this strategy was designed to work within the usual parameters of a market not declining by greater than 30% in one year.

8.    From January to July of 1997 Exponential Returns, L.P. gained 23.7% in value. It

Bill Murphy Affidavit                                                                Page 3 of 53

CS 000355

obviously did have some volatility and risk and potential for significant profits. On August 1, 1997, as Trustee, I directed the William J. Murphy III Testamentary Trust to invest another $50,000 in Exponential Returns, L.P. By September 30, 1997, the $75,000 of invested assets had grown to $87,437. Therefore, on October 1, 1997, another $100,000 was invested.

9.     In early 1998 I received an audited financial statement for Exponential Returns, L.P., dated December 31, 1997, prepared by the professional accounting and auditing firm of Whitley, Penn and Associates (Exhibit 3). This audit provided independent verification that the results that the principals of Exponential Returns, L.P., Conrad Seghers and James Dickey, had reported were true. It contained a Balance Sheet, Statements of Securities, Statements of Operations, Statements of Partners' Capital, and Statements of Cash Flows. There was no disclaimer by the auditors and the audit stated that, "In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Exponential Returns, L.P. as of December 31, 1997, and the results of its operations and cash flows for the years then ended in conformity with generally accepted accounting principles." This audit, together with the fact that the audit verified the marketing materials and regular monthly mailings and investor statements that were being sent out on behalf of Exponential Returns, L.P. by Conrad Seghers and James Dickey, provided independent verification that everything was going exactly as had been presented to me, which I believe it always has been even through and including the difficult times in 2001.

10.     Another audit was performed by the independent accounting firm of Whitley, Penn & Associates dated June 30, 1998 (Exhibit 4). It listed independent confirmation of the values and figures that had been given by Conrad Seghers and James Dickey, and contained a Balance Sheet, Statement of Operations, and Statement of Partners' Capital.

CS 000356

11.   Exhibit 5 is an investor update dated December 7, 1998 from genesislp@earthlink.net listing the November 1998 performance figures. It states "Please contact us for more information." Conrad Seghers and James Dickey were always very accessible by telephone and immediately responded to any requests for information, including trades and positions of the portfolio.

12.   Furthermore, in addition to the audits, I had received independent accounting reviews and opinion letters from Whitley, Penn and Associates, also independently verifying the rate of return for my portfolio and Exponential Returns, L.P. Exhibit 6 is an accounting "review" dated February 17, 1999 listing the returns with independent confirmation " ... solely to provide a third-party with comfort as to the valuation of the investments of Genesis Market Neutral Index Fund, L.P. as of December 31, 1998." Integral Hedging, L.P. only began on December 1, 1998 and was therefore not included. All of the investments were listed, and outside of the terms of a note receivable with no maturity date, "No other exceptions were noted as a result of the procedures performed."

13.   Exhibit 7 is an independent accounting review from Whitley, Penn and Associates, independently verifying the rate of return for my portfolio. This accounting "review" is dated June 10, 1999 and covers the period through April 30, 1999 for both Sum-It Investments, L.P., which later changed its name to Integral Arbitrage, L.P., as well as for Integral Hedging, L.P. It states, "The annualized rates of return for the partnerships from inception through April 30, 1999 using a monthly compounding methodology are as follows: Integral 30.77%, Sum-It 23.15%." Once again there was independent confirmation of very impressive returns that were proven to exist and be true. Exhibit 7 then continues by stating, "No exceptions were noted as a result of the procedures performed."

CS 000357

14.    I have been completely satisfied with the level of professionalism and expertise and customer service that Conrad Seghers and James Dickey have provided to me since the first day I invested with them, which is now nine years ago, and I to this day still feel the same way. I have even been invited to stay and have slept in Conrad Seghers' house, and Conrad Seghers has taken my mother out to dinner many times. We remain close friends despite this ordeal.

15.    In fact, since I first met Conrad Seghers in 1997, I have considered him to be extremely intelligent and very honest. I also like him tremendously. We are fellow white-water kayakers and I look forward to accompanying him on one of the white-water river trips that he organizes for groups of 15-20 people. These trips are to restricted rivers in desolate canyons that have no communications or food or water supplies, that in addition require tremendous whitewater kayaking experience. Preparation for and organization of these trips is a long, arduous task. Many people make a career out of doing the work for paying customers. These trips can include a week or more on the river with no contact with civilization during the entire period.

16.    Due to this level of comfort that developed between the future principals of Integral Investment Management, L.P., Conrad Seghers and James Dickey, and myself, I directed the William J. Murphy III Testamentary Trust to remain invested in the hedge funds Conrad Seghers and James Dickey were managing.

17.    I had been informed in my monthly email communications and quarterly statements that in late 1998 a new hedge fund, Integral Hedging, L.P., had been created by Conrad Seghers and James Dickey. Conrad Seghers explained to me that it would be possible to have the assets invested in Exponential Returns, L.P. be moved into a new fund, Integral Hedging, L.P., if I so requested. This was therefore eventually done at my request.

Bill Murphy Affidavit                                          Page 6 of 53

CS 000358

18.    As soon as the William J. Murphy III Testamentary Trust invested in a hedge fund managed by Dr. Seghers, whether that be Exponential Returns, L.P. or Integral Hedging, L.P., I began getting regular communications from that hedge fund and from Conrad Seghers and James Dickey regarding virtually everything important that was happening with the funds. As explained before, many of these communications were via regular telephone conversations. Many others of these communications were via email.

19.    Exhibit 8 is an email dated June 10, 1999 from genesislp@earthlink.net. It is a group mailing that was sent out to all of the investors on a monthly basis, with additional sendings in between sometimes occurring as well. A portion of this email states that, "The Fund's goal is to achieve very steady monthly returns which annualize to approximately 20% per year, after all fees." This was the goal, and not the promise, of Integral Investment Management, L.P. Attached to Exhibit 8 was also a Microsoft Word document with much additional information and disclosure about the hedge funds. These attached documents also had all of the necessary legal disclaimers explaining that for all legal issues relating to notifications and strategy descriptions the investors should go to the Offering Memorandum as the reference.

20.    Exhibit 9 is an email dated July 14, 1999 from genesislp@earthlink.net. It is again a group mailing that was sent out to all of the investors on a monthly basis, with additional sendings in between sometimes occurring as well. A portion of the email states that, "The General Partner performs fundamental arbitrage and statistical correlations by inter-linking the G-5 currency, debt, and equity markets, creating hedges on financial vehicles at prices significantly less than the open market premiums. As expected, and as verification of the consistent returns that we strive to obtain, Sum-It Investments, L.P. is right on track to earn 20% net for the year and Integral Hedging, L.P. is on par for 30% net." The strategy is clearly

CS 000359

explained in these few sentences. The strategy centers around the creation of hedges (similar to put options) that do not protect the portfolio 100% but as a trade-off for this decreased protection can be obtained synthetically for discounted prices, generating arbitrage opportunities.

21.   Furthermore, Exhibit 9 goes on to state "Certain information concerning the Partnerships and their investing philosophies are included in this letter. This document is intended to give prospective investors an overview of Sum-It Investments, L.P. and Integral Hedging, L.P. (the Partnerships). It does not constitute an offer to sell, or a solicitation of an offer to buy, an interest in the Partnerships. This document is subject to the more complete disclosures set forth in the Partnerships' Offering Memorandums, which must be reviewed prior to making any decision to join the Partnerships. We invite prospective investors to contact us for more information."

22.   Exhibit 10 is a monthly email dated August 12, 1999 listing the July 1999 performance results. It states "Our three .funds utilize a unique statistical arbitrage trading strategy that employs fundamental correlations across the currency, equity, and debt markets, in addition to hedging EVERY individual position that is taken. Consistent monthly returns with extremely low volatility and annual net profits of 20-30% are the goals, depending on the fund and its trading parameters." Each position was explained to actually mean a combination of 4-8 individual trades, that behaved as a group or basket with a limited downside hedge that came at a price cheaper than that obtainable in the open market by outright purchasing a put or call option.

23.   Exhibit 11 is a monthly email dated September 13, 1999 listing the August 1999 performance results. It states, "Our funds utilize a unique statistical arbitrage trading strategy that employs fundamental correlations across the G-5 currency, equity, and debt markets, while hedging EVERY individual position in the portfolio. On October 1, 1999 we will be launching

CS 000360

the offshore version of Sum-It Investments, L.P. as well." I understood the last sentence to be an indication that one or more offshore investors had shown interest in Sum-It Investments, L.P., the future Integral Arbitrage, L.P. As I understand it, when there is seed capital an investment manager will frequently launch an offshore version of a hedge fund.

24.     Exhibit 12 is a monthly email dated September 14, 1999 listing the August 1999 performance results.

25.     Exhibit 13 is a monthly email dated October 8, 1999 listing the September 1999 performance results. It states, "Attached are the results from yet another consistent month of returns and performance due to our revenues coming from several types of transactions including interest income, volatility premiums, and market movements in many of the G-5 bond, equity, and currency markets, which by diversification makes our results very immune to impact from the financial markets themselves." Again there was full disclosure of the types of trades made and in which markets. There was also disclosure regarding how the income was generated including a breakdown by interest income, volatility premiums, and market movements. Furthermore, the email explains that the Integral Investment Management, L.P. hedge funds have results that are "very immune," without a guarantee, to large swings in the financial markets. This was exactly the type of hedge fund I wanted to be invested in.

26.     Exhibit 14 is a monthly email dated October 14, 1999 again listing the September 1999 performance results.

27.     Exhibit 15 is a monthly report detailing the September 1999 performance results. Again the disclaimer is at the bottom. Exhibit 15 explains how returns are generated by being "hedged through baskets of instruments we call Risk Adaptive Structures (RAPS). RAPS are protection that is purchased for a smaller premium than market prices, with the pricing based on

CS 000361

the structure of options, standard deviations, time values and interest rates." Again, full disclosure is given with a complete explanation of the trading models of the hedge funds, followed by a disclaimer that for a complete listing of the risk and strategies one should peruse the Offering Memorandum. One can thus see that multiple times per month updates were sent out and telephone calls were made. The investors were completely aware of all events regarding the hedge funds.

28.     Exhibit 16 is a letter from Whitley, Penn & Associates dated October 22, 1999 verifying all of the returns and the hedge fund performances through September 30, 1999. It was created " ... for the following purposes:

•       To provide third parties with comfort as to the ending monthly valuations and monthly percentage returns of Integral and Sum-It from inception in 1998 through September 30, 1999.

•       Determine if gains and losses are being allocated to partner's capital accounts in accordance with the respective partnership agreements.

•       Provide an independent calculation of the percentage return for each partnership from inception through September 30, 1999.

29.     The annualized NET rates of return for the partnerships from inception through September 30, 1999 using a monthly compounding methodology are as follows: Integral 28.4%, Sum-It 22.8%." Once again therefore independent confirmation was given of all of the results of the hedge funds of Integral Investment Management, L.P., and "No exceptions were noted as a result of the procedures performed."

30.     The findings of Whitley, Penn regarding the Funds' financial statements, accounting principles, values and valuation methodologies would later be verified and also

CS 000362

confirmed by the independent accounting and auditing firms of Deloitte and Touche as well as Bulloch, Seger, and Weaver. I see only two possibilities: One is that Whitley, Penn and Associates, Deloitte and Touche, and Bulloch, Seger, and Weaver are all either incompetent and/or corrupt. The other possibility is that there is no need to revalue the funds' assets and that all valuations performed by Integral Investment Management, L.P. and Olympia Capital Associates, L.P. have been correct.

31.    Exhibit 17 is a monthly email dated November 9, 1999 showing the returns for October 1999. A lengthy legal disclaimer is at the bottom.

32.    Exhibit 18 is a monthly newsletter titled "1999 Year in Review." It discusses the articles and publications that had been written about Integral Arbitrage, L.P. and Integral Hedging, L.P., the RAPS strategy stating that "RAPS provide us with synthetic hedges that offset a large part of the directional volatility of the portfolio," and containing a disclaimer as well as a summary of performance figures and charts and descriptions of the hedge funds.

33.    Exhibit 19 is another year-end summary of the three hedge funds, stating, "They have never had a down month since inception. These consistent returns are achieved through several types of arbitrage transactions, with a "synthetic" hedging component in each and every trade." A legal disclaimer is at the bottom.

34.    Exhibit 20 is an email dated January 11, 2000 titled "Complete Year 1999 Fund Update for Genesis Market Neutral Index Fund, L.P., Integral Hedging, L.P., and Sum-It Investments, L.P." and listing all of the returns for all three hedge funds.

35.    Exhibit 21 is an email from myself to genesismgmt@earthlink.net detailing my desire to invest additional capital through an IRA account. I state "I am very sorry for this being so difficult." The principals Conrad Seghers and James Dickey were however fully patient and

CS 000363

cooperative with my needs and desires.

36.    On January 21, 2000 I received an email with an attachment (Exhibit 22) from Conrad Seghers. The attachment shows the Integral Funds' performance for the year of 1999. Integral Hedging, L.P. was up 25.8%, net of all fees, for the year.

37.    On February 9, 2000 I received an email (Exhibit 23) from Conrad Seghers which included the Integral Funds' performance for January of 2000.

38.    On February 10, 2000 I received another email (Exhibit 24) from genesismgmt@arthlink.net which included the Integral Funds' performance for January of 2000, sent by Conrad Seghers.

39.    On March 13, 2000 I received an email (Exhibit 25) from Conrad P. Seghers.

40.    On March 14, 2000 I received an email (Exhibit 26) from Conrad which included the Integral Funds performance for February of 2000. It stated:

"Hello to everyone, February again was an interesting and extremely volatile month for all of the financial markets. Genesis Market Neutral Index Fund, L.P., our equity only arbitrage fund, posted a respectable profit of 1.07% net despite the S&P 500 losing over 2% and the continuing divergence of the Dow Jones Industrial Average and the NASDAQ. Integral Hedging, L.P., our more diversified fund that is also involved in the bond and currency markets, posted a net profit of 1.51%, and Sum-It Investments, L.P., our most conservative fund, was virtually unphased by the market declines and volatility and returned 1.44% net for February."

41.    On April 6, 2000 I received an email (Exhibit 27) from Conrad Seghers which included the performance of Integral Hedging, L.P. for March 2000. It stated: "Hello to

Bill Murphy Affidavit                                                          Page 12 of 53

CS 000364

everyone. While March was again a very volatile month for the financial markets our hedges held very well and actually needed only minor adjustments. This led to the month yielding slightly higher returns for Integral Hedging, L.P. and Sum-It Investments, L.P. We are now in our third calendar year and have yet to have a losing month for any of our three funds that trade using fundamental correlations between the financial markets. We institute hedged positions on any trade the fund enters. These same fundamental market relationships that we exploit have led to our consistent returns that have high Sharpe ratios and a lack of market correlation." A legal disclaimer followed and again proper disclosure of the strategy had occurred.

42.   On May 10, 2000 I received an email (Exhibit 28) from Conrad which included the Integral Funds' performance for April of 2000. It stated:

> "April was a challenging month for the markets in which our hedges were tested
> and they performed well. On April 14, halfway through the month and with the
> markets at their lows, all three of our funds were still positive (though slightly less
> than usual due to the market volatility). While our returns for April were thus
> slightly lower than usual we are actually more proud of our performance this
> month than normal. So far in May as of today the markets are again down but our
> premiums and profits are being consistently earned, without a loss from the mark-
> to-market volatility most other funds are experiencing."

43.   It then continued by further explaining the RAPS trading strategy and stating: "Our proprietary Risk Adaptive Portfolio Structures (RAPS) hedging methodology is responsible for our success. RAPS provide us with synthetic hedges that offset a large part of the directional volatility of the portfolio, allowing us to capture steadier premium profits, interest rate profits, and longer-term appreciation profits from the G-5 bond, equity, and currency markets. This

Bill Murphy Affidavit                                                                 Page 13 of 53

CS 000365

trading methodology allows us to diversify our investments and sources of income more effectively, and thereby capture opportunities in the financial markets that may have been too volatile to take advantage of without the benefits of RAPS." It was therefore clear to me that the RAPS strategy of generating portfolio protection at discounted prices versus a purchased option or put on the portfolio was possible due to RAPS not hedging the portfolio 100%, and would therefore be successful only as long as the markets fell by less than 20%-30% in any given period.

44.    On June 6, 2000 I received an email (Exhibit 29) from Conrad Seghers at genesismgmt@earthlink.net which included the Integral Funds performance for May of 2000. It stated:

"May was yet another volatile month in which all the major market indices were down, with some down over 10%. Integral Hedging, L.P., our most popular fund that performs arbitrage across the bond, equity and currency markets, posted a net profit of 1.76%. Sum-It Investments, L.P., our most conservative fund, was virtually unphased by the market declines and volatility and returned 1.51% net for May. Genesis Market Neutral Index Fund, L.P., our equity only arbitrage fund, posted a respectable profit of 0.12% net despite the S&P 500 losing 2.2% and the NASDAQ losing 11.9%."

45.    All of these monthly emails, such as this one, ended with the disclaimer alerting all investors to the fact that:

"Certain information concerning the Partnerships and their investing philosophies are included in this letter. This document is intended to give prospective investors an overview of Genesis Market Neutral Index Fund, L.P., Sum-It Investments,

CS 000366

L.P. and Integral Hedging, L.P. (the Partnerships). It does not constitute an offer to sell, or a solicitation of an offer to buy, an interest in the Partnerships. This document is subject to the more complete disclosures set forth in the Partnerships' Offering Memorandums, which must be reviewed prior to making any decision to join the Partnerships. We invite prospective investors to contact us for more information."

46. Once again, therefore, adequate disclosure had been made of the risks associated with an investment in Integral Hedging, L.P. such as I had directed occur, and frequent written and oral communications with the investors was maintained.

47. On July 14, 2000 I received an email (Exhibit 30) from Conrad Seghers which had the Integral Semiannual report as an attachment. In the attachment, which also had a disclaimer as did the email itself, it stated:

"This has been another good quarter for our three funds and company in terms of performance, growth and stability. All three funds hedge every individual trade that is taken, allowing consistent returns to be realized and making us an excellent fixed income alternative. Integral Hedging, L.P., our most popular fund that performs arbitrage across the bond, equity and currency markets, has posted a year-to-date net profit of 8.53%. This return is slightly less than usual due to the large amount of market volatility that the year 2000 has witnessed so far, which has caused more frequent and costly hedging adjustments to be necessary to remain neutral to market forces. Sum-It Investments, L.P., our most conservative fund, has been virtually unphased by the market declines and volatility and has returned 8.80% net year-to-date. Genesis Market Neutral Index Fund, L.P.

CS 000367

("GMNIF"), our equity only arbitrage fund, has posted a profit of 3.13% net year-to-date despite the S&P 500 losing 1.0% and the Dow Jones Industrial Average losing 9.1% so far. The trades in GMNIF have now been restructured to allow for more profitability even if the equity markets do not go up. All of these returns were even produced in a challenging environment of increasing interest rates and volatility. The 1999 Annual Returns were 32.8% Net for Genesis Market Neutral Index Fund, L.P. ("Genesis"), 25.8% Net for Integral Hedging, L.P. ("Integral"), and 20.6% Net for Sum-It Investments, L.P. ("Sum-It")."

48.    These Exhibits indicate that it was clearly and repeatedly explained to all investors, both orally and in writing, that smaller returns and sometimes even negative returns are earned when there is a large amount of market volatility, which causes more frequent and costly hedging adjustments to be necessary to remain neutral to market forces. Therefore all of the investors knew that RAPS needed adjusting when the markets were volatile or declined as the RAPS strategy did not protect the portfolio from declines in the markets greater than 30%. In fact, in rapidly declining markets adjustments might not even be possible to make and large losses were possible. Further, the monthly update explained how Sum-It Investments, L.P. was the most conservative fund while Integral Hedging, L.P., was more aggressive. Integral Hedging, L.P. paid smaller premiums for smaller RAPS hedges which exposed it to larger losses and gave it the opportunity to make larger profits.

49.    Exhibit 31 shows another July 14, 2000 email I received from Conrad Seghers concerning the quarter which stated:

"This has been another exciting quarter with many new developments, including continued expansion of our company both in terms of infrastructure and

CS 000368

employees and assets under management.   Integral Hedging, L.P., our most popular fund that performs arbitrage across the bond, equity and currency markets, has returned 8.53% year to date net. This is despite the markets being so volatile which requires us to make constant adjustments to our portfolio, which costs profits.   Sum-It Investments, L.P., our most conservative fund, returned 1.02% net for May and is up 8.80% net year to date.  This annualizes to 18.37% net, and shows how Sum-It Investments is virtually unphased by any of these market conditions.   Genesis Market Neutral Index Fund, L.P., our equity only arbitrage fund, posted a profit of 0.34% net for June. These consistent returns are achieved through several types of arbitrage transactions, with a "synthetic" hedging component in each and every trade.  This month we teamed up with Olympia Capital International to be the Administrator for all of our funds, and we signed up with marketing firms and hired two new people as well."

50.    Therefore it had been disclosed that the markets being so volatile required constant adjustments to the portfolio, which costs profits.  This was almost a foreshadowing of the events to come in 2001, and showed how it was explained that declining and volatile markets lead to smaller profits and in extreme cases even losses, which is how I understood the strategy to work.

51.    Exhibit 31 also explained that a new administrator, Olympia Capital Associates, L.P., was hired by Integral Hedging, L.P. to independently calculate all values.  Statements of account values now began to come on a monthly basis, rather than simply quarterly, with monthly emails in the interim, as had been provided previously.  In addition to the independent confirmation of values on a monthly basis from Olympia Capital Associates, L.P., the monthly

CS 000369

emails such as in Exhibit 31 continued to be sent out as well. Now a third layer of independent confirmation of the results had been created, and the control of assets belonging to the hedge funds themselves had been moved to Olympia Capital Associates, L.P. The Securities and Exchange Commission has since alleged that there was no investor disclosure and that the original values were not correct. These Exhibits indicate definitively that the allegations regarding lack of disclosure are not correct. The need for revaluation resulting from accounting principles that are not in compliance with GAAP has been previously addressed.

52. Exhibit 32 is titled "Semiannual Report – June 30, 2000." It explains how Integral Equity, L.P. ("GMNIF") had its trades restructured so as to generate profits even if the markets did not rise any longer in 2000. Obviously there was no magic going on, but rather real trades with real strategies and real decisions about forecasting market direction and making hedged bets on these predictions.

53. Exhibit 33 is an email dated August 11, 2000.

54. On August 14, 2000, I again received an email (Exhibit 34) from genesismgmt@earthlink.net which included the Integral Funds performance for July of 2000. It stated, "A brief summary of our three domestic funds follows-

- Total assets under management of over $51 million

- Asset growth of over 10% per month during the last year

- Average 1.0 to 2.0% NET return per month, every month

- Monthly standard deviations of only 0.35% to 0.65%

- No down months since inception

- Funds rank in top 1% of all funds for Sharpe Ratio (risk adjusted returns)

- Strategies include various multi-strategy overlays

CS 000370

Options Arbitrage

Market Neutral/Long-Short (Jones Model)

Macro"

55.    Exhibit 34 then continues with "This combination of strategies results in our consistent returns to date." Once again, please notice the words "a brief summary" which means that for all detailed information one must go to the Offering Memorandum for a complete description of the strategies and risk associated with an investment in Integral Hedging, L.P. "Asset growth ... during the last year" means that this information was simply a report of what had happened and not a reflection on future activities that no one can forecast, "no down months since inception" which means that since inception things had been going well but that there was no guarantee that in the future that there could not be problems, and finally that the strategy for Integral Hedging, L.P. involved "options arbitrage, market neutral /long-short (Jones model) and macro trading methodologies."

56.    I have seen a copy of the email sent by Larry Platoni at Olympia Capital Associates, L.P., the administrator who calculated all values for Integral Investment Management, L.P. and its hedge funds, on September 18, 2000 which listed the percentage returns for each of the hedge funds (Exhibit 35). As proof that Olympia Capital Associates, L.P. calculated all returns for the hedge funds it is actually a follow-up to an email (Exhibit 35) dated September 15, 2000 wherein Olympia Capital Associates, L.P. lists the percentage returns and states, "Also enclosed are revised spreadsheets for Sum-It & GMNIF" and also has attached the spreadsheets that Olympia Capital Associates, L.P. has created and calculated. Furthermore, also in Exhibit 35 is an email from Conrad Seghers to Larry Platoni asking "can you please also give me IH Offshore?  Thanks."  This shows that Integral Investment Management, L.P. DID NOT

CS 000371

calculate the returns for the hedge funds and that they were all independently and correctly calculated by a third-party. This Exhibit 35 is being included as it shows that all of the values were correct and independently calculated by Olympia Capital Associates, L.P. and then later verified by many different independent auditing firms,

57.    Exhibit 36 is an email dated October 6, 2000 that I received from genesismgmt@earthlink.net that stated, "I had promised you a number by today. This is just an estimate for September 2000. The markets have been very hectic recently, as you know. We should have these numbers finalized by Monday. These are all net numbers. The S&P 500 was down over 5% for September and the NASDAQ was down over 12.5%. Integral Hedging, L.P. - 1.0%, GMNIF -0.5." This email shows that in horrible market circumstances such as September of 2000 where the equity market indices declined by over 12.5%, which means many individual stocks declined in value by greater than 30%, the hedge funds like Integral Hedging, L.P. did in fact post losses for the month as they were not completely hedged against all market declines. The Integral Funds' losses were much smaller than the percentage declines in the equity markets because of the hedges that were in place and because of the professional and competent management. Integral Hedging, L.P. was performing exactly as had been explained to me countless times.

58.    Exhibit 37 is a final email concerning the September 2000 results from Conrad P. Seghers, dated October 9, 2000, stating:

> "Last month the S&P 500 and Dow Jones Industrial Average were both
> down over 5% and the Nasdaq was down over 12%. While we once again
> showed an ability to protect against negative movements in the market, two of our
> funds showed a slight loss for the month, despite our funds being ABSOLUTE

CS 000372

RETURN funds where asset protection and reasonable profits are the goal. Integral Hedging, L.P. was down approximately 1.1%, and Genesis Market Neutral Index Fund, L.P. lost approximately 0.4% as more of its positions involve equity indices rather than individual stocks.

Sum-It Investments earned approximately 1.2% because of its arbitrage strategy. Integral Hedging Offshore, Ltd. earned approximately 0.3% since it has newer equity related positions and could roll those positions at less cost. Despite the NASDAQ so far in October losing over 8% our positions are now hedged with an even lower downside and we are still expecting a positive return for all of our funds for October. Year-to-date performance numbers are -7% and -10% for the Dow Jones Industrial Average and the Nasdaq. Integral Hedging, L.P. is up over 10% and Sum-It Investments, L.P. is up by about 14% for the same period as it goes after more steady returns with a lower volatility return profile.

We thank you for your business and hope you appreciate our performance year-to-date and our proactive stance with reporting adverse results. We believe that performance in negative situations is the true test of a firm and fortunately or otherwise the market has given us multiple opportunities this year to be tested. As always, please feel free to call if you have any questions.

Genesis Market Neutral Partners, L.P.

(972) 238-9531 phone

(972) 238-7733 fax

P.S. If any of you are not receiving monthly reports with dollar values from Olympia Capital please let us know."

CS 000373

59.    It was thus clearly explained that losses can occur and why, even though the goal is to have absolute returns of earning profits regardless of whether the markets go up or down. It was also stated that "Integral Hedging, L.P. was down approximately 1.1%, and Genesis Market Neutral Index Fund, L.P. lost approximately 0.4% as more of its positions involve equity indices rather than individual stocks." Therefore even in September of 2000 it was disclosed that many of the trades of Integral Hedging, L.P. involved the market indices, which were the positions in the NDX-100 index that later surrounded the downfall of Integral Hedging, L.P. in 2001 when the markets declined and horrible errors occurred at Morgan Stanley.

60.    Exhibit 37 then states "We thank you for your business and hope you appreciate our performance year-to-date and our proactive stance with reporting adverse results. We believe that performance in negative situations is the true test of a firm and fortunately or otherwise the market has given us multiple opportunities this year to be tested." This is true customer service. In this negative market not only was Integral Investment Management, L.P. quick to report a negative return and negative events, but it was pro-active in addressing investor concerns and worries.

61.    Finally, Exhibit 37 concludes by stating, "P.S. If any of you are not receiving monthly reports with dollar values from Olympia Capital please let us know." In other words, all investors were completely aware that Olympia Capital Associates, L.P. was responsible for calculating all values and distributing them to investors, while Integral Investment Management, L.P. provided the reports and updates on the hedge fund activities.

62.    Exhibit 38 is a cover email dated October 10, 2000 simply stating, "Attached as a Microsoft Word file are our quarterly and year-to-date returns." Attached to this Exhibit 38 is a Quarterly Report titled "Quarterly Report – September 30, 2000" which states "All three funds

CS 000374

hedge every individual trade that is taken, allowing consistent returns to be realized and making us an excellent fixed income alternative and an ABSOLUTE RETURN fund where asset protection and reasonable profits are the goal." The hedging was performed using the RAPS trading methodology as had been previously explained. It then states, "Last month the S&P 500 and Dow Jones Industrial Average ("Dow") were both down over 5% and the NASDAQ was down over 12%. While we once again showed an ability to protect against negative movements in the market, two of our funds showed a slight loss for the month." Again, full disclosure had been provided with the usual legal disclaimer at the bottom of the monthly update stating that one should read the Offering Memorandum for detailed information.

63.    Exhibit 38 then states, "Integral Hedging, L.P. ("Integral") was down 1.21% net for Sept. Genesis Market Neutral Index Fund, L.P. ("Genesis") lost 0.44% in Sept. and gained 2.8% net in the quarter, as more of its positions involve equity indices rather than individual stocks. Despite the NASDAQ so far in October losing 11%, our positions are now protected at these levels and we still expect a positive return for all of our funds for October."

64.    Exhibit 38 then states, "The return for Integral is slightly less than usual due to the large amount of market volatility that the year 2000 has witnessed so far, causing more frequent and costly hedging adjustments in order to remain neutral to market forces. The 1999 Annual Returns were 32.8% Net for Genesis, 25.8% Net for Integral, and 20.6% Net for Sum-It." In other words, volatility and market declines such as would later become horrendous in 2001 cause frequent and very costly hedging adjustments to be necessary as the RAPS strategy intentionally does not protect a portfolio 100% in order to save costs. However, in 1999 the returns for the funds were very respectable and were audited when the market was not yet so volatile.

65.    On December 11, 2000 I received an email with an attachment (Exhibit 39) from

Bill Murphy Affidavit                                              Page 23 of 53

Conrad Seghers which included the Integral Funds performance for November of 2000. This is inside the email dated December 19, 2000 titled "New Website" (Exhibit 41). It states "Our assets now exceed $80 million and we were again positive in all of our funds, despite the NASDAQ posting its largest point drop EVER and its largest monthly percentage drop EVER. This came on the heals of September 2000 when the NASDAQ posted its largest point drop EVER (at the time) and its third largest monthly percentage drop EVER. In September we adjusted all of our funds to withstand the enormous volatility and potential downside risk that has turned out to come to fruition." It is clearly explained and disclosed how market declines will affect the hedge funds adversely, and how Integral Hedging, L.P. had withstood what until then had been the largest point drops ever for the NASDAQ.

66. Exhibit 39 then continued by stating, "We hope that you are as pleased as we are with the steady performance and obvious ability to withstand most market downward periods and volatility stress points." Yes, I as an investor was as pleased as Integral Investment Management, L.P. was with this ability to withstand most market downward periods. Note the word most, as later in 2001, with the portfolio already stressed from frequent adjustments as was disclosed to me orally and in writing, even worse declines would come simultaneous with errors that were egregious from Morgan Stanley.

67. Exhibit 40 is the attachment to Exhibit 39 that is referenced and is the "Results Report – November 30, 2000."

68. On December 19, 2000 I received an email (Exhibit 41) from Conrad Seghers at Integral Investment Management, L.P. titled "New Website." It states, "We have been expanding quite rapidly on many fronts, with assets and personnel being just a few of them." So the firm was expanding and hiring new staff, which is always a good sign. Exhibit 41 goes on to

Bill Murphy Affidavit

Page 24 of 53

state, "Many of you have suggested that our fund names were simply too confusing. In order to simplify this we have taken your advice and all of our funds and entities now bear the INTEGRAL _____, L.P. name. These new names more properly identify the trading strategies of the underlying funds." I was one of the individuals who had stated this to Conrad Seghers and was glad to see the names change.

69.    It then states, "In addition we have also created a website to go along with the new names. Feel free to visit us at our new website www.integralinv.com and learn more about all of our funds." I was also excited to see this website, that Conrad Seghers explained had been difficult to create due to SEC regulations and therefore had taken some time and required the approval of several law firms. He also stated that he had been to several other hedge fund websites to get a flavor for what was allowed and not allowed as per the SEC and that this website was quite normal for what others in the industry were displaying at the time, which was still in the year 2000.

70.    Exhibit 41 then states, "We are attaching a simple Excel spreadsheet showing the returns of all of our funds compared to the market indices. You will notice that our consistency is quite impressive, which comes from our focus on absolute returns." All of this is and was true.

71.    It goes on stating, "In case some of you do not have the November results email, that is below as well." Customer service and the frequent correspondence with investors was the center of Integral Investment Management, L.P.

72.    The December 19, 2000 email (Exhibit 41) also states, "The General Partner of our funds has changed its name and is now registered with the Texas Secretary of State as INTEGRAL INVESTMENT MANAGEMENT, L.P. (rather than Genesis Market Neutral

CS 000377

Partners, L.P.).  INTEGRAL ARBITRAGE, L.P. is the old Sum-It Investments, L.P., INTEGRAL EQUITY, L.P. is the old Genesis Market Neutral Index Fund, L.P., INTEGRAL HEDGING, L.P. retains its original name.  We wish all of you a wonderful Holiday season and thank you for your support and patronage which has helped us achieve record growth this year."

73.     Exhibit 40 is the attached spreadsheet referred to in Exhibits 39 and 41 listing the returns for all of the Integral Investment Management, L.P. hedge funds through November 30, 2000.  Note how Integral Hedging, L.P. at a net investor return of 11.97% year-to-date in 2000 was performing below its goals of a 20% consistent return due to the market declines and volatility, as had already been explained multiple times to the investors.

74.     Sovereign Assets, LLC was formed as an investment vehicle for The William J. Murphy III Testamentary Trust and the Murphy family members.  On 1/1/2001 the William J. Murphy III Testamentary Trust investment was transferred to a position for Sovereign Assets, LLC in Integral Hedging, L.P., at my request.  The William J. Murphy III Testamentary Trust is the largest investor in Sovereign Assets, LLC.

75.     Exhibit 42 is the monthly performance email titled "Results Report – January 31st, 2001."  It states, "Despite the severe market uncertainty and increased volatility in the past few months our portfolio positions have performed as expected. Performance numbers for 2000 were –6.2% for the Dow, -10.1% for the S&P and –39.3% for the NASDAQ.  Integral Hedging was up 12.96% net, Integral Equity was up 9.52% net and Integral Arbitrage was up 18.42% net as it goes after more steady returns with a lower volatility return profile."  It then goes on to explain that, "The returns for Integral Hedging and Integral Equity were slightly lower than usual due to the inordinate amount of market volatility that the year 2000 witnessed, causing more frequent hedging adjustments in order to remain neutral to market forces."

CS 000378

76.    Exhibit 42 then continues by stating, "Integral Investment Management, L.P. is constantly refining its mix of trading systems to improve on the returns and safety levels of its investments. Our proprietary Risk Adaptive Portfolio Structures (RAPS) hedging methodology provides us with synthetic hedges that offset a large part of the directional volatility of the portfolio, allowing us to capture more steady premium profits, interest rate profits, and longer-term appreciation profits from the G-5 bond, equity, and currency markets." It was very clear what RAPS was and how RAPS was a combination of options that together behaved as a "synthetic" option that protected the portfolio up until drops of approximately 30% in the major market averages, in exchange for being able to be purchased at a much cheaper price.

77.    On March 26, 2001 I received an email (Exhibit 43) with two attachments (Exhibit 44) from Integral Investment Management, L.P. which included the Integral Investment Management, L.P. Hedge Funds' performance for February of 2001 and an overview of the hedge funds. It stated The declines in the market to that point had been withstood by Integral Hedging, L.P. due to its hedges, although more pressure would be coming in the next few months of 2001 and Integral Hedging, L.P., due to its protection levels already being stretched, might not be able to withstand such increased pressure.

78.    Exhibit 44 is one of the two attachments of Exhibit 43. It is the monthly report. Exhibit 45 is the attached PowerPoint presentation. The monthly report stated, "The month of February 2001 will stand out as a rude awakening to the investment community regarding the speed with which sentiment, perception, and a spate of earnings warnings can change market prospects. February saw the Dow lose –3.4% and the S&P500 and NASDAQ drop –9.1 and -22.4% respectively (NDX100 had the worst month ever). Preliminary estimates by Van Hedge Fund Advisors show that the average U.S. Hedge Fund slipped –2.3% net. Integral Investment

Bill Murphy Affidavit                                              Page 27 of 53

Management's funds were not completely immune to this market turmoil." It was once again very clear that substantial and sharp market declines are bad for the performance of the Integral Investment Management, L.P. trading strategy.

79.    Exhibit 44 continued by stating, "All three funds hedge every individual trade that is taken, allowing consistent returns and resulting in steady, uncorrelated, low beta returns where asset protection and reasonable profits are the goal. Due to the inordinate volatility, combined with extraordinary retracements particularly in the tech sector, we were obliged to re-hedge or "reinsure" our portfolios. This protective action came at a price however. Although we are currently protected against further reasonable drops in asset values, the "insurance" cost resulted in a modestly negative performance for two of our funds." Again, it is self-explanatory from the large level of investor information that was constantly given by Integral Investment Management, L.P.

80.    Exhibit 45 is the PowerPoint presentation that was attached to Exhibit 43. It is for all three hedge funds combined and describes them as risk-protected funds that have hedges. It then describes the results to date, and then goes on to state that, "There is no secret. Our combination of multi-strategy overlays provide consistency." It is referring to "Option Arbitrage" as well as "Market Neutral, Long-Short (statistical arbitrage) overlays on these positions." It is therefore very clear again that not every position is hedged, but rather that each group of positions and the portfolio itself is hedged. Exhibit 46 then goes on to give several trade examples.

81.    Exhibit 45 continues with a slide on "Cash Management and Exposure," describing how "Cash positions in the portfolio are generally maintained at 70%, with at least 40% of the portfolio in unencumbered cash. This ensures protection against margin increases,

Bill Murphy Affidavit                                                                    Page 28 of 53

market shocks and unforeseen events." It is obvious that the objective was to begin every group of trades using a RAPS basket that left approximately 70% cash for future adjustments should they be necessary. However, in this situation as had been clearly explained for many months now many adjustments had been made and therefore the old positions in the portfolio did not have much cash left over to be able to hold their positions, making them vulnerable to any further large market declines.

82.     Exhibit 45 continues with a slide concerning Volatility and Variance Swaps. This was what RAPS were designed to do. RAPS were a type of Swap contract that minimized volatility. Nevertheless, I was told by Conrad Seghers that they were constantly looking at and pricing these types of variance swaps that could be purchased, at a much higher cost to the hedge funds, directly from various brokers although they were not necessarily publicly traded investment vehicles. These were the types of instruments being used to describe, as is stated in Exhibit 46 and in the many monthly reports, as "MultiStrategy Overlays" that provided maximum but not guaranteed portfolio stability and consistent returns, through Option Arbitrage and Market Neutral, Long/Short Overlays.

83.     The next slide, number 26, on Exhibit 45 describes the Management Profiles and summaries of the three principals of Integral Investment Management, L.P., Conrad Seghers, James Dickey, and Sam Vogel. Slide 27 describes the company structure, which are the three principals just listed, along with four other employees, and eight third-party staff at firms such as Olympia Capital Associates, L.P.

84.     I think that the next slide, number 28 in Exhibit 45, is crucial. It states that Integral Investment Management, L.P. " ... has an investment in the funds in excess of $4,000,000, which represents substantially all the Principals' investable assets." This means that

CS 000381

$4 million belonged to Integral Investment Management, L.P., in the form of fees and accounts payable and various reinvestments that the hedge funds owed to Integral Investment Management, L.P. Evidently over $4 million in fees and accounts belonged to the hedge fund manager Integral Investment Management, L.P. as of February 2001, with many more fees to be earned during the rest of 2001 All hedge fund valuations and allocations have been calculated by an independent third party administrator, Olympia Capital Associates, L.P., and then audited by large international prestigious auditing firms such as Deloitte and Touche, makes any allegations of fraud baseless when they are read and then considered side by side with the responses of Integral Investment Management, L.P.

85.    Exhibit 45 I feel is therefore at the root of the false allegations of fraud. I feel this way because the next names on the list of slide 28 are the "Administrator: Olympia Capital, Legal Counsel: Creel, Sussman & Moore (Dallas) and Tannenbaum, Helpern, Syracuse & Hirschtritt (New York), Auditing Firm: Deloitte and Touche, and Main Broker: Morgan Stanley Dean Witter." Notice how Morgan Stanley is not listed as a "prime broker" as the SEC alleges in their lawsuit which can be found on their website against Conrad Seghers and James Dickey.

86.    On April 25, 2001 I received an email with attachment (Exhibit 46) from info@integralinv.com which included an attachment (Exhibit 47) with the Integral Funds' performance for March of 2001. It states that this has been "one of the toughest quarters the markets have seen in recent years." Therefore, for problems to have started here that only became known to all of the parties many months later is now in retrospect completely understandable.

87.    Exhibit 47 is the attachment to Exhibit 46. It is the March 2001 monthly investor update in Microsoft Word form. It states "March saw the Dow lose −5.9%, the NASDAQ drop −

Bill Murphy Affidavit                                              Page 30 of 53

CS 000382

14.5% and the S&P500 fall by an alarming -12.1%. According to MAR, 52% of hedge funds reported negative results for March while 90% outperformed the S&P index. Again, the inordinate volatility of the market, combined with severe falls in equity prices across the board, resulted in us having to "re-hedge" or "reinsure" our portfolios. The cost of this reinsurance resulted in our slight negative results for our two funds most affected by the turmoil in equity markets, while the arbitrage portfolio proved its resilience against market shocks."

88.     It therefore explains that most hedge funds are having a very difficult time and that the market declines had caused the hedge funds to have to reinsure or roll their positions frequently, thereby giving up profit opportunities in exchange for continuing to hedge the portfolio. In March 2001 alone the S&P 500 lost over 12%. Once again, it shows that nothing is magic and that the trading strategy is solid and does have certain situations in which it does not function well, such as these.

89.     Exhibit 47 continues with "Integral Equity, L.P. was down –0.84% net for March. Integral Hedging retreated -1.58% and Integral Arbitrage maintained its lifetime positive result record, earning +0.70%. Despite the severe market uncertainty and increased volatility in the past few months our portfolio positions have performed admirably in what may be considered as the worst possible scenario for our strategies." It then goes on to state that "While the funds are now protected against further collapse in the equity markets, we have had to sacrifice some upside participation in our maturing short-term portfolio. Despite this, new investment flows and our rolled positions are able to institute new, hedged positions on assets that now offer exceptional upside potential. These positions are expected to reap accelerated returns in the second and third quarter of 2001." In other words, old trades and positions have had to pay dearly for "purchasing" protection that now works down to much lower market prices, while at the same

CS 000383

time the scarce amount of "free and unencumbered" cash is able to purchase extraordinary positions at discounted prices. Unfortunately, most of the portfolio was already invested before the markets began to crash in 2000, making the ability to profit from the new opportunities very limited except to the extent of new investments that were made by new outside investors.

90.    Exhibit 47 continues with "Our proprietary Risk Adaptive Portfolio Structures (RAPS) hedging methodology provides us with synthetic hedges that offset a large part of the directional volatility of the portfolio, allowing us to capture more steady premium profits, interest rate profits, and longer-term appreciation profits." Once again, RAPS is described to a level which I understand.

91.    On May 15, 2001 I received an email with an attachment (Exhibit 48) from info@integralinv.com which included the performance of the hedge funds of Integral Investment Management, L.P. for April of 2001. Exhibit 49 is the attachment that begins with "MARKETS - This year has proved exceptionally difficult. Expectations of an impending global economic slowdown, corporate earnings warnings and a re-rating of technology stocks have resulted in increased volatility and continuing bearish sentiment. Uncertainty reigns as investors are torn between expectations of a market bounce and further downward momentum." In other words, this is a difficult year for the hedge funds based on their investment strategy.

92.    Exhibit 49 continues with "April saw the markets recoup some of their recent losses, accompanied by extreme volatility. These large moves to the upside in effect meant that the extra portfolio insurance we instituted had been in vain. Although this hedging was prudent, in hindsight it was unnecessary, costing us "insurance premium" and reducing our upside participation in the markets in the short term. These volatile market environments are difficult, forcing us to make decisions about the amount and timing of hedging required." In other words,

CS 000384

it is not just the market declines but also the volatility of the markets first moving down and then back up again that had now locked Integral Hedging, L.P. into certain positions with very limited further downside protection and at the same time very little if not zero upside profit opportunity. The way for Integral Hedging, L.P. to emerge unscathed from the market debacle that was occurring was simply to wait it out until the option positions it was involved in expired.

93.     Exhibit 49 continues with "METHODOLOGY - All three funds hedge the underlying positions that are entered, allowing consistent performance from steady, uncorrelated returns where asset protection and reasonable profits are the goal. Generally, positions are hedged against a 30% negative move with a 40% profit cap. When prices move outside of these ranges, as they have recently, we are obliged to readjust our portfolios." In other words, the hedges offered by the RAPS strategy were again described, correctly and accurately and in detail, and the investors were again made aware that any market decline by greater than 30% was severely detrimental to the hedge funds. The NDX-100 had reached an all-time high on March 24, 2000 of 4,816.35. By April 4, 2001 it had declined to 1,348.52, a decline of 72% in only one year. Obviously this was well outside the parameters of how much a RAPS hedge was supposed to protect a portfolio. It again explained how only a 30% drop in the markets is covered. However, even with this drop of 72% in only one year the portfolio, while weak without much free cash, was still able to hold its own and expected to recoup its positions by either September or December of 2001, on options expiration day.

94.     Exhibit 49 continues with "The inordinate volatility of the market, combined with severe falls in equity prices across the board, has resulted in us having to "re-hedge" or "reinsure" our portfolios. The cost of this reinsurance resulted in our slight negative results for our two funds most affected by the turmoil in equity markets, while the arbitrage portfolio

Bill Murphy Affidavit                          .                          Page 33 of 53

proved its resilience." Exhibit 49 then explains, "OUTLOOK - Despite the severe market uncertainty and increased volatility, our portfolio positions have performed as expected in what may be considered as the worst possible scenario for our strategies. The significant market drop over the past few months, while difficult for existing long-term positions, offers significant opportunity for new investments. We are able to institute new, hedged positions on securities at prices that offer exceptional upside potential with reduced risk. These new positions are expected to reap accelerated returns in the third and fourth quarter of 2001." This had already been noted above as the time at which the old positions could be unwound without significant losses and new positions should lead to tremendous opportunities due to the volatility in the markets. It was all repeatedly and clearly explained to the investors, both orally and in writing. Finally, Exhibit 49 states that "DEVELOPMENTS - The principals, James Dickey, Conrad Seghers and Sam Vogel, are pleased to welcome Britt Bowers to our team. He will be working with our brokers and our administrator, Olympia Capital, who independently verifies and consolidates all trades and positions, to further streamline operations as we continue to grow. In addition, Deloitte & Touche expects to complete our 2000 audit by May 31." Once again it is explained the level of independent verification of values that occurs, and in writing Integral Investment Management, L.P. explains that Olympia Capital independently verifies and consolidates all trades and positions. All of this work is then further verified by independent auditors such as Deloitte and Touche.

95.     Exhibit 50 is the monthly email update for May 31, 2001. It states, "While the year has proved to be exceptionally difficult for fund managers, the month of May provided a brief respite to the turmoil. The abatement of market volatility in May, as the market remained largely range-bound, resulted in a return to consistency for our three domestic funds. Due to

Bill Murphy Affidavit                                                          Page 34 of 53

these benign conditions we were able to monitor our portfolios with less requirement for re-hedging of our positions and this contributed to our stable returns. This allowed our newer, long-term positions to profit and our short-term portfolio to settle." In other words, yet again, it was explained that frequent time-consuming and expensive readjustments had to be made.

96.    Exhibit 50 continues by stating, "All three funds hedge the underlying positions that are entered .... *Generally, positions are hedged against a 30% negative move* with a 40% profit cap. When severe price volatility is experienced we are obliged to readjust and re-hedge our portfolios in order to protect against these moves. Systematic and specific risks are identified and tempered, resulting in steady returns with reduced risk." (Emphasis added.) This was explained repeatedly to the investors. After a 30% market decline the portfolio has significant risk and danger, while volatility in the markets can make 30+% declines even more costly to the funds.

97.    Exhibit 50 then states "The significant market drop over the past few months, while proving difficult for existing long-term positions, offers significant opportunity for new investments. We are able to institute new, hedged positions on securities at prices that offer exceptional upside potential with reduced risk. These new positions are expected to reap accelerated returns in the fourth quarter of 2001 and into 2002."

98.    Exhibit 50 concludes with "We thank you for your business and hope you appreciate the performance that we have been able to maintain even in these adverse and volatile markets." In other words, these are the worst of times for the Integral Investment Management, L.P. hedge funds. "The principals, James Dickey, Conrad Seghers and Sam Vogel, would like to announce that our audit, performed by Deloitte and Touche, is in hand. Investors will be receiving complimentary copies of the audit and we invite all other interested parties to contact

Bill Murphy Affidavit                                                                                    Page 35 of 53

CS 000387

us for copies if interested. Please visit our website at www.integralinv.com for our latest downloads." This shows that professionalism at the firm continued and that audits were being completed by very large respectable international auditing firms. Furthermore, the website was available for the investors to go to and retrieve even more information concerning their investments.

99.     Exhibit 52 is the actual audit that was sent together with a cover letter dated June 20, 2001 that is Exhibit 51 that I have seen. The audit was created by Deloitte and Touche and is titled "Integral Hedging, L.P. (A Texas Limited Partnership) Financial Statements Year Ended December 31, 2000 and Independent Auditors' Report." It states that, "We have audited the accompanying statement of financial condition of Integral Hedging, L.P. (the "Fund"), including the change of investments, as of December 31, 2000, and the related statements of operations, changes in partners' capital and cash flows for the year then ended. We conducted an audit in accordance with auditing standards generally accepted in the Unites States of America. We believe that our audit provides a reasonable basis for our opinion. The Fund invests in other entities which value their security portfolios based on an amortization method of accounting, as prescribed in the Fund's prospectus; in our opinion, accounting principles generally accepted in the Unites States of America require that such securities be accounted at fair value. Accounting for these securities at fair value would result in an *increase* of $315,000 in the Fund's investments and partners' capital at December 31, 2000." (Emphasis added.)

100.     Exhibit 51 is a letter dated June 20, 2001 that contained the audit from Deloitte and Touche. It stated, "Attached herewith is our audit for 2001. It was performed by Deloitte & Touche, our first with them, and thus you all are due a few explanatory notes. The Investment Advisor, which is a Texas Limited Partnership and thus a domestic entity, cannot be invested in

CS 000388

Integral Hedging Offshore, Ltd. Thus all money and fees are transferred to our domestic limited partnerships and Integral Investment Management, L.P. has no assets except for accounts receivable and payable in Integral Hedging Offshore, Ltd."

101. It continues with "Galileo Fund serves as a master feeder to our domestic funds. Galileo Fund Offshore is a master feeder to Integral Hedging Offshore, Ltd., our only offshore fund. The reason a 3rd party is used in our master feeder structure is to allow it to behave as a performance swap, which thereby makes the returns long term capital gains as opposed to short term gains. You all have noticed that this year there was even an added benefit of these long term capital gains being mostly unrealized."

102. Exhibit 51 continues with "Our trading strategies have some cyclicality. Our trades are placed with a 30% hedge, and in these markets where many big name instruments have fallen by over 75% several of our hedges have had to be readjusted. Many of these trades will still be breakeven despite the markets crashing so badly, but it will take a few more months for this to occur. Also, new trades take 12 to18 months to mature so while the first period of the trade is not making profit, later this year we expect to see a return to strong and steady profits, continuing through 2002. This is why we are advising investors to take advantage of the opportunity to invest beginning October 1." .

103. This fact has already been explained many times and even pointed out by me as well many times earlier in this affidavit. There is a 30% hedge. The markets had fallen by much greater than 30%. Despite this, even though this was still the second quarter, by the end of the third quarter it was anticipated that the portfolio would be break-even again and able to reinstitute new positions with a new 30% hedge from the now very low market levels. Investors were not being lied to about the situation the portfolio was in. Rather, investors were being told

CS 000389

the truth and not being encouraged to invest now under these weak conditions but rather only in the 4th quarter, or after October 1, even though this letter was written in the 2nd quarter. Once again, this letter shows the truthfulness of Integral Investment Management, L.P.

104.    Exhibit 51 concludes with, "We have made a change from Morgan Stanley to Spear, Leeds & Kellogg, L.P., a division of Goldman Sachs. As we have switched to Spear, Leeds, & Kellogg, errors from Morgan Stanley are being resolved and the monthly performance figures and statements should now be available in a more timely manner." In other words, there were many errors at Morgan Stanley and they are not only being resolved but to ensure that they did not happen again the accounts had moved to Goldman Sachs. "Also, as you know, Deloitte & Touche has completed our audit, Olympia Capital continues to be the administrator for our funds, and Tannenbaum, Helpern, Syracuse & Hirschtritt, LLP is the legal counsel for Integral Hedging Offshore. Things are thus looking good for the 4th quarter and we are planning to start the year 2002 strong. The Principals and the Staff at Integral Investment Management would like to thank our current and potential investors for being patient with us during this transition period." The present time period was thus described as a "transition period." In other words, all top level professional servicing firms were part of this now very large company that was having temporary problems. Galileo Fund, L.P. was fully disclosed to all investors as well, yet again, as it had been previously been disclosed many times and in previous audits and in the Offering Memorandum which has been shown in this affidavit to have been constantly referenced in the monthly updates in the appropriate disclaimer.

105.    Exhibit 52, the audit of Integral Hedging, L.P. for December 31, 2000, shows that all activities and investments of Integral Hedging, L.P. are accounted for at the fair market value of the security. It also explains about Galileo Fund, L.P., in which the investors knew from the

CS 000390

Offering Memorandum as well as investor letters that Integral Hedging, L.P. was invested. Exhibit 51 from Integral Investment Management, L.P. which stated that "Galileo Fund serves as a master feeder to our domestic funds. Galileo Fund Offshore is a master feeder to Integral Hedging Offshore, Ltd., our only offshore fund. The reason a 3rd party is used in our master feeder structure is to allow it to behave as a performance swap, which thereby makes the returns long term capital gains as opposed to short term gains."

106.    Therefore, there were definite gains to investing in Galileo Fund, L.P., even more so than simply the Section 1256 tax treatment wherein 60% of the gains were treated as long-term capital gains as had been implemented by Whitley, Penn & Associates. These gains to the investors came at a huge cost to the management of Integral Hedging, L.P. as missing $315,000 in assets from the total meant that $63,000 (20% of $315,000) less of asset allocation fee would be charged and that another $3,150 less in management fees could be charged.

107.    For the principals of Integral Hedging, L.P. to value their fund in this manner, as was disclosed to the investors and financially beneficial to the investors while financially negative to the management of Integral Hedging, L.P., shows that a fraud was most likely simply not occurring. Exhibit 52 then lists in the Statement of Financial Condition that Integral Hedging, L.P. is invested in Galileo Fund, L.P., and has total assets on December 31, 2000 of $37,660,347. Furthermore, the Statement of Operations lists $3,819,662 as the Increase in Assets Resulting from Operations. Exhibit 52 then continues with "We do not account for our portfolio at fair value because is would not enable us to enter the above described performance swaps. Our legal documents describe this fact, and a significant part of the audit report is actually comprised of portions of our legal document pasted into it. Both methods of accounting, however, were performed for this audit, and you see in the audit report that they did not differ

CS 000391

significantly from one another." This fact is true. It was again properly disclosed. More importantly, however, is that the actual value for Integral Hedging, L.P., Integral Arbitrage, L.P., Integral Equity, L.P., and Integral Hedging Offshore, Ltd. would have been much *higher* had the mark-to-market valuations been used by Deloitte and Touche rather than the properly disclosed RAPS values. This will be explained in detail in Exhibit 52.

108.    Exhibit 53 is the statement for Sovereign Assets, LLC for June 30, 2001. It was sent by Olympia Capital Associates, L.P., and in the disclaimer at the bottom states "Distributed by Olympia Capital Associates, L.P." It also states "Olympia Capital Associates, L.P. ("Olympia") has prepared this statement based, in part, upon information and investment valuations directly received from entities outside of the Fund." Olympia Capital Associates, L.P. therefore acknowledges that it has "distributed" this statement, that it has "prepared" this statement, and that some valuations are received from outside parties. Therefore, Integral Investment Management, L.P. did not perform the valuations and Olympia Capital Associates, L.P. was fully in charge of all investment valuations. Conrad Seghers has even told me several times that Integral Investment Management, L.P. played absolutely no part in the valuation process, other than alerting Olympia Capital Associates, L.P. to investor inflows and outflows and sometimes providing a very rough estimate of approximately what the values might be as that was what was required in the legal .

109.    I was aware that Integral Investment Management, L.P. had recently switched from Morgan Stanley, our primary broker for the past year, to the prime brokerage department of Spear, Leeds & Kellogg - a division of Goldman Sachs. This item had been disclosed orally to me, along with apparently to many other investors, for some time. A new Offering Memorandum was being prepared to reflect this change. I was told that the hedge funds were

Bill Murphy Affidavit

CS 000392

switching from Morgan because of serious errors that had recently been uncovered that have cost the funds millions of dollars. That loss then caused a margin call, causing another loss of hundreds of thousands of dollars. Integral Investment Management, L.P. had taken the immediate step of moving to Spear, Leeds, and Kellogg and made the investors aware of these issues and their seriousness.

110.   On July 13, 2001 I received the attached letter (Exhibit 54) from OCA in New York distributing a new Offering Memorandum for Integral Hedging, L.P. The letter stated that the brokerage firm had been moved away from Morgan Stanley to Spear, Leeds and Kellogg and explained about Galileo Fund, L.P. when it referenced investing through a "master fund." It also referenced the audit that had been sent out the prior month

111.   On July 20, 2001 I received an email with an attachment (Exhibit 55) from Integral Investment Management, L.P., which included the performance results for June of 2001.

112.   Later on July 20, 2001 I received an email (Exhibit 56) with a revised attachment (Exhibit 57) from Integral Investment Management, L.P. which included Integral Hedging's performance for June of 2001. It states, "The tech laden Nasdaq (-12.55%) that continues to suffer from an unwinding of speculative excesses and earnings disappointments." The NASDAQ, to which the trades of Integral Hedging, L.P. were pinned through the NDX-100 options, continued to crash, losing over one-eight of its value, again, in June of 2001 alone. Exhibit 57 then explains that it had become necessary to "aggressively rehedge our portfolios as markets retreated in the last week of June expiration. Many of these trades were rolled and will be traded out at breakeven within the next two months. Our longer term trades remain stable and are expected to perform well during the next cycle." The NASDAQ crash had resulted in the necessary re-adjustment of the portfolio and rolling out of the June options into September

Bill Murphy Affidavit

CS 000393

options and December options for 2001, the "next cycle." It would therefore be necessary for Integral Hedging, L.P. to remain locked into positions that had virtually no upside in exchange for holding steady so as to be able to exit these positions by September or December of 2001 without significant damages.

113.    Exhibit 57 continues with, "Integral Arbitrage maintained its positive track record with a return of +0.19%, while Integral Equity and Integral Hedging, which follow the underlying equity markets more closely, experienced losses of −2.49% and −2.42% respectively." Significant losses were therefore being experienced and reported for Integral Hedging, L.P., although by September and December of 2001 hopefully the rest of the portfolio would no longer be so exposed to market risk.

114.    Exhibit 57 then again explained the underlying strategy by stating "All three funds hedge the underlying positions that are entered. Generally, positions are hedged against a 30% negative move with a 40% profit cap. When severe price volatility is experienced we are obliged to readjust and re-hedge our portfolios in order to protect against these moves. We are able to institute new, hedged positions on securities at prices that offer exceptional upside potential with reduced risk. These new positions are expected to reap accelerated returns in the fourth quarter of 2001 and into 2002." Again, the story is consistent and true with full investor disclosure of all events. Exhibit 57 concludes with "DEVELOPMENTS - The principals, James Dickey, Conrad Seghers and Sam Vogel, would like to announce that we have retained Spear, Leeds & Kellogg, a division of Goldman Sachs, as our Prime Broker due to their specialization in derivatives and market leading risk management systems. This development will result in even more efficient trade execution, administrative services, risk management and reporting. For additional information on any of our funds, please visit our website at www.integralinv.com." In other

CS 000394

words, once again the move away from Morgan Stanley was announced in writing to the investors.

115.   Exhibit 58 is a letter that was sent to me by Conrad Seghers dated August 10, 2001 from the auditing firm of Bulloch, Seger, Weaver and Company, LLC.  It states, "This letter is to communicate a reasonable estimate of errors relating to the Morgan Stanley recordkeeping of Integral Investment Management funds activity, in the accounts of Galileo Fund, L.P. for its domestic funds and Galileo Fund Offshore, L.P. for Integral Hedging Offshore, Ltd."

116.   Exhibit 58 continues with, "Our review of the records provided and email communications from Morgan Stanley agents for the period February 1, 2001 through July 31, 2001 reflects many problems.  A precise estimate is not obtainable without a full review of Integral's and Morgan Stanley's records.  A lowside estimate of $10,000,000 is reasonably appropriate from our review."  Therefore, even professional accounting and auditing firms were aware of the egregious errors that had occurred at Morgan Stanley as Integral Investment Management, L.P. was handling the case in the proper manner.  I had been told by Conrad Seghers that experienced legal counsel from New York had also been hired to go against Morgan Stanley.  Everything seemed to be going along well with a resolution that Conrad Seghers told me he expected would be enormously profitable to the investors of Integral Hedging, L.P.  In fact, he explained that it was unfortunate that Integral Equity, L.P. and Integral Arbitrage, L.P. would not be as exposed to the situation with Morgan Stanley as they were growing larger and thus diversifying away completely from Galileo Fund, L.P.

117.   Exhibit 59 is an email dated August 30, 2001 from info@integralinv.com.  It states that attached is the monthly update, and that an offshore version of Integral Arbitrage, L.P.

was expected to launch in October of 2001. Exhibit 60 is the Microsoft Word attachment titled July 31, 2001 Monthly Update. It states "**MARKETS** – This year has seen a market torn by the opposing forces of a sharp earnings recession versus the Fed's easing of monetary policy. The Fed has aggressively lowered interest rates 8 times this year by a total 3.0%, the largest Fed move in a calendar year, in an attempt to reinvigorate the faltering economy, against a backdrop of a steep decline in corporate earnings, particularly in technology stocks. These market conditions have resulted in a negative performance for most indices in 2001 ... with the tech laden Nasdaq (-17.9% YTD) suffering worst from an unwinding of speculative excesses and earnings disappointments." According to the explanations I had received about the IIM trading strategy, this was the worst economic environment possible.

118. Exhibit 60 continues with "With our hedges holding but continually being stressed with lower lows, our exposure to selected high-profile stocks ... resulted in a draw-down .... Profitability tends to be weighted towards the end of our option cycle, which due to market conditions has now been extended into early next year. Many of our losing trades were thus rolled and are anticipated to be liquidated at breakeven within the next several months." Again, this is self-explanatory and a repeat of what had been disclosed to investors many different times. Furthermore, it would apparently take until 2002 to completely exit many of the losing option combinations, some of which still existed from the year 2000. Losses and losing trades were again disclosed.

119. Exhibit 60 continues with, "In addition, the influx of new capital that we are experiencing enables us to enter the markets at these lower levels, with protection, and thus we have excellent chances for generating significant profits for the fund as a whole. Integral Equity and Integral Hedging, which follow the underlying equity markets more closely, experienced

Bill Murphy Affidavit

Page 44 of 53

CS 000396

losses of −1.69% and −0.73% respectively." As stated before, new capital had excellent opportunities at these stressed market prices while older trades were suffering.

120. Exhibit 60 then states "METHODOLOGY - All three funds hedge the underlying positions that are entered. Generally, positions are hedged against a 30% negative move with a 40% profit cap. When severe price volatility is experienced we must readjust and rehedge our portfolios in order to protect against these moves. There are added markets of G5 bonds and currencies that are traded in Integral Arbitrage, which are not traded in Integral Equity, that do add stability to the portfolio in market conditions such as these." In addition to explaining about having only a 30% hedge, it was explained how volatility and market declines led to losses and costs from rehedging. It was also explained that Integral Arbitrage, L.P. invested differently from Integral Hedging, L.P. and was also in the bond markets, which also goes against an Art Institute of Chicago accusation that they had no idea that the extremely profitable investment Integral Arbitrage, L.P. made in Recovery Partners II, LLC was part of the investing strategy.

121. Exhibit 60 concludes with "Due to market demand we are planning on launching an offshore version of Integral Arbitrage in October. We are also anticipating several large new domestic investments in the coming weeks. Last month we announced that we have retained Spear, Leeds & Kellogg, a division of Goldman Sachs, as our Prime Broker due to their specialization in derivatives and market leading risk management systems. We have since experienced much more efficient trade execution, administrative services, risk management and reporting than Morgan Stanley was ever able to provide. We are also still in the process of resolving outstanding issues with Morgan Stanley. For additional information on any of our funds, please visit our website at www.integralinv.com." Every sentence in this paragraph is important. There is full disclosure on every topic. The launch of Integral Arbitrage Offshore,

Ltd. was disclosed. The new investment from The Art Institute of Chicago for September 1, 2001 was disclosed, as much as possible without listing them by name. The new brokerage firm was doing well and providing much better trade execution and reporting services. Further, issues with Morgan Stanley were still being worked out. Finally, the website was available for additional information. Integral Hedging, L.P. was a very professional firm.

122. After the markets were closed after the World Trade Center attack, I knew the market decline was beyond what the strategy of Integral Hedging, L.P. was designed to profit from, and even to have portfolio protection from, as such declines are actually very unusual for very large market averages that are composed of thousands of large companies. I therefore suspected that there might be a large monthly decline rather than a gain in the fund's value, especially since I was well aware that the portfolio was already stressed and stretched to capacity.

123. Exhibit 61 is the "August 31, 2001 Monthly Update." It states that "Our thoughts and prayers go to all those affected by the cowardly acts perpetrated against our country Sept. 11, 2001. MARKETS – For August a string of bad economic news took its toll on the markets. Technology again bore the brunt of the onslaught, with the Nasdaq -10.94% for August (-28.84% YTD), followed by the S&P –6.41% (-14.71 YTD) and the Dow –5.45% (-7.85% YTD). PERFORMANCE – Integral Arbitrage posted a positive return of 0.07% (+6.34% YTD), while Integral Equity and Integral Hedging, which follow the underlying equity markets more closely, experienced losses of 3.33% (-5.68% YTD) and 2.40% (-5.28% YTD) respectively." In other words, August 2001 was horrible for the equity markets and the NASDAQ had lost another 11%. Integral Hedging, L.P. was already stretched to capacity. And the impact of 9/11 was yet to come.

Bill Murphy Affidavit                                                                                    Page 46 of 53

124. Exhibit 61 continues with "This month with the World Trade Center tragedy appears to be much worse for the markets. While we are disappointed with the market's impact on our August results, our performance in all of our funds has been as expected given the circumstances. Our methodology provides a limited hedge in a downward spiraling market, generally protecting 30% to the downside, with capped profit levels. While our hedges have held through the turmoil, they have been continually stressed by the markets, particularly in the high-profile technology stocks. As markets continue to slide downward our losses in our equity tracking hedge funds will begin to mirror those of the markets more." In other words, August 2001 was horrible for the portfolio of Integral Hedging, L.P. September 2001 would be even worse. I had been previously and repeatedly advised that the funds were hedged against a 30% decline and those levels had been broken long ago. I therefore anticipated that losses for the hedge funds would begin to mirror the equity markets. That is exactly what happened during September of 2001. In other words, I expected IH to perform as IA actually did perform in September, 2001.

125. Exhibit 61 then continues with, "Profitability tends to be weighted towards the end of our option cycle, which due to market conditions has now been extended into next year. Many of our prior trades have been rolled and are anticipated to be liquidated at better prices as markets stabilize towards the first half of 2002. Generally, positions are hedged against a 30% negative move with a 40% profit cap. When severe price volatility is experienced we must constantly readjust and rehedge our portfolios in order to protect against these moves. While these readjustments so far have been effective, the funds' results will quickly begin to match the market's if further deterioration occurs. Integral Arbitrage includes G5 bond and currencies trades that add stability to the portfolio in severe market conditions such as these." In other

CS 000399

words, earnings come at the end of an option cycle and not in a month such as August, and therefore are not present to offset large losses in the portfolio. The positions had now been rolled into 2002 as the portfolio had been stressed so much. The middle of 2002, without any further market declines to further stress the portfolio, was the earliest that the portfolio could unwind and simply return to a break-even level. Further market declines, such as later occurred in September of 2001, would lead to large losses in the portfolio dollar per dollar. And finally, Integral Arbitrage, L.P. had a different trading strategy that made it much less affected by market declines than Integral Hedging, L.P.

126. Exhibit 61 then finishes with "DEVELOPMENTS – Due to market demand we are planning on launching an offshore version of Integral Arbitrage in November. In June we announced that we had moved from Morgan Stanley and had retained Spear, Leeds & Kellogg, a division of Goldman Sachs, as our Prime Broker. This was in response to developments at Morgan Stanley that directly contributed to negative performance in Integral's funds. This issue is now the subject of legal action and settlement against Morgan Stanley, the successful resolution of which would have a material, positive effect for current investors." This is another example of the honest and professional communication from IIM. Integral Arbitrage Offshore, Ltd. would thus no longer be launched on October 1, 2001 as had been planned due to the many market forces. Goldman Sachs was performing much better than Morgan Stanley. And finally, legal action had this time been taken against Morgan Stanley. Note how it was still thought, and today still is thought, that resolution of the Morgan Stanley matter would lead all of the investors in Integral Hedging, L.P. to be made whole and in fact to all be profitable.

127. Exhibit 62 is a copy of the letter that I received on Integral Investment Management, L.P. letterhead, that I believe was sent from New York and Olympia Capital

CS 000400

Associates, L.P. By the time it was sent out on October 23, 2001 it basically contained old news. I knew from many conversations with Conrad Seghers most of the information in the letter and that the letter had taken weeks to write. Exhibit 62 states, "We wish to inform you of several events that have transpired over the last few weeks concerning your investment in Integral Hedging, L.P. You all have received our monthly updates and your monthly account statements. In addition, we have spoken with several of you in recent weeks as these developments unfolded. As you are aware, the assets of the Fund are substantially invested in Galileo Fund, L.P. ("Galileo"). Due to the events surrounding the World Trade Center tragedy, and the unprecedented market declines and the resulting lack of liquidity, the Fund experienced enormous losses of capital. We are examining various actions of the Fund's former broker, discussed below, in order to determine if they contributed to the losses as well. The margin calls that resulted during those weeks have caused a portion of the portfolio to be liquidated." I understood this to mean that the forced liquidation of positions would result in greater losses than allowing them to expire. In other words, the assets were in Galileo Fund, L.P. and many account statements and letters had been previously sent out documenting the events. Further, the events of 9/11 had caused the hedge funds to have to liquidate their positions, making break-even now impossible even though it would have taken half-way through 2002 otherwise to do so as the portfolios were already so stressed. Exhibit 62 continues with, "As you know from the Information Memorandum, the audited financial statements, and the letters associated with them, the Fund is largely invested in RAPS Contracts and based on those contracts, the NAV is calculated on an amortized basis. Although the calculation of the NAV for September 30, 2001 has not been completed, it is anticipated that it will reflect a loss of approximately 17% from the August 31, 2001 NAV, based upon the amortization formula consistently applied since the

**Bill Murphy Affidavit**

CS 000401

Fund's inception spreading the realized losses over the time period until the expiration of the contract; however, it is likely that a mark-to-market or liquidation value will reflect a loss of over 90%." As I understood it, this meant that the forced liquidation changed what would have been a 17% loss into a 90% loss. In other words, all investors were aware of the RAPS contracts and the benefits to the investors, but while those losses would be 17% due to liquidation that now occurred 90% of the portfolio had been wiped out. Exhibit 62 continues with "The NDX (Nasdaq-100) Index and S&P 500 Index have fallen dramatically - - 77% and 38%, respectively - - from their highs set just eighteen months ago. As is explained in our marketing materials, synthetic hedges utilized in our investment strategy on average protect for up to a 30% decline. Accordingly, we had to adjust several of our hedged positions several times over. Many positions had to be liquidated during the past month at losing prices, both to reduce risk and to satisfy margin calls. Since the protection has been rolled so significantly and large portions have been liquidated, the remaining positions will now begin to mirror the markets in any further downward movement. Conversely, since upside potential has been sold away and liquidated and further-out expiration dates have been utilized to avoid losses to date, short-term market moves to the positive will not be mirrored in the Fund's results. Further, because the expiration periods have had to be extended, these are long-term illiquid positions." In other words, the portfolio was only protected up to a 30% decline, as had been disclosed countless times, and the NASDAQ had declined 77%.

128.    Exhibit 62 continues with, "The Fund experienced a number of problems relating to trade execution and reporting of information by Morgan Stanley Dean Witter ("Morgan Stanley"), the Fund's former primary broker. On several occasions, the Fund received information which appeared to be inconsistent and possibly inaccurate which resulted in delays

CS 000402

in reporting information on the Fund's performance to you.  We are also investigating margin calls made by Morgan Stanley to determine whether they were issued in error and may have resulted in the premature closing out of positions.  The Fund has hired special legal counsel to conduct a full investigation of these matters and determine whether the Fund has claims against Morgan Stanley arising out of its conduct.  In the meantime, the Fund has terminated Morgan Stanley and retained Spear, Leeds & Kellogg as its prime broker."

129.    Exhibit 62 continues with "We understand that due to the problems experienced in connection with the reporting of information concerning the Fund's positions, the Fund's Administrator, Olympia Capital International, Inc., has notified the Fund of its resignation, effective on January 4, 2002.  In the interim, Olympia is continuing to serve as the Fund's administrator and we are working with Olympia to provide them with the information required to calculate the NAV.  We assure all our investors that, to the best of our knowledge, the information reported to you is accurate, but we are taking appropriate investigative steps to determine if any inaccuracies have occurred."  I understood this to mean that calculating the true values was very difficult due to the problems Morgan Stanley had created but to the best of everyone' knowledge what had been reported was accurate, including the independent firm of Olympia Capital Associates, L.P.

130.    Exhibit 62 concludes with, "The Fund is currently considering various alternatives to address the present circumstances, including a general partial withdrawal on a pro-rata basis or possible liquidation of the Fund.  We will report to you in the near future concerning our plans for the Fund, but be assured that whatever plan is adopted will be in the best interest of all investors and will be executed in a fair and equitable manner.  We assure our investors that all of our efforts are focused on preserving the assets of the Fund.  We are available to answer

Bill Murphy Affidavit                                                                                          Page 51 of 53

CS 000403

investors' inquiries and to meet with investors to explain the position of management in order to assure you that the decisions we are making are in your best interest." In other words, information was plentiful and telephone calls were all answered, as they always had been, and meetings were possible at any time if requested. I understand that the Art Institute of Chicago and their consulting firm in fact had many meetings with Integral Investment Management, L.P., both in Dallas, and Chicago. As always, full disclosure of all events and a satisfactory resolution to the problems was proposed to the investors.

131.    In November of 2002 the Receiver Mr. Dan Jackson sent a letter attached as Exhibit 63, which was largely an excerpt from an advisor he had hired to determine whether actions or mistakes by Morgan Stanley had contributed to the losses. That advisor's conclusion was that Morgan Stanley had definitely made mistakes on the Integral accounts as well as on other accounts.

132.    In December of 2002, I received a letter (Exhibit 64) from Jackson, wherein he stated, "We are also potentially going to pursue legal actions against Morgan Stanley as a result of its alleged conduct with regards to trades executed on behalf of IA and Integral Hedging, L.P."

133.    In June of 2003, I received a six page letter (Exhibit 65) from Jackson. The entirety of the discussion of Morgan Stanley contained in that letter is as follows:

*Potential Recovery from Morgan Stanley*

*We have spent considerable time and effort in determining the best path of recovering assets on behalf of IA and Integral Hedging, L.P. that were invested with Morgan Stanley. As mentioned in my December 2002 letter we were in the*

CS 000404

*initial stages of interviewing several firms with regards to representing the funds in its litigation efforts against Morgan Stanley. At this point we have selected counsel and will sign the engagement agreement with respect to IA and/or Integral Hedging, L.P.'s claims against Morgan Stanley on or about June 25, 2003. Again, as additional information is obtained we will update you accordingly.*

13½. It is most regrettable that the SEC has chosen not to bring the real culprit in this matter, Morgan Stanley, before this Court.



FURTHER AFFIANT SAYETH NOT.

Bill Murphy

Signed and subscribed
Before me this 4ᵗʰ day of February 2005

Notary Public
State of Georgia, County of Fulton

My commission expires: _____

Bill Murphy Affidavit                                                      Page 53 of 53