

# IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

FEB 1 1 2005

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3-04 CV-1320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

# ORIGINAL

## DEFENDANT CONRAD P. SEGHERS' SWORN RESPONSE
## TO PLAINTIFF'S STATEMENT OF ALLEGEDLY UNDISPUTED FACTS

Charles B. Manuel, Jr.
James C. Jones
Shira Y. Rosenfeld
MANUEL & JONES, P.C.
230 Park Avenue, Suite 1000
New York, New York 10169
Tel. (212) 808-6584
Fax (212) 808-3020

Carl A. Generes    Attorneys for Defendant
4315 West Lovers Lane    Conrad P. Seghers
Dallas, Texas 75209
Tel. (214) 352-8674                                         February 7, 2005
Fax (214) 352-8852
Of Counsel

# IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF TEXAS

### DALLAS DIVISION

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Civil Action No. 3-04 CV-1320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY, | § § § | |
| Defendants. | § § | |

## DEFENDANT CONRAD P. SEGHERS' SWORN RESPONSE
## TO PLAINTIFF'S STATEMENT OF ALLEGEDLY UNDISPUTED FACTS

Charles B. Manuel, Jr.
James C. Jones
Shira Y. Rosenfeld
MANUEL & JONES, P.C.
230 Park Avenue, Suite 1000
New York, New York 10169
Tel. (212) 808-6584
Fax (212) 808-3020

Carl A. Generes                    Attorneys for Defendant
4315 West Lovers Lane              Conrad P. Seghers
Dallas, Texas 75209
Tel. (214) 352-8674                                February 7, 2005
Fax (214) 352-8852
Of Counsel

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | § § § | |
| Plaintiff, | § § | |
| vs. | § § | CIVIL ACTION No. 3:04-CV-01320-K |
| CONRAD P. SEGHERS and JAMES R. DICKEY | § § § | |
| Defendants. | § § | |

## DEFENDANT CONRAD SEGHERS' SWORN RESPONSE
## TO PLAINTIFF'S STATEMENT OF ALLEGEDLY UNDISPUTED FACTS

Defendant Conrad P. Seghers submits this response, under oath, to plaintiff's statement of allegedly undisputed facts on its motion for summary judgment. Plaintiff's statements (without its appendix citations) are set forth first, with Dr. Seghers' responses following in boldface.

1.    Defendant Conrad P. Seghers resides in Garland, Texas. Seghers was a co-founder and control person of Integral Investment Management, L.P. and Integral Management, LLC from July 1998 to May 2002, when a Texas state court appointed an administrator, who has since been appointed Receiver, over these entities. *The Art Institute of Chicago v. Integral Hedging, L.P. et al.*, Cause No. 01-10623 (Dallas County). Integral Investment Management, L.P. was the general partner of the Funds and Integral Management, LLC was the general partner of Integral Investment Management, L.P. Through these entities, Seghers controlled the Funds.

**Defendant's Response 1: Partly true, but inaccurate in the last sentence. Seghers acted as a member of Integral Management, L.L.C., performing investment roles in that capacity. Olympia Capital Associates, L.P. ("Olympia Capital") had 100% control and/or custody of the assets, and**

1

after the litigation began did not return millions of dollars in hedge fund assets it had solely in its possession. Exhibit 1 is the introductory letter from Olympia Capital International, Ltd., Exhibit 2 is the Olympia Capital Associates, L.P. Response to Client Questionnaire, and Exhibit 3 is the Agency and Administration Agreement. There is also a listing of Operations Procedures (Exhibit 73) that further proves this point.

Integral Arbitrage, L.P., Integral Hedging, L.P., and Integral Equity, L.P. will collectively be referred to as the "Funds." Seghers did not in any way have any control over the Funds' main investment accounts at Morgan Stanley Dean Witter Discover, which included Galileo Fund, L.P. (which Bizri Capital Partners, Inc. and Sam Bizri controlled). James Dickey and Sam Vogel were also Managing Partners of Integral Management, L.L.C.

2.      James R. Dickey resides in Flower Mound, Texas. He was a co-founder and general partner of Integral Investment Management, L.P. responsible for marketing. He was also the president of Integral Management, LLC during the relevant period.

Defendant's Response 2: True, except James Dickey was also a Managing Partner of Integral Investment Management, L.P. James Dickey was not a co-founder of Integral Investment Management, L.P. ("Integral") or Integral Investment Management, LLC, but was President and a member of Integral Management, L.L.C., and Managing Partner of Integral Investment Management, L.P., which he became a few months after their inception. (see Exhibit 4). Exhibit 4 is from early in 2002, when Sam Vogel, another Managing Partner of Integral Investment Management, L.P., was no longer with the firm.

James Dickey was responsible for marketing as well as investor relations, website development, attorney meetings, auditor meetings, investor account statements, creation of marketing materials and distribution of those

2

documents to investors. He did not consummate sales and was not paid a commission. Some of these points are summarized in Exhibit 4.

3.      Samer M. El Bizri ("Bizri") resides in Los Angeles, California. Bizri has been the sole control person of Bizri Capital Par t ners, Inc. ("BCP") since its incorporation in 1997. Bizri was an unregistered investment adviser during the relevant period. In connection with their alleged involvement in the scheme described in this Complaint and pursuant to their offers of settlement, Bizri and BCP have been ordered by the Commission to cease and desist from committing or causing any violations and any future violations of the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and 206(2) of the Advisers Act and to pay a $50,000 civil penalty. Bizri was also barred from association with any investment adviser for five years, and Bizri and BCP were barred for five years from acting in certain capacities in connection with any investment company.

**Defendant's Response 3: True.**

4.      Integral Investment Management, L.P. ("Integral"), fka Genesis Market Neutral Partners, L.P., is a Texas limited partnership formed in 1998 by Seghers, Dickey, and Bizri. Integral was the general partner of the Funds and was responsible for investing the Funds' assets. From July 1998 to May 2002, Seghers controlled Integral. Since May 2002, Integral has been under the control of a Texas state court-appointed administrator who, in September 2003, was appointed Receiver over Integral.

**Defendant's Response 4: False. Exhibit 5 is the initial management profile of Genesis Market Neutral Partners, L.P. It describes the background of the initial management, which consisted of Conrad Seghers, a limited partner doing business as Seghers Capital Partners, and Bizri Capital Partners, Inc., the California company that was the other initial limited partner of Genesis Market Neutral Partners, L.P.**

3

CS 000754

**Integral was formed by Seghers and Bizri, but Bizri was barred from having any direct involvement with the Funds, on the advice of legal counsel, many months before any outside assets were even invested (Exhibit 6).**

**In 1998, due to National Futures Association (NFA) regulations, Seghers was advised by legal counsel that in order to begin any investments with Bizri Capital Partners, Inc., a California company, in currency forward and Swap contracts, a revised Offering Memorandum complying with NFA regulations would have to be created. This was done together with the law firm of Creel, Sussman and Moore in Dallas, TX. Initially, Sam Bizri and Bizri Capital Partners, Inc. were incorporated as part of the corporate structure (as a "second General Partner"), although later it was determined that disclosure of this trading relationship, without his actually being part of the Texas based hedge funds, was sufficient.**

**Proof that Kennedy Capital Advisors, Inc. ("KCA") and the Art Institute of Chicago ("AIC") had full knowledge and awareness of Sam Bizri, and his role for the Funds, stems from their meeting him in person in Dallas, Texas before any investments were made, their seeing the marketing documents for Integral Investment Management, L.P. that disclosed Sam Bizri, and their seeing the Offering Memoranda for the hedge funds that listed only Conrad Seghers, James Dickey and Sam Vogel as the principals of Integral Management, L.L.C. Furthermore, KCA specially requested on behalf of AIC that Bizri provide the AIC with hedging mechanisms for natural gas prices. It is for this reason that AIC was fully aware at all times of Bizri and his role with Galileo Fund, L.P. and RAPS Contracts.**

5. Integral Management, LLC, fka Genesis Management, LLC, is a Texas limited liability company formed in 1998 by Seghers and Bizri. Integral Management is the general partner of Integral. From July 1998 to May 2002, Seghers controlled Integral Management. Since May 2002, Integral Management has been under the control of a Texas state court-

appointed administrator who, in September 2003, was appointed Receiver over Integral Management.

> **Defendant's Response 5: False. See responses to 1, 2 and 4. In addition, for a period of only two months in 1998, Bizri Capital Partners, Inc. was one of the members of Integral Management, L.L.C., but was removed prior to the execution of any transactions by Integral Management, L.L.C.**

6.    Integral Hedging, L.P., Integral Arbitrage, L.P. (fka Sum-it Investments, L.P.), and Integral Equity, L.P. (fka Genesis Market Neutral Partners Index Fund, L.P.) (collectively, the "Funds") are Texas limited partnerships formed in or about 1998. The Funds were hedge funds operated by Integral.

> **Defendant's Response 6: True.**

7.    In exchange for a monetary investment in one of the Funds, each investor received a limited partnership interest in the Fund that entitled the investor to a *pro rata* share of the Fund's profits and losses. Specifically:

> **Defendant's Response 7: True.**

      a.    Integral Hedging, L.P. offered and sold limited partnership interests from at least July 1999 through at least September 2001. From June 2000 through September 2001, Integral Hedging raised approximately $37.4 million from approximately 13 investors. Since August 2002, Integral Hedging has been controlled by the Receiver.

> **Defendant's Response7a: False. May 2001 was the last month, with May 31, 2001 being the last valuation date, of any sale or solicitation of investment in Integral Hedging, L.P. Beginning at least in August 2001, partnership interests were intentionally not sold while**

CS 000756

investigating the events at Morgan Stanley, in order to avoid diluting
the existing limited partners and their opportunity to recoup losses
through the legal pursuit of claims against Morgan Stanley.

b.      Integral Arbitrage, L.P. offered and sold limited partnership interests
        from at least July 1999 through at least October 23, 2001. From June
        2000 through September 2001, Integral Arbitrage raised approximately
        $33.9 million from approximately 21 investors. Since August 2002,
        Integral Arbitrage has been controlled by the Receiver.

**Defendant's Response 7b:  True.**

c.      Integral Equity, L.P. offered and sold limited partnership interests from at
        least July 1998 through at least October 23, 2001. From June 2000
        through September 2001, Integral Equity raised approximately $300,000
        from one investor. Since September 2003, Integral Equity also has been
        controlled by the Receiver.

**Defendant's Response 7c:  True.**

8.      The Funds' stated main investment objective was to "exploit market
inefficiencies and price discrepancies" through arbitraged and hedged positions in various
financial instruments. The offering documents for each of the Funds stated that the Fund would
invest in various investments, including securities such as equities, options, partnerships,
investment funds and money market instruments, as well as other investments, such as futures,
forward and swap contracts.

**Defendant's Response 8:  True.  This statement provides full disclosure of the
overall investment methodologies employed by the Funds.**

6

9.    The offering documents represented that Integral had full discretion, consistent with the stated investment objectives, to invest that Fund's assets. Moreover, the offering documents stated that Integral was under no obligation to disclose the Funds' holdings or trades to the limited partners. Consistent with that representation, the monthly statements sent to the Funds' investors did not disclose the Funds' holdings. For Integral's services, the Funds paid Integral a quarterly management fee based on the Funds' net assets and a quarterly performance fee based on the Funds' net gains.

**Defendant's Response 9: True that the offering documents represented that Integral had full discretion, consistent with the stated investment objectives, to invest that Fund's assets and stated that Integral was under no obligation to disclose the Funds' holdings or trades to the limited partners.**

**However, the allegation that the monthly statements sent to the Funds' investors did not disclose the Funds' holdings is incomplete and inaccurate. Integral did, indeed, disclose snapshots of the Funds' holdings to investors who requested it. Additionally, Funds' holdings were disclosed in the Funds' annual audits performed by independent accounting firms, which listed both the RAPS valuation calculations provided by Bizri and the mark-to-market equivalent of the portfolio's holdings. Complete balance sheets and income statements were also provided to all investors. Further, PowerPoint and other marketing presentations were routinely distributed to all investors that disclosed trade examples and trading strategies and concepts of the hedge funds of Integral Investment Management, L.P. Even short one page summaries such as Exhibit 4 disclosed the types of investments the hedge funds were in.**

**The following is a non-exhaustive list of documents and reports relative to disclosure of Funds holdings which were furnished by Integral to investors.**

7

A.    Exhibit 7, a June 29, 2000 e-mail, shows how Kennedy Capital Advisers (KCA) asked for and received snapshots of the portfolio and examples of trade positions that had been forwarded to Integral by Bizri. Integral had no access to such actual positions until 2001, when actual portfolios were sent to KCA by Integral, which now had direct access to them.

B.    Exhibit 8, a document first sent to KCA in August 1999, shows the Fund structure and explains the IRS classification of swap contracts.

C.    In 1998 investors were informed in a RAPS marketing brochure, Exhibit 9, that RAPS were "synthetic hedges" which behaved like a "synthetic option."

D.    Exhibit 10 is a marketing document prepared by Bizri showing currency and debt trade structures, as well as equity index trades.

E.    KCA arranged a meeting with its client, who it was the "agent" for, which was the Art Institute of Chicago (AIC), in February 2001. Prior to this first meeting with the Board of Finance of the AIC Integral provided the following marketing documents: (1) a detailed Equity Trade PowerPoint of the trading strategy and (2) Equity Trade Example. Exhibit 11 describes how the proposed materials were to be presented to AIC in the first ever meeting with the AIC Board of Finance on February 22, 2001.

G.    Exhibit 12 contains marketing documents which were prepared by Bizri and Dickey and distributed to KCA. There is an Equity Portfolio Examples sheet and an Index Portfolio Examples sheet, of the type referenced in Exhibit 7. These documents show combination position examples for the RAPS strategy, both on an equity index and on individual equities.

CS 000759

H.     These documents are similar to the many sent out in response to a June 29, 2000 request from KCA for an old holdings sheet (Exhibits 7 and 13).

I.     In November 2001, the first ever marketing document and PowerPoint for Integral Arbitrage, L.P. was prepared. It was sent to KCA and all Integral Arbitrage, L.P. investors. The document included distressed debt investments and was updated through October 2001. The new investments made in the 4th quarter of 2001 were all approved by the Funds' legal counsel, were all in accordance with the Funds' Offering Memoranda, and were immediately disclosed to investors. (See Exhibit 14.)

Exhibit 14 lists the principals, the vendors, Fund performance summaries with monthly results and statistics, and the Fund trading methodologies. Note, as explained above, how James Dickey is not a Founder but within a few months of inception of the Funds became President of Integral Management, L.L.C. Investments in the equity and equity option markets, private equity markets, foreign exchange markets, distressed debt, and convertible debt sectors of the investment industry are all discussed. Furthermore, this Integral Arbitrage, L.P. PowerPoint was created and released to investors immediately after the new investments were made. This demonstrates how the assets were invested as represented.

J.     On October 27, 2001, Bizri, at Integral's insistence, prepared a special presentation containing actual trades and portfolios and accounts, together with errors that had occurred in the Morgan Stanley accounts, for distribution to investors. See Exhibit 15.

K.     Exhibit 16, dated August 28, 2000, shows a complete package of "Statements of Positions and Trades, Statement of Assets and Liabilities, and

9

Statement of Changes in Net Assets" which was sent to investors. Actual portfolio positions are included, down to trade execution prices, dates, and commissions charged per trade.

L.      Furthermore, a letter dated August 30, 2000, Exhibit 17, was sent to the same investors disclosing the internal legal structure of ownership of the accounts executing the transactions.

M.      Lastly, the company policy regarding trade disclosure is illustrated in Exhibit 18, a December 18, 2000 e-mail from D. Michael Adams, one of the outside marketing agents for Integral. It explains how Integral provides transparency "equal to the standards of the industry and the requests of our prospects."

10.     From at least July 1998 through at least October 23, 2001, Seghers and Dickey solicited high net worth investors and other investment funds in the United States and abroad to invest in the Funds. Moreover, Dickey was involved in negotiations between the Funds and investors regarding certain conditions with respect to their investments. Seghers and Dickey met potential investors by attending conferences, mining personal contacts, and through Internet websites on which Integral reported its performance.

Defendant's Response 10:  Incomplete and inaccurate. Defendants Seghers and Dickey solicited high net worth investors and other investment funds both in the United States and abroad to invest in the Funds and Integral Hedging Offshore, Ltd. These were hedge funds with full investor disclosure and five different law firms actively working for them, together with administrators and accountants valuing all positions in an investment situation.

The allegation that Seghers and Dickey met potential investors through Internet websites on which Integral reported the Funds' performance is

10

CS 000761

false.   The website, created with the advice of counsel, conformed with SEC no-action rulings, as described in the accompanying memorandum of law. (See response to statement 11.)  Not a single investor ever learned of Integral Investment Management, L.P. through the website.

11.    In mid-2000, Dickey and Seghers created an Internet website called integralinv.com to further their marketing efforts.  Seghers and Dickey publicly offered limited partnership interests in the Funds through this website.

**Defendant's Response 11: False.  The website was not created to publicly offer limited partnership interests in the Funds.  The website was created to serve the needs of current investors.  The site was password protected to prevent anyone not meeting the tests of a qualified or accredited investor, or anyone who had not been pre-qualified by Integral and previously issued a password, from obtaining any detailed information on the funds.  There is no record of any investor or prospective investor ever investing in the Funds as a result of entering the website.**

**The website was carefully constructed with the supervision of two different law firms, Creel, Sussman and Moore, L.L.P., and Tannenbaum, Helpern, Syracuse, and Hirschtritt, L.L.P.  In mid-2000, at the request of Kennedy Capital Advisers, Inc. ("KCA"), Integral created the website integralinv.com. Exhibit 19 shows KCA not only creating all of the marketing materials for Integral and the Funds, but also making specific materials for The Art Institute of Chicago ("AIC"), KCA's largest client.  Exhibit 19 shows KCA's two PowerPoint Presentations – one for AIC, one to change the IIM image.**

**The changes KCA suggested concerned name changes, investment strategy changes, and marketing document changes.  KCA also urged Integral Investment Management, L.P. to change its business practices and stated "it**

11

CS 000762

is best to err on the side of secrecy." All future disclosures to AIC were handled by KCA.

Exhibit 20 is one of the PowerPoint presentations referenced in Exhibit 19. KCA urges Integral to create a website for its clients and future clients such as AIC. However, it is not true that Integral publicly offered limited partnership interests in the funds through this website. In fact, Integral specifically requested verification from counsel that the website did not violate rules about public solicitation. Virtually all of KCA's suggestions for Integral and the Funds were implemented, most notably the name changes, website, and corporate image.

Exhibit 21 is an e-mail requesting verification that the new website complied with all guidelines. Exhibit 22, dated November 16, 2001, shows the procedure used when edits to the website were made, including how updated legal assurance was again sought. Exhibit 23, a March 29, 2002 e-mail, shows how employees of Integral maintained the website and how all information on it was accurate including performance numbers calculated by Olympia Capital Associates, L.P., which were posted for the convenience of existing Fund investors. No new investors were ever obtained through the Integral website.

Exhibit 24 is an e-mail dated June 29, 2000, titled "Corporate Image," from KCA with its overview and suggestions for budgeting and changes KCA deemed necessary for Integral to make.

12.    In late 1998, Seghers began transferring the Funds' assets to Bizri for investment. Bizri was to invest the assets pursuant to a hedging strategy that he had purportedly developed. In June 1999, Bizri opened an account under the name "Galileo Fund" at a broker-dealer in order to invest the Funds' assets. Bizri was primarily responsible for

12

CS 000763

trading this account. By June 2000, Seghers had transferred the vast majority of the Funds' assets to the Galileo Fund's account at Morgan Stanley.

**Defendant's Response 12: Inaccurate and incorrect. In 1999, Integral began transferring the Funds' assets to Bizri Capital Partners' (BCP's) Galileo Fund, L.P. for investment. BCP was to invest the assets under a hedging strategy that Bizri had developed. In June 1999, Bizri opened an account under the name "Galileo Fund, L.P." at Morgan Stanley in order to invest the Funds' assets. Bizri was solely responsible for trading this account. Bizri had sole access to this account, except for monthly three page summary statements he allowed Morgan Stanley to send to the Funds. By June 2000, Integral had transferred the vast majority of the Funds' assets to the Galileo Fund, L.P. account at Morgan Stanley.**

**However, plaintiff, by this statement and statements in the remainder of this section, and without alleging or citing to any supportive or credible evidence, is attempting to create the inference that the defendants made material misrepresentations to investors and fraudulently overvalued investors' interests in the funds. The inference and allegation is false. Plaintiff has not claimed and cannot claim with supportive and credible evidence that defendants made material misrepresentations to investors and fraudulently overvalued investors' interests in the funds.**

**The Morgan Stanley account was utilized solely for the execution of the RAPS agreement that had been approved by Ron Sussman, Esq., legal counsel for the Funds. Further, the valuation method used by Bizri for the "Swap contract" was reviewed by several "Big 5" accounting firms as follows:**

**A.      Exhibit 25 shows an August 3, 2000 e-mail from the senior partner at Ernst & Young detailing how the RAPS Agreement would work and be valued. Notice that simply using lines 1, 9, and 18 one can show a full**

13

description of the valuation methodology Bizri utilized, and which Ernst & Young had approved. Within the RAPS amortized valuation strategy, Ernst & Young actually shows two different valuation methodologies that can exist.

The most important item to notice in this Exhibit is that after 18 months both the amortized value and the mark-to-market values are equal, with only minor differences in the interim, while allowing the investors to achieve long term capital gains.

B.      In Exhibit 26, on August 28, 2000, Price Waterhouse Coopers explains the validity of the amortization method of valuation employed by Bizri. However, they explained the utilization of the amortization method of accounting would lead to an "except for" disclosure in the Offering Memoranda and in the audits. This agreement was obtained through the Subscription Documents. Price Waterhouse Coopers lists several different accounting treatments that are all acceptable to the Big 5 accounting community.

Deloitte & Touche, another "Big 5" accounting firm, actually audited Bizri and Galileo Fund, L.P. as part of the Funds' audits for 2000. In their audits, Deloitte & Touche reviewed the accounting methodology and listed the minuscule differences in valuations that the RAPS valuation methodology created. For example, for Integral Arbitrage, L.P. ("IA") a difference of $92,000 on $11,989,000 is noted (less than 1%); for Integral Equity, L.P. ("IE") a difference of $79,000 on assets of $10,472,000 is noted (again less than 1%); and for Integral Hedging, L.P. ("IH") a difference of $315,000 on assets of $37,660,000 would have been noted. All of these differences are less than 1%.

14

E.    Exhibit 27 is the IA Audit Opinion Letter by Deloitte & Touche, which shows that the RAPS valuation methodology utilized by Bizri and by Galileo Fund, L.P. decreased the actual value by $92,000.

F.    Exhibit 28 is the IE audit Opinion Letter by Deloitte & Touche, which shows that the RAPS valuation methodology utilized by Bizri and by Galileo Fund, L.P. decreased the actual value by $79,000.

G.    Exhibit 29 shows the IH Audit Opinion Letter, which shows that the RAPS valuation methodology utilized by Galileo Fund, L.P. decreased the IH actual value by $315,000.

H.    Finally, Exhibit 30 is the IHO Audit Opinion Letter by Deloitte & Touche which shows that the RAPS valuation methodology decreased the actual value by $374,000.

Exhibits 27, 28,  29, and 30, respectively for IA, IE, IH, and IHO, are the opinion letters and statements of the December 31, 2000 audit itself, performed by the international accounting firm of Deloitte & Touche.

For all three of the domestic hedge funds the difference between RAPS and mark-to-market values was less than 1%.  Most significantly, in all four of the hedge funds the RAPS value was actually lower than the mark-to-market value.  This means that it would have been financially more beneficial to have been using mark-to-market valuations, as increased fees and charges on profits and management fees (calculated as a percentage of assets) would have been earned.

For December 31, 2000 the RAPS valuations utilized by Bizri led to total of $172,000 less in 2000 Total Asset Allocation Fees for 2002 – or $860,000 in total assets less in value multiplied by 20%.   Therefore, Integral earned

15

CS 000766

significantly less fees in the year ended December 31, 2000 due to using the RAPS valuation methodology as was required in the legal contract approved by their attorney Ron Sussman.

Finally, in addition to having an independent administrator (Olympia Capital Associates, L.P.) handle all of the assets, and independent "Big 5" accounting firms perform audits, Integral had accounting "reviews" and opinion letters written up as well.

I.      Exhibit 31 is a June 10, 1999 accounting review.

J.      Exhibit 32 is an October 22, 1999 accounting review of the valuations and returns of the Funds.

In summary, the Defendants' documents evidence several notable conclusions:

- RAPS had the blessings of "Big 5" firms.

- The RAPS' amortization valuation methodology was audited and/ or approved by three different "Big 5" accounting firms.

- RAPS resulted in lower not higher valuations.

- The 2000 audits show that all values were correct as of 12/31/00.

- The cumulative difference between the RAPS values and the mark-to-market values was $860,000.   If mark-to-market valuations were used, an additional $8,600 in management fees

16

CS 000767

(1% of assets) and $172,000 in performance fees (20% of profits)
would have been achieved.


13.    In June 2000, Seghers hired a fund administrator  From June 2000 through
September 2001, Seghers provided Olympia Capital Associates, L.P. ("Olympia") with the
purported values of the Funds' holdings in the Galileo Fund.  Olympia did not verify the values
provided by Seghers for the Galileo Fund and explicitly disclosed to investors that it had not
verified the values which it provided to investors.


**Defendant's Response 13:    False.    Exhibit 33 is an e-mail from Priscilla
Murray Brown dated August 2, 2000.  It contains the executed and attached
copy of the Agency and Administration Agreement (Exhibit 3.)  Exhibit 3
states in the pertinent part that Olympia Capital International, Inc., and its
subsidiary Olympia Capital Associates, L.P.:**

> [were  appointed by the Funds as] Agent and Administrator to act as
> their agent and to supervise, to arrange for or to provide the Funds
> with administrative and other services ... [establish] and [maintain]
> ... bank, brokerage, custodian and other accounts as may be
> necessary or advisable; supervis[e] registrar and transfer agent
> services, the processing of the acceptance of subscription agreements,
> processing of the acceptance of capital contributions and collecting
> payments for interests in the respective Limited Partnerships;
> disbursing payments in connection with the withdrawal of limited
> partners' interests ... distribution of annual, monthly and other
> periodic reports to the investors ... preparing and maintaining ...
> financial and accounting books and records ... communicating with
> investors and prospective investors, and members of the general
> public and distributing the respective Funds' Memoranda and
> marketing materials; <u>calculating the net asset value of each Fund in
> accordance with its then-current Memorandum</u> ... (emphasis added)

17

CS 000768



... reviewing statements provided by the Fund's investment advisors with respect to payments due or withdrawals by investment advisors, and confirmation to such investment advisor and/or custodian(s) of the respective Fund's assets that such payments or withdrawals are in conformity with applicable Documents.

[The agreement expressly provided that] the Funds' <u>net asset valuations for Fund assets invested in the Galileo Fund, L.P. shall be provided to the Agent and Administrator by the General Partner of such fund and the Agent and Administrator shall be entitled to rely on such valuation information with no obligation to independently verify or investigate such.</u> (Emphasis added.)

<u>Seghers did not provide the administrator with the values of the Funds' holdings in the Galileo Fund, L.P.</u> Final valuations for the Galileo Fund, L.P. account and/or the holdings of this account and/or the investment contract the Funds had with Galileo Fund, L.P. were provided to Olympia Capital by Bizri. Seghers only provided the administrator with estimates of the values of the Galileo Fund, L.P. holdings, and with valuations from certain other outside parties to which Integral had access. Integral simply forwarded valuations calculated by Bizri of Galileo Fund, L.P. to Olympia Capital. Olympia Capital did request that certain information regarding cash flows and investor contributions and redemptions be sent to them in a specified format, which Integral did. This was not a valuation but simply a breakdown of values given by Sam Bizri and Bizri Capital Partners, Inc. and other independent parties. The estimates provided to Olympia Capital were not used as final valuation.

BCP calculated the values for Galileo Fund, L.P., as seen in Exhibit 34, while Olympia Capital calculated the Funds' values by also consulting directly with the auditors. See Exhibit 35.

18

CS 000769

As previously stated herein, Seghers did not provide values to Olympia Capital for Galileo Fund, L.P.'s holdings. Olympia Capital, as expressed in the Agency and Administration Agreement (Exhibit 3), was responsible for calculating and verifying all values, with the exception of Galileo Fund, L.P. Virtually all other accounting functions were performed by Olympia Capital, outside of the valuations of GF to which neither Integral nor Olympia Capital had access to the necessary information. This is shown in Exhibit 36, which is an August 9, 2000 e-mail from Olympia Capital to Integral explaining accounting "reconciliation" and "Balance Sheet" and "Shareholder Summary." It states "Enclosed is our July 31, valuation for Integral Hedging Offshore, Ltd. which does contain some differences from the data you sent me." Exhibit 37 is another August 9, 2000 e-mail from Olympia Capital to Integral detailing the "Shareholder Summary" Olympia Capital was providing.

Olympia Capital created and calculated all valuation files and worksheets, as shown in Exhibit 38, dated January 12, 2001, wherein Olympia Capital is sending Integral all such files on each Fund.

Olympia Capital also created and distributed marketing documents of the Funds. Exhibit 39 is an Olympia Capital e-mail dated November 30, 2000 showing how Olympia Capital prepared and distributed marketing documents for the Funds to investors.

Exhibit 40, an e-mail from Olympia Capital dated July 31, 2001, shows that Olympia Capital was also responsible for distributing all legal documentation to investors.

Exhibit 41, a letter from Olympia Capital dated September 4, 2001, shows Olympia Capital writing AIC to let them know that the AIC Pension had invested $2.5 million in IA on September 1, 2001.

19



Exhibit 42, dated October 16, 2000 from Olympia Capital to Integral, contains account statements for the month and quarter ending September 30, 2000. The e-mail states that investor statements had already been sent out by mail, together with a quarterly report updating investors on events of the Funds. The attached letter from Olympia Capital to Mr. Stillwater verifies that Olympia Capital had seen all underlying positions and independently valued the assets.

Olympia Capital also distributed all legal documentation to the investors on a regular basis, as shown in Exhibit 43.

Exhibit 44 is a letter dated July 18, 2000 showing Olympia Capital distributing audits to all investors.

KCA and AIC communicated directly by telephone and e-mail with Olympia Capital about values and valuation methodologies, with KCA insisting that Olympia Capital provide details of each account, as shown in Exhibit 45.

Exhibit 46 is a June 26, 2001 letter from Olympia Capital to an investor detailing the holdings and cash accounts and cash transactions for IHO. The Exhibit demonstrates full disclosure to the investor.

Exhibit 47 states that Olympia Capital was holding the funds' money hostage and paralyzing the company. Olympia Capital also incorrectly and falsely informed an investor who requested a redemption of IA assets, starting in November 2001 that "All activity in the fund (IA) is suspended until further notice." (See also Exhibit 48.)

14.    Olympia used the Galileo Fund values provided by Seghers in determining each investor's ownership percentage of the Fund, each investor's share of expenses and net profits

CS 000771

or losses, and the amounts of any investor redemptions. Olympia also used the values in reporting to the Funds' investors. Specifically, Olympia sent the Funds' investors monthly and quarterly statements showing the purported value of, and the net earnings or losses from, their Fund investments.

> **Defendant's Response 14: False. Galileo Fund values, as previously stated herein, were not provided to Olympia by Seghers other than his forwarding such values of Bizri to Olympia. Seghers was not able to provide such calculations for the reasons described herein. Olympia used the Galileo Fund values provided by Bizri to determine the Funds' values, each investor's ownership percentage of the Fund, each investor's share of expenses and net profits or losses, and the amounts of any investor redemptions.**

> **Exhibit 49 is an Olympia Capital e-mail dated October 24, 2001 about Olympia Capital determining final values for 9/30/01 and demonstrating how it was all done through their legal counsel.**

> **Olympia Capital had full access to all positions in all accounts. This included Galileo Fund Offshore, L.P. as early as 2000, when Olympia became the Administrator (see Exhibit 3) and Galileo Fund, L.P. when it became available to Integral in June and July of 2001. Olympia Capital had the responsibility and legal duty as per the executed Agency and Administration Agreement to value all positions in the Funds, which Integral is extremely confident that it did. Olympia Capital appears to be taking the incorrect and false stance that it never valued assets despite its having all information and the legal duty to do so.**

> **Olympia is also taking the incorrect and false stance that emails from Bizri, forwarded on to Olympia by Seghers, constitutes Seghers valuing assets that he did not even know the constituents of, let alone the numbers for. Evidence**

21

CS 000772

that Olympia Capital had such access to the valuations is shown in Exhibit 50, an e-mail to an investor dated December 13, 2000 disclosing that Olympia Capital had full access to all positions and underlying investment positions.

Olympia Capital is shown in Exhibit 51, a July 13, 2000 letter to KCA, to give laudatory remarks about Integral and Seghers to KCA and other prospective clients. The Principal of Olympia Capital is quoted as saying, "I can also tell you that Conrad is a pleasure to work with and is very hands-on. He seems to have heart and soul enveloped in his business, and works very hard."

Olympia Capital, in summary, had responsibility for all investor communications issues, including calculating all values independently and issuing investor statements using those independently calculated values.

15.    From June through November 2000, Bizri held over 90% of the Funds' assets in the Galileo Fund's account at Morgan Stanley in cash or money market funds. There were no trades in this account from June 2000 until November 2000. On a monthly basis, from June through November 2000, Seghers caused Olympia to overstate to investors the value of their investments in the Funds by as much as approximately $8.5 million, or 38%:

| Statement Date | Funds' Asset Value Reported By Seghers To Investors | Funds' Asset Value Calculated Using Reports By Brokers And Banks To Seghers | Amount Seghers Overstated To Investors | Percent Over-Stated |
|---|---|---|---|---|
| 6/30/00 | $30,803,908.74 | $22,334,733.83 | $8,469,174.91 | 38% |
| 7/31/00 | $35,798,145.28 | $30,589,132.96 | $5,209,012.32 | 17% |
| 8/31/00 | $39,571,680.37 | $34,252,256.61 | $5,319,423.76 | 16% |
| 9/30/00 | $39,324,430.97 | $33,953,941.26 | $5,370,489.71 | 16% |
| 10/31/00 | $35,680,662.52 | $29,885,476.69 | $5,795,185.83 | 19% |
| 11/30/00 | $46,448,585.52 | $41,041,764.30 | $5,406,821.22 | 13% |

22

**Defendant's Response 15:** Inaccurate and misleading. Assuming that from June through November 2000, Bizri held over 90% of the Funds' assets in the Galileo Fund's account in cash or money market funds, it is entirely conceivable that for the five month period, June to November 2000, there were no trades in this account. The Galileo Fund, L.P. as described herein and so demonstrated in statements and marketing materials to Integral by Bizri, invested in forward and futures transactions. These transactions often mature at intervals up to eighteen months or more in duration. Consequently, defendant does not believe that any inactivity necessarily indicates improper investment of funds by Galileo Fund, L.P., but may reflect the interval between investment and maturity as well as reflect the fact that trades were performed solely by Bizri, and that Integral assets were held by Bizri in places other than at Morgan Stanley. Furthermore, large portions of Integral assets were in the name of Bizri Capital Partners, Inc., initially and especially in 2000 before Integral insisted that Galileo Fund, L.P. be created so as to separate the assets and begin the creation of a "master feeder" fund. This issue of inactivity was never raised by any documents sent to Integral. Additionally, this issue of inactivity was never raised by Deloitte & Touche, L.L.P., which audited the Funds, or Olympia Capital and OCI, which tracked and reported on the Funds as Integral's Administrator and agents.

Seghers was also not involved with the valuation of the Funds, nor was Integral or Integral Management, L.L.C. Additionally, the values of investments were not overstated to investors at any time during this period. Valuations were provided by outside parties and compiled by Olympia Capital Associates, L.P. ("Olympia Capital"), in accordance with the terms of the various investment contracts and audited by Deloitte & Touche, L.L.P.

23

CS 000774

Neither Seghers nor Integral caused the administrator to overstate to investors the value of their investments in the Funds. It is believed even today that all valuations were correct.

In fact, valuations of the Funds were regularly audited and reviewed by accounting and auditing firms, as well as by the independent Administrator on a monthly basis. (See the Whitley Penn independent valuation letters for 1999 appended to the Seghers background affidavit, the Olympia monthly valuation reports appended hereto, and the Deloitte & Touche audit of the Funds for the year 2000, released in June 2001, Exhibits 27, 28 and 29.)

Audits were also performed by Deloitte & Touche, as previously discussed. Further, such audits were distributed to all investors by Olympia Capital, as seen in Exhibit 53.

Finally, concerning administration, Olympia Capital was the Administrator and saw all transactions and had access to all information Integral had available to it. In fact, on May 9, 2001 Morgan Stanley was still restricting information they sent to Integral and Olympia Capital, and yet small errors were being noticed by Olympia Capital anyway.

In summary, Olympia Capital had access to all of the information Integral had access to, as did their in-house legal counsel, Priscilla Brown, who was kept abreast of all valuation activities and Morgan Stanley events.

The following is Seghers' analysis of the chart set forth in plaintiff's statement 15:

The values for Galileo Fund, L.P. were calculated by Sam Bizri and sent to both Integral and Olympia. The methods of calculation of the above values in the chart, for each of the columns for the months from June to November

24

of 2000 in the Table above, are identical, where a rough version of Fund valuations is calculated by simply summing up asset values given by outside sources, and after being compiled by Integral to generate an estimate that estimate was sent to Olympia. The final and actual value of the Funds was compiled by Olympia Capital in a process taking as long as 30 days.

The "Fund Asset Value Reported by Seghers to Investors" was not "Reported by Seghers to Investors" and was also not calculated by Seghers. These values were not overstated to investors, and if overstated, were not done so by Seghers but by Olympia Capital. Furthermore, all reporting of asset values and account values to the investors was done by Olympia Capital. The column "Amount Seghers Overstated to Investors" is incorrectly labeled and it is falsely alleged that those amounts were overstated by Seghers. Once again, assets were not overstated and Seghers did not state them, but rather Olympia Capital calculated them and also stated them. The column labeled "Funds' Asset Value Calculated Using Reports By Brokers and Banks to Seghers" is again falsely labeled since neither Seghers nor Integral received all of the reports from brokers and banks, as many of these reports were sent directly to Olympia Capital, solely to Olympia Capital, and in fact were held at accounts such as State Street that Integral did not even control in any way. Furthermore, the column labeled "Funds' Asset Value Calculated Using Reports By Brokers and Banks to Seghers" is not relevant to valuations as the contracts for these investments prohibited them from being valued in this manner.

The only column having significance therefore is the one titled "Funds' Asset Value Reported by Seghers to Investors." Seghers did not report asset values to investors after June 1, 2000, when Olympia Capital became the administrator for the Funds, nor did Integral. However, the Funds' asset values reported to investors prior to June 1, 2000 were. Interestingly, the

25

SEC does not make any allegations of improper valuations for any time period prior to Olympia Capital becoming the administrator.

A.    June 30, 2000 - Taking the first value, for June 30, 2000, Exhibit 54, dated July 7, 2000, shows that the values were actually sent by Bizri, with no statements backing up these values being sent or required until completion of the year-end auditing process. This practice is standard and typical in the hedge fund industry. These values were inserted into the file named Position Tracker by Integral which is shown for June 30, 2000 in Exhibit 55. Please note that Bizri's values of $5,355,712.33 for "BCP Accounts," $16,475,826.49 for "Galileo," and $3,303.00 for "Sum-It" in this Exhibit came directly, down to the penny, from Bizri in the previous Exhibit. The total assets for the Funds, taken directly from this Exhibit and calculated roughly by Integral in this spreadsheet that simply sums up various figures, is $31,053,474, a number which differs insubstantially from the actual and final value calculated by Olympia Capital of $30,803,908.74 and seen in the SEC Table above.

The number in the Table above for June 30, 2000 of $22,334,733.83 cannot be verified or denied by Integral as such statements were not and are presently not available to Integral. However, such statements have been shown previously by Morgan Stanley to have been in error many times. In addition to the errors found in the statements furnished by Morgan Stanley, such valuation is not permitted by the investment agreement, does not comply with legally agreed upon valuation methods for the Funds, and is thus irrelevant for purpose of valuing the holdings in the Funds. Furthermore, most likely not all assets belonging to Integral are included in the various accounts being referenced and totaled, which includes more assets and accounts than simply the Funds and Galileo Fund, L.P.

26

CS 000777

**B.     July 31, 2000 -** Exhibit 56 shows an e-mail from Morgan Stanley to Seghers, dated August 3, 2000 and carbon copied to Bizri, and sent upon Bizri's instructions to Morgan Stanley due to the request of such information by Seghers of Bizri.  Exhibit 56 shows amounts and assets sent via wire transfer by the Funds to Galileo Fund, L.P. ("GF") and Galileo Fund Offshore, L.P. ("GFO") had in fact been received at Morgan Stanley. It lists all credits and debits to the accounts during July 2000.   Not how all of the accounts receive dividends and are thus invested in some manner, such as in Treasury bills or money market funds, and not simply in cash.   Only the account of GF receives dividends on equities, which does prove that the account is invested in Coca Cola as well as Compaq and most likely numerous other securities, apparently contrary to the SEC assertion of not being invested at all.  Exhibit 57 shows the values given by Bizri for GF, IH, IA, and the BCP Accounts for July 31, 2000.  These values given by Bizri of $3,187,043.22 for IH, IA (Sum-It) of $279,735.59 minus as Bizri explains "a deposit 7/31 276,416.50" leaving $$3,319.09, Galileo $16,571,406.67 and BCP Accounts $6,294,553.64 ALL fit down to the penny directly into Exhibit 58, which is the Position Tracker file for July 31, 2000.  Therefore Bizri calculated ALL values for the Funds of assets not held directly by the Funds or under the custody of Olympia Capital, and the totals were simply added together and added to bank accounts the Funds controlled to arrive at the Funds' total values.  Finally, Olympia Capital actually did the calculation of Fund values as is seen in Exhibit 59, dated August 10, 2000.  Exhibit 59 also includes Olympia Capital sending the IHLP073100.xls file containing all of the limited partner names and addresses and tax identification numbers and values, as calculated and distributed by Olympia Capital to the investors in the form of monthly investor statements.

27

CS 000778

C.    The next Fund Asset Value to be proven in the SEC Table is that for August 31, 2000. Exhibit 60 shows Bizri stating that the value is equal to that of 7/31/00 plus $491,755.86. This number is equal to the sums of the differences in values in Exhibit 61, which is the 8/31/00 Position Tracker File. In other words, cumulatively, out of the four component accounts at Morgan Stanley in the names of IA, IH, BCP, and GF, the 8/31/00 value is equal to that of the 7/31/00 value plus $491,755.86. Bizri explains on September 11, 2000 that the reason he cannot break down the numbers further is due "I cannot access the accounts online" combined with "I don't have the monthly statements yet." These issues of Bizri are explained in Exhibit 62 to Olympia Capital, dated September 13, 2000, which shows the values for IH and IA in Galileo Fund, L.P., based on Bizri's valuation, and even explains how from those two numbers all other values in the Position Tracker file can be derived. Note how the Funds' Asset Value calculated in the Position Tracker file is equal to $39,916,107.20, a number not very different from the value Olympia Capital calculated, which is the final figure referred to in the SEC Table above —$39,571,680.37. Note the statement, "A letter with the correct value for the IH account at MSDWD will be faxed to you." In other words, the statements at Morgan Stanley were incorrect even in 2000, although easy to remedy and a letter documenting this fact would be sent out.

Note how despite the statements being incorrect even in 2000 the audits by Deloitte and Touche were performed and the administrator continued to calculate valuations for the Funds each month, as brokerage account statements can be recreated by hand if one knows all of the transactions in any given month that occurred.

CS 000779

D.    The next Fund Asset Value to be proven in the SEC Table is that for September 30, 2000.  Exhibit 63, titled Fwd:FW: 9/30/00 Account Values, shows that Bizri has reported the value of GF at $17,507,311.72.  Integral did not have access to the accounts of IA and IH at Morgan Stanley, and those values were therefore also reported by Bizri.  From this value, Exhibit 64, which is the 9/30/00 Position Tracker File, was created.  These issues are explained in Exhibit 63 to Olympia Capital, titled Fwd:FW: 9/30/00 Account Values, which shows the values for IH and IA in Galileo Fund, L.P., based on Bizri's valuation.  Note the Funds' Asset Value calculated in the Position Tracker file is equal to $39,353,452.59, a number only slightly different from the final value calculated by Olympia Capital and referred to in the SEC Table -- $39,324,430.97.  Once again, the Olympia Capital value that takes much longer to calculate and is calculated independently by Olympia Capital is the final and correct value.

E.    The next Fund Asset Value shown in the SEC Table is that for October 31, 2000.  Exhibit 65 shows that Bizri on November 2, 2000 reported the value of the BCP account at $6,485,959.73.  From this and other BCP values, Exhibit 66, which is the 10/31/00 Position Tracker File, was created.  Note how only the BCP value is given as most likely only this account is invested, although such information is not known even today to Integral and earlier it has been shown that all accounts were receiving dividend payments monthly.  The Funds' Asset Value calculated in the Position Tracker file is equal to $35,652,460.45, a number not different from the value Olympia Capital calculated—$35,680,662.52 which is the final figure also referred to in the SEC Table.  Exhibit 67 shows a cleaner version of the Position Tracker file that was actually sent to Olympia Capital.

29

F.     The last number in the SEC Table above is the final values calculated by Olympia Capital for the three Funds on November 30, 2000 — $10,408,834.52 for IE, $24,699,085.45 for IH, and $11,340,665.55 for IA.   The total of these three values is $46,448,585.52, as is listed in the SEC Table but incorrectly labeled as "Funds' Asset Value Reported by Seghers to Investors." The values given by Bizri for November 30, 2000, found in Exhibit 68, are $23,603,553.08 for the BCP and Galileo Fund, L.P. Accounts combined, which value equals that for Galileo Fund, L.P., $1,757,715.48 + $8,918.60 profit for IH (or $1,766,634.08). These values are placed directly, down to the penny, in the "Position Tracker" file of Integral which is attached for November 30, 2000 as Exhibit 69. Simple addition gives a total rough estimate for the Funds as calculated by Integral on November 30, 2000 of $46,501,638.19, — only $53,000 greater than the final value calculated by Olympia Capital. Furthermore, even listings of Assets Under Management, as shown in the December 8, 2000 e-mail under Exhibit 70, come directly from the Position Tracker file which comes directly from values given by Bizri.

Information on the accounts of Galileo Fund, L.P. was not available to Integral at all, unless provided by Bizri or through Bizri's authorization. Exhibit 71 shows how on July 6, 2001, when Integral had discovered more serious errors than cash flows and incorrect statements, information on actual trades and positions in the accounts from Morgan Stanley had to come through Bizri.

Finally, Exhibit 72, titled "Letter to Tony" and dated September 4, 2001 from Britt Bowers, is proof that the only information Integral itself calculated and compiled was the list of investors entering the Funds and investments made by the Funds at the first of the month, together with a

30

Position Tracker file that Olympia Capital did not rely on but insisted in the terms of the Operations Procedures (Exhibit 73) that it receive. The Position Tracker file has been shown to not contain final values, to be only estimates that were required that Integral submit to Olympia Capital, and to contain numbers that came directly from Bizri.

Exhibit 73, dated June 12, 2000 and titled Operations Procedures, was sent to both the Funds and Morgan Stanley, with carbon copies going to several individuals including Principals at Olympia Capital. It lists requirements of Morgan Stanley communicating directly with Olympia Capital regarding trade confirmations and daily activity reports, and insists that "all necessary account opening forms be sent to Olympia Capital for execution." IIM, therefore, had no role relating to valuations, daily monitoring of the portfolios and trade reconciliations, all of which were handled between Olympia and Morgan Stanley. It states in the "Pricing of the Fund" section that the Funds must provide information such as exists in the "Position Tracker" files to Olympia Capital for Olympia Capital to utilize in independently calculating valuations.

Concerning accounting reviews, Exhibit 52 from Bulloch, Seger, Weaver and Co., P.L.L.C., dated August 13, 2001 states, "Our review of the records provided and e-mail communications from Morgan Stanley agents for the period February 1, 2001 through July 31, 2001 reflects many problems. A precise estimate is not obtainable without a full review of Integral's and Morgan Stanley's records. A low-side estimate of $10,000,000 is reasonably appropriate from our review."

16.    In January 2001, Bizri discovered what he believed to be significant errors by Morgan Stanley in the Galileo Fund's accounts. These errors included positions in the account at incorrect prices, unauthorized trades, duplicative trades and margin calculation errors.

31

CS 000782

**Defendant's Response 16:  Seghers does not know what Bizri "discovered" or when he discovered it.**

17.     At or before the end of March 2001, Bizri told Seghers that Morgan Stanley's errors in the Galileo Fund's account prevented him from valuing the account. Despite this knowledge, Seghers continued to provide purported values of the Funds' assets to Olympia, who then provided statements containing these values to investors. The statements to investors contained the following misrepresentations as to the value of their investments:

| State-Ment Date | Funds' Asset Value Reported By Seghers To Investors | Funds' Asset Value Calculated Using Reports By Brokers And Banks To Seghers | Actual Asset Value (Correcting For Broker's Errors) | Amount Seghers Overstated To Investors | Percent Over-stated |
|---|---|---|---|---|---|
| 3/31/01 | $69,837,817.94 | $60,039,724.55 | $47,234,137.05 | $22.603,680.89 | 48% |
| 4/30/01 | $69,181,990.53 | $57,164,081.70 | $47,499,831.70 | $21,682,158.83 | 46% |
| 5/31/01 | $71,555,919.52 | $38,948,100.82 | $48,103,600.82 | $23,452,318.70 | 49% |
| 6/30/01 | $70,886,740.54 | $41,303,631.85 | $50,780,381.85 | $20,106,358.69 | 40% |

**Defendant's Response 17:  False.  Clearly this is not the case as Bizri was still valuing the account as of June 11, as indicated in his e-mail titled, "Fwd: Your e-mail," as shown in Exhibit 85.  The June 11 e-mail clearly shows that Bizri was capable of doing the valuation regardless of whether or not there were any errors in the account.**

**Seghers did not have the knowledge allegedly furnished by Bizri as it was never told to him, and regardless this information could not have been true (valuations can be derived regardless of the extent of errors in the account).**

**Exhibit 74 is a letter dated June 6, 2001 from Sonny Matharu at Morgan Stanley stating "The statement values for Integral Equity, Galileo Fund and**

32

Galileo Fund Offshore have been incorrect since February 2001, including most recently the statements for May 31, 2001. They have not accurately reflected the actual value of the accounts during any of those periods. We are making the necessary adjustments to reflect the values. Thank you for your patience."

Exhibit 74 has proven that ALL of the SEC entries in the column titled "Funds Asset Values Calculated Using Reports by Brokers and Banks to Seghers" are completely false for several reasons. First, Exhibit 74 states that "The statement values for Integral Equity, Galileo Fund and Galileo Fund Offshore have been incorrect since February 2001, including most recently the statements for May 31, 2001." With the above table covering the time period from March to June 2001, and with Exhibit 74 showing that all "Reports by Brokers and Banks" over this time period were inaccurate, these values cannot be true. These values also cannot be true as Seghers did not get a reporting of all statements values, as some of them such as State Street Bank (controlled solely and 100% by Olympia Capital) and Galileo Fund, L.P. (controlled solely and 100% by Bizri) could not be accessed by Integral. Further, even had the values on these reports been accurate they were not part of the valuation methodology of the RAPS contracts and therefore would not have affected valuations or the ability to perform valuations.

The valuations of the investment contracts reported by Bizri, as specified in the terms of their contracts, were never calculated using "Reports by Brokers and Banks to Seghers." Furthermore, Seghers, as previously established, did not receive the Morgan Stanley reports of Galileo Fund, L.P. Therefore, the column titled "Actual Asset Value" is also irrelevant to the valuations as such numbers would have been impossible to derive when statements, whether correct or incorrect, were not available to Seghers. These values are also irrelevant as such mark-to-market valuations were not the legally accepted valuation methodology used for such assets in order to

33

obtain long-term capital gains benefits for the limited partners. The only verification of values ever sent by Morgan Stanley is referenced in Exhibit 75, a July 2, 2001 e-mail from Morgan Stanley, showing the usual three-page account summary Integral requested directly from Morgan Stanley to verify that no theft or embezzlement of assets had occurred by Bizri. These summaries contained no positions or account transparency and were used solely to monitor cash inflows and outflows from the Galileo Fund, L.P. account. Since the account valuations submitted by Morgan Stanley were proven to be erroneous, the monitoring of cash inflows and outflows was the sole and only purpose for which these statements could be relied upon.

However, all assets held directly by the Funds were always calculated using mark-to-market valuations.

Exhibit 76, dated February 8, 2001, shows that Integral calculated an accounting of cash inflows and outflows, whereas Bizri calculated the valuations for Galileo Fund, L.P. Exhibit 76 was created by Integral due to Olympia Capital sending Integral Exhibit 77, an e-mail dated November 25, 2000, requesting information to be furnished in their preferred format.

The following is Defendant Seghers' analysis of the documents related to the valuation of the Funds:

A.    March 31, 2001 - The Funds' asset values reported by Seghers to investors on 3/31/01 were obtained from Bizri. Bizri's values for 3/31/01 are shown in Exhibit 78, entitled March Values and dated April 9, 2001, showing a value of $41,067,048.46 and a loss for the month of $389,694.34.

        This value is entered into the Position Tracker file for this period, Exhibit 79, and is used to derive the Position Tracker values for the Funds of $69,838,270.88 on March 31, 2001, or $69,838,084.44 if Misc. Accounting Debits are omitted from the calculation, which is different from the Olympia Capital calculated value of $69,837,817.94 for that date which is obtained by adding up the three Fund values from the

34

Olympia Capital files. Olympia Capital's values as always were the final values and were always accepted by the Funds.

B.    For the figures above on 4/30/01, of "Fund's Asset Value Reported by Seghers to Investors," these figures were reported by Bizri to Integral and Olympia Capital which reported them to investors. Bizri's values for 4/30/01 are seen on Exhibit 80, entitled Fwd: RAPS Values, and shows a value of $43,970,151.90. It is dated Friday May 11, 2001 at 00:30:59 PST. This e-mail was sent after Exhibit 81, dated May 10, 2001 and titled Fwd: RAPS Values, which stated that the value would be greater than $45 million. This value $43,970,151.90 is pasted into and thus part of Exhibit 82, sent May 11, 2001, which contained Exhibit 83, the Position Tracker file for this period. This was sent as an attachment to Olympia Capital listing the complete and only information ever sent to Olympia Capital by Integral for valuations, and therefore includes the monthly investments into the Fund and investments made by the Funds. Note the time of this e-mail of 10:38 a.m. on Friday, May 11, 2001, hours after arriving at work and finding the e-mail from Bizri entitled Fwd: RAPS Values with a value of $43,970,151.90. The value of $43,970,151.90 is used to derive the Position Tracker values for the Funds of $69,181,529.37 on April 30, 2001, or $69,137,945.21 if Misc. Accounting Debits are omitted from the calculation. These values are different from the Olympia Capital calculated value of $69,181,990.53 for that date which is obtained by adding up the three Fund values from the Olympia Capital files. Note, therefore, how even when adding in a number for Misc. Accounting Values, called a "plug," the values calculated by Integral are still slightly different from those calculated by Olympia Capital which are the final and real values for the Funds.

Exhibit 84, an e-mail from Integral to Olympia Capital dated April 25, 2001, summarizes the cash flows for April of 2001. Notice how complicated this process is due to the many investors, a process that was made much more complicated by Bizri's refusal to honor redemption requests. Note also the statement, "Margin calls and Morgan Stanley mess-ups with pricing and SMA values (ALL MARGIN CALCULATION PROBLEMS, not problems with cash balances and actual account values or incorrect statements, which were the extent of the problem known at the time to Integral) required it for people to be paid in time." In other words, redemptions could not be honored and Bizri was refusing to pay redemptions, blaming it on margin calls. The e-mail goes further to state in anger and frustration at Morgan Stanley, "We might be considering a lawsuit/arbitration against MSDWD." It is ironic that this statement would later turn out to be true for completely different reasons when it was learned that this was not simply a short-term

35

error in margin calculations preventing people "[from being]... paid on time."

Many of these assumptions had been learned on Seghers' trip to meet Morgan Stanley on April 17, 2001 in Los Angeles. Notice how immediately afterwards, in Exhibit 84, he is disclosing everything he has learned, and the many new items he has assumptions on, to Olympia Capital who is in charge of reporting to investors.

C.   For the figures above on 5/31/01 of "Fund's Asset Value Reported by Seghers to Investors," these figures were reported by Bizri to Integral and Olympia Capital. Olympia Capital then reported them to investors. Bizri's values for 5/31/01 are seen on Exhibit 85, titled "Your e-mail" and sent on June 11, 2001. This e-mail came after Exhibit 86, a June 8, 2001 e-mail that stated "44,360,837.98 Number subject to revision pending final Morgan Stanley corrections." This value was later changed by Bizri to $44,877,697.43 and pasted into and thus part of Exhibit 87, the Position Tracker file for this period. Exhibit 88 to Olympia Capital dated June 12, 2001 includes the monthly investments into the Fund and investments made by the Funds. Note the statement in this Exhibit to Olympia Capital on June 13, 2001 from Integral of "VERY IMPORTANT, I think the value of Integral Equity [as reported by Morgan Stanley] as usual is very messed up. The Galileo Fund, L.P. value [as reported by Morgan Stanley] has also been fluctuating wildly and we have been having margin issues due to this. We may thus have to revise values slightly. Yesterday Galileo Fund, L.P. gave us 3 different values depending on MS and margin calculations. We will be switching from Morgan very soon due to all these problems." Once again this Exhibit shows that Olympia Capital calculated all values, Integral provided simply investor inflows and outflows, and Morgan Stanley was beginning to have very serious errors. Note also the full disclosure of events to Olympia Capital, who already had direct contact with Morgan Stanley as shown in the Operations Procedures.

D.   The value of $44,877,697.43 is used to derive the Position Tracker values for the Funds of $71,555,922.66 on May 31, 2001, or $72,300,123.38 if Misc. Accounting Debits are omitted from the calculation. These values are different from the Olympia Capital calculated value of $71,555,919.52 for that date which is obtained by adding up the three Fund values from the Olympia Capital files GMNIFLP09301B, IHLP093001B, and SUMLP103101. Note, therefore, how substantially different from the final values calculated by Olympia Capital the Integral Position Tracker value of $72,300,123.38 is, before adding in a number for Misc. Accounting Values, called a "plug."

36

CS 000787



E.   For the June 30, 2001 valuation previous Exhibits have now shown that Integral had discovered that significant errors other than cash flow calculations had occurred at Morgan Stanley. Bizri sent three separate e-mails, Exhibit 89, on Friday July 6, 2001 containing the information necessary to calculate values that was otherwise unavailable to the Funds that had no access to Galileo Fund, L.P. other than through Bizri. These three emails were entitled 1) File attached, 2) Account Positions as of 6/28, and 3) Activity for 6/29/01. June 29, 2001 was a Friday and the last trading day of June 2001 and therefore from these three files Integral could calculate the RAPS values that Bizri was now refusing to calculate any longer, due to Integral's exposure of the errors at Morgan Stanley.

Integral thus calculated the RAPS value of $44,107,910.88 for June 30, 2001. This was the first time ever that Integral had had the information available to it to make this calculation, despite the legal contract the Funds were invested through. This led to a calculation of the Funds' value on June 30, 2001 of $70,886,748.34, versus $70,907,619.34 if the Integral numbers were not trued up to more closely match the calculations of Olympia Capital which also received all of the raw data for 6/30/01. The Funds' value for 6/30/01 of $70,886,740.54 is shown in the Table above.

Finally, Seghers did tell the Administrator that the losses attributable to Morgan Stanley were included in the values he provided Olympia, the Administrator. However, this was only for the single month of August 2001 and was discussed with Olympia Capital and their legal counsel, as well as with Marc LoPresti and Ron Sussman representing the Funds. This valuation of only $10 million was on the advice of our auditors, as shown in Exhibit 52, and when rejected due to a difference of opinion between Olympia Capital and the auditors in September 2001 it was no longer used as an asset of the Funds. This valuation, used by Olympia Capital on the advice of their counsel and the counsel of the Funds, and approved by outside independent auditing firms, had no bearing whatsoever on investor interests or new investments or redemptions as none occurred as of this valuation date, as no new investments were being solicited so as to not dilute the substantial profits to the Funds, particularly Integral Hedging, L.P., and its limited partners, that were still being anticipated from the Morgan Stanley

37

CS 000788

damages. As stated earlier, May 31, 2001 was the last valuation date on which new investments were made into Integral Hedging, L.P.

Nevertheless, in September 2001 Olympia Capital changed its mind on this valuation methodology and it was therefore omitted again. This is despite the auditors of the Funds having given approval in their August 13, 2001 letter (Exhibit 52). The true statement was and is that the losses attributable to the alleged broker-dealer errors were, to the best of Integral's knowledge, not included in the values Bizri had provided to Integral and the Administrator. If the losses were or were not included in the valuations provided, that would be entirely the responsibility of Bizri, not Seghers or Dickey.

18.     By the end of March 2001, Dickey was aware that there were errors in the Galileo Fund's account at Morgan Stanley that prevented Bizri from valuing the account. Dickey nevertheless tried to convince Bizri to continue to value the Galileo Fund account. Dickey also continued to offer and sell interests in the Funds throughout the relevant period.

Defendant's Response 18: False. There were no errors in the Galileo Fund's account that prevented Bizri from valuing the account. Furthermore, Bizri continued to provide valuations – even to the extent of claiming that the valuations he provided included adjustments for any errors by the broker. However, it was not known if this meant that additional trades had been placed to offset errors by the broker, or if this meant that accounting adjustments had been made. The former is believed to be the case, meaning that no accounting adjustments had occurred. Also, there were the previously mentioned multiple sources providing independent verification that the funds were being valued correctly, giving Dickey no reason to suspect problems with the valuation and much reason to conclude otherwise.

38

CS 000789

Furthermore, Dickey did not speak to Bizri about continuing to value the Galileo account. During this period, Dickey might have tried to convince Bizri to do his duty in valuing the account on a more timely basis each month, to support the added transparency desired by Dickey, or to provide additional trade details, but at no time and in no way did Dickey attempt to induce Bizri to mislead investors.

Moreover, Morgan Stanley was providing independent verification of account values, as evidenced by Exhibit 90, the March 21, 2001 letter from Sonny Matharu to Kevin Campbell, and Exhibit 91, the April 10, 2001 letter from Sonny Matharu to Zurich Capital Markets, and Exhibit 92, the April 30, 2001 Letter from Sonny Matharu to Shirley Xian. Since Morgan Stanley was providing this independent verification directly to investors, there was no reason to doubt or question the values as reported.

19.     After March 2001, Dickey continued to receive monthly statements from Olympia purporting to reflect his personal holdings in Integral Hedging and Integral Arbitrage. Therefore, Dickey was aware that someone was trying to value the Funds even though Bizri had told him that the Galileo Fund account could not be valued. In addition, Dickey provided weekly values of the investments held by The Art Institute of Chicago and its investment adviser, Kennedy Capital Advisers, Inc. ("Kennedy Capital"), to Kennedy Capital, and Dickey represented that he calculated these values.

Defendant's Response 19: False. The implication in this statement that Dickey knew and reported false information to investors is false. Furthermore, not only did Bizri make no statement that the Galileo Fund, L.P. account could not be valued, such a statement would not have been true. As the following chronology shows, Bizri was valuing the account, and was fully capable of doing so regardless of the presence or absence of errors.

The following is a chronology of events relating to (i) Bizri's ability to determine Fund values, (ii) Integral's efforts to acquire accurate information

39

regarding its Funds, and (iii) the subsequent disclosure of that information to investors:

A.   Letter to Sam Bizri regarding Deloitte & Touche on May 11, 2001 (Exhibit 93) indicates that Bizri had verified all values and that they were independent, not subject to influence or control, and accurate. Such a letter was sent to Deloitte & Touche by, and signed by, Sam Bizri. It also listed all contributions and profits earned for 1999 and 2000, as calculated and reported by Bizri.

B.   Exhibit 74, the June 6, 2001 letter from Sonny Matharu to Conrad Seghers, is the first written confirmation that Morgan Stanley had serious problems with its brokerage account statements. Morgan Stanley stated: "We are making the necessary adjustments to reflect the correct values." In other words, the statements were in error but nevertheless correct values were known by Morgan Stanley and possible to calculate, and therefore adjustments could be made to the incorrect statements so as to reflect correct values. Therefore, this was not a valuation problem but rather a monthly statement problem.

C.   The fact that valuations were still possible to calculate by Sam Bizri is seen in his June 8, 2001 e-mail, Exhibit 86. Once again, he lists and has calculated all values for Galileo Fund, L.P. He even states "Number subject to revisions pending final Morgan Stanley corrections." This means that corrections were possible to make to the incorrect brokerage account statements, that Bizri had made them, and that Bizri was eager to see what the corrections were once Morgan Stanley had made them independently of Bizri to determine if the two independent parties, Bizri and Morgan Stanley, both outside parties to the Funds, were in agreement on the corrections. Integral had no access to the positions in this account or the account statement. The June 11, 2001 e-mail from Sam Bizri to Conrad Seghers (Exhibit 85) clearly shows that Bizri was in complete control of the account, was completely responsible for valuations, and was still fully capable of valuing the Funds. This Exhibit shows a difference of approximately $63,000 in Bizri's calculations of the May 31, 2001 values between June 8 and June 11 of 2001, due to recalculating values to offset the errors in the Morgan Stanley statements. $63,000 is a difference of only approximately one-seventh of one percent, and therefore absolutely miniscule for the valuation, once again instilling confidence to the Funds that all asset valuations were correct.

D.   The June 12, 2001 e-mail (Exhibit 94) from Britt Bowers to Conrad Seghers is the first internal confirmation of multiple errors at Morgan Stanley. These errors were much larger than simply cash flows and

40



debits and credits posted to the accounts.  Britt Bowers had begun work full-time for Integral on June 1, 2001.  On June 12, 2001 it was discovered by Integral that there were problems at Morgan Stanley larger than Morgan Stanley was acknowledging, larger than Sam Bizri had disclosed, and not correctable by simply using a calculator and calculating " ... the sums of the credits and debits."

E.   Exhibit 95 is a June 12, 2001 fax from Sam Bizri regarding a "Fed Call" in the account of Galileo Fund Offshore, L.P.  Note Bizri's notations of "F'd up" and "Positions OK but mixed."  The discovery of problems at Morgan Stanley larger than simply the sums of credits and debits, and incorrect brokerage account statements that Morgan Stanley acknowledged were incorrect, had begun.

F.   Yet even then, as the e-mails between Britt Bowers and Leslie Seligson on June 13 and June 14, 2001 (Exhibit 96) and the e-mail from Conrad Seghers to Leslie Seligson on June 15, 2001 (Exhibit 97) show, Morgan Stanley was still indicating that they could and would fix the errors in the account.  Integral and its employees had no idea what the actual trades and underlying positions were or should have been in Galileo Fund, L.P.  Morgan Stanley in Exhibit 96 had replied, "Dear Britt, I have contacted Sam to determine whether or not these trades do in fact belong to Galileo Fund."  This was because Sam Bizri was the sole individual with authority over and access to the account of Galileo Fund, L.P.  Note how Britt Bowers at the time had actually started his analysis on the account of Galileo Fund Offshore, L.P., which Sam Bizri also obviously controlled.  Britt Bowers had stated, "Leslie, here are the trades you all messed up that should never have been in the Galileo Fund Offshore account.  Conrad told me that you all requested/needed us to send them to you in order to fix your errors."  Leslie Seligson responded, "Thank you for your helpful e-mail.  I am in the process of working on your request.  I did want to ask you about which account these trades needed to be in."  Britt Bowers responded, "I don't know.  They should have never been in our account.  They probably should have been in Sam's, but we don't know."  This shows that normally Integral could access the Galileo Fund Offshore, L.P. account, but that it did not have access in any way to the account of Galileo Fund, L.P., which Sam Bizri solely controlled.

G.   Exhibit 98, dated June 19, 2001, shows that Integral on a daily, very laborious and cumbersome basis (note the tens of check marks and notations) was now inspecting all accounts at Morgan Stanley, which since June 1, 2001 had become available to it.  Note the laborious task of checking each and every position, both long and short, including

41

CS 000792

quantity, and then also making certain that the cash flow balances were correct.

H.   Bizri was also cooperating in this internal investigation that Integral, and not either Morgan Stanley (see Exhibit 96) or Bizri had begun. Exhibit 99 shows Bizri calculating cash flows and positions and finding missing trades and many errors in positions that apparently, known only to Bizri, should not have been in the account. Note how this is a file created by Integral that Bizri is working from and correcting.

I.   Contrary to the SEC's assertion that Integral did not inform investors and prospects in a timely manner that there were problems with the Morgan Stanley account, the issues uncovered from June 6 through June 15 were first raised with investors and prospects in the June 20, 2001 letter marked Exhibit 100. The letter states: "errors from Morgan Stanley are being resolved and the monthly performance figures and statements should now be available in a more timely manner." By June 20, 2001 Integral had also forced Bizri Capital Partners, Inc. to switch the accounts to the prime brokerage division of Spear, Leeds and Kellogg to prevent any future errors or issues.

J.   Attached to the letter, Exhibit 100, were the audits for 2000 (the letter has a typographical error and states audits for 2001) which further explained the investment and legal structure of the hedge funds. The letter also discusses the RAPS contracts and their valuation mechanisms and their benefits to the investors. The letter discusses Galileo Fund, L.P. and also discusses the strategy outlook for the hedge funds at the time. Finally, the letter updates investors on the events at Morgan Stanley that were known at the time. Once again, full disclosure of investment strategies and Morgan Stanley problems was made.

K.   The July 31 update to all investors and prospects (Exhibit 101), states: "We are also still in the process of resolving outstanding issues with Morgan Stanley."

L.   Exhibit 102, an August 22, 2001 e-mail from Sam Bizri concerning Morgan Stanley, shows that in August 2001 Bizri was helping Integral and its attorney, Marc LoPresti, who Integral was paying and who now against Integral's wishes represents Bizri. This Exhibit describes events occurring in March and April of 2001 at Morgan Stanley which Integral had never been made aware of.

M.   Exhibit 103, an October 27, 2001 e-mail from Sam Bizri concerning Morgan Stanley, shows that even in October 2001 Integral continued

42

CS 000793

to rely on Bizri's assistance in reconstructing his involvement in events which led to the Morgan Stanley problems. Exhibit 103 describes errors that occurred at Morgan Stanley. It was prepared for and provided to the Funds' investors, including Kennedy Capital Advisors ("KCA") and The Art Institute of Chicago ("AIC"). It states, "I think this is ample. This is just scratching the surface and we're investigating these and the other positions and problems that Morgan has caused." Bizri is referring to an investor presentation Integral was giving to Kennedy in detail showing that Morgan Stanley was at fault.

N.    Exhibit 104 is a November 9, 2001 e-mail from Bizri to Integral describing how Bizri was continuing to compile information concerning errors that occurred in March 2001. Bizri even states, "This is a first draft." Bizri did not report these errors to Integral in March 2001. Note how one of the attachments is labeled "Notes_26_Kennedy.doc" meaning that simultaneous with the discovery of errors and compilation of data files, files for investor notification are prepared.

20.    From March through mid-July 2001, the Funds, through their investment in the Galileo Fund, suffered realized and unrealized losses of over $10.4 million, or approximately 20% of the Funds' total assets as of June 30, 2001, from the Galileo Fund's trading in NASDAQ 100 options.

Defendant's Response 20:    This assertion was unknown and cannot be confirmed or denied by Integral as Integral did not have access to account statements from Morgan Stanley which Morgan Stanley now says were erroneous. This much is known, however: whatever the amount of the loss, it was caused by Morgan Stanley. Indeed, an outside firm hired by the Receiver in the AIC civil case has found a single Morgan Stanley error that accounts for $6 million of the purported loss referred to above. The Receiver has also written an extensive letter documenting how he had hired outside professional firms to evaluate and discover millions of dollars in errors at Morgan Stanley.

The chronology of events related to the above described realized and unrealized losses is as follows:

43

CS 000794

A.   Exhibit 105 is a May 31, 2001 e-mail from Morgan Stanley to Integral that shows that Integral had requested information it previously did not have concerning trades and transactions in the Galileo Fund, L.P. account. It states, "I have put together the package of information for Galileo. I am waiting on Sam's approval to forward the item." Integral hired Brittain Bowers on June 1, 2001 to commence an investigation into the Morgan Stanley problems.

B.   However, Integral was aware of margin calculation problems. These were portrayed as simply incorrect margin calculations by Morgan Stanley causing certain positions, notably those involved in butterfly option combinations, to require larger maintenance than is normally required. This is a common error at brokerage firms, as a butterfly is a combination of four trades that together have either zero risk (other than a capital outlay) or a fixed risk, depending on whether one is long or short the butterfly. However, if instead of being perceived as a single group of four trades, two sets of two option combinations are perceived, very large margin maintenance requirements can be possible. An example of such an error, which was the extent that Integral knew of the problems at the time, is shown in Exhibit 106, an April 5, 2001 e-mail from Bizri to Morgan Stanley complaining about how option premiums collected must be part of the margin calculation.

C.   The transparency in connection with Morgan Stanley problems that began June 1, 2001 was continued as shown in Exhibit 107, a June 4, 2001 e-mail from Morgan Stanley to Integral and Olympia Capital with the day's transactions that Bizri had ordered and placed. This was being sent to prevent future problems, although at this point still very limited accessibility to past problems was being provided to Integral.

D.   Exhibit 108, another June 4, 2001 e-mail from Morgan Stanley, shows Morgan Stanley sending Integral all transactions for June 2001 to date as the beginning of Brittain Bowers' investigation of the Morgan Stanley accounts and their errors. Morgan Stanley in this Exhibit asks Integral to notify it of the incorrect trades which apparently were abundant. One of the items disclosed in this information on trades and positions was a $3 million payment to Galileo Fund Offshore, L.P. which had been omitted by Morgan Stanley, while Morgan Stanley did place that trading account with the $3 million liability of being short those option contracts.

E.   Morgan Stanley's first admission of a trade error that Integral was aware of, and therefore an error greater than cash flow balances,

44

occurred on June 18, 2001 and is shown in Exhibit 109, a June 18, 2001 e-mail from Morgan Stanley canceling a trade of NDX put options purchased for portfolio protection at a market value of $800,000.

F.    Exhibit 110 is a July 19, 2001 e-mail from Morgan Stanley concerning their research of the basis for trades Bizri had performed. Integral had never been made aware of these trades. The basis was needed for Spear, Leeds and Kellogg, which was going to be receiving these positions during the ACAT/DTC transfer of the accounts. At this point, Integral was still largely unaware of the magnitude of the losses at Morgan Stanley.

21.    In late June 2001, Dickey met with Christopher Umscheid, a portfolio manager for Yankee Multi-Manager Fund, L.P., a fund which had invested in Integral Hedging. Even though Dickey knew that errors prevented proper valuation of the Galileo Fund's account, he falsely represented to Umscheid that Integral Hedging's assets were valued based on the previous day's closing price, and that every position was hedged. Dickey further falsely represented that all of the trading was done "in-house," even though the trader, Bizri, was not, in fact, an Integral Hedging employee.

**Defendant's Response 21: False. As previously discussed hereinabove, errors would not prevent the proper valuation of Galileo Fund's account. All assets held directly by the Funds were valued at mark-to-market prices and were valued on the previous day's closing price. All trading of assets held by the Funds was done in-house by Sam Vogel and Conrad Seghers. Furthermore, by late June, dissatisfaction with Bizri's performance had reached the point that Seghers and Bizri had negotiated a separation agreement which meant that future trading would, in fact, become "in-house." All the directly held assets of Integral Hedging, L.P. were actually valued based on the previous day's closing price (this excludes everything in the Galileo Fund, L.P. exclusively controlled by Bizri which was valued using amortization). Integral Hedging, L.P. was attempting on a daily basis to have its attorney, Marc LoPresti, negotiate a termination of the RAPS Contract that was sooner than the scheduled expiration date of December 31,**

45

2001, as the Funds were desiring a complete withdrawal of their assets invested in and through Bizri by July and August of 2001.

The following chronology of events occurred following the separation of Integral and Bizri:

A.  It was explained by Integral to the investors by letter dated June 20, 2001, Exhibit 100, that "Galileo Fund, L.P. serves as a master feeder to our domestic funds. The reason a 3rd party is used in our master feeder structure is to allow it to behave as a performance swap, which thereby makes the returns long term capital gains as opposed to short term gains. We do not account for our portfolio at fair value because it would not enable us to enter the above described performance swaps. Our legal documents describe this fact, and a significant part of the audit report actually consists of portions of our legal document which is inserted into it. Both methods of accounting, however, were performed for this audit, and as described in the audit report the methods did not result in significant differences from one another."

The June 20, 2001 letter, exhibit 100, also states, "Our trading strategies have some cyclicality. Our trades are placed with a 30% hedge, and in these markets where many big name instruments have fallen by over 75% several of our hedges have had to be readjusted. Many of these trades will still be breakeven despite the markets crashing so badly, but it will take a few more months for this to occur. Also, new trades take 12 to 18 months to mature so while the first period of the trade is not making profit, later this year we expect to see a return to strong and steady profits, continuing through 2002. This is why we are advising investors to take advantage of the opportunity to invest beginning October 1."

22.  In July 2001, Seghers and Bizri transferred the Funds' assets in the Galileo Fund account to a second broker-dealer, Spear, Leeds & Kellogg. Bizri also opened a second account in the name of Galileo Fund Domestic, L.P. at Spear, Leeds & Kellogg. Some of the Funds' assets were deposited into this new account. Bizri traded in the Galileo Fund and Galileo Fund Domestic accounts at Spear, Leeds & Kellogg pursuant to Seghers' instructions until sometime in September 2001, when he stopped trading in the accounts. From mid-July through September 2001, the accounts at Spear, Leeds & Kellogg lost over $10.2 million, or approximately 22% of the Funds' total assets as of September 30, 2001. Seghers nevertheless

46

CS 000797

continued to provide false representations to Olympia, who consequently provided monthly statements to investors which falsely represented the following:

| Statement Date | Funds' Asset Value Reported By Seghers To Investors | Funds' Actual Asset Value | Amount Seghers Overstated To Investors | Percent Overstated |
|---|---|---|---|---|
| 7/31/01 | $72,523,134.47 | $49,401,727.37 | $23,121,407.10 | 47% |
| 8/31/01 | $60,659,263.15 | $34,230,438.92 | $26,428,824.23 | 77% |
| 9/30/01 | $73,852,329.40 | $46,718,114.57 | $27,134,214.83 | 58% |

**Defendant's Response 22:** **False.** The June 20, 2001 letter, Exhibit 100, continued:

> "*Commitment to Professionalism:*
>
> We have made a change from Morgan Stanley to Spear, Leeds & Kellogg, L.P., a division of Goldman Sachs. As we have switched to Spear, Leeds & Kellogg ("Spear Leeds & Kellogg"), errors from Morgan Stanley are being resolved and the monthly performance figures and statements should now be available in a more timely manner. Also, as you know, Deloitte & Touche has completed our audit, Olympia Capital continues to be the administrator for our funds, and Tannenbaum, Helpern, Syracuse & Hirschtritt, LLP is the legal counsel for Integral Hedging Offshore. Things are thus looking good for the 4th quarter and we are planning to start the year 2002 strong. The Principals and the Staff at Integral Investment Management would like to thank our current and potential investors for being patient with us during this transition period."

In conclusion, there again was full disclosure by Integral to the investors of the problems the Funds were facing as they approached the third quarter of 2001, including issues with Morgan Stanley and Spear Leeds & Kellogg and the market declines. Valuations and methodologies were again disclosed. And finally, it was therefore not possible that Dickey would have stated that "all of the trading was done 'in-house,'" except in relation to the correct statements that all trading of Integral accounts were done in-house and that all accounts would soon be managed in-house.

47

Exhibit 111 shows a July 13, 2001 letter to investors disclosing the changes that Kennedy Capital Advisors had strongly urged, including changing Galileo Fund, L.P. to a "master feeder" and changing the name of Integral to Integral and changing to Spear Leeds & Kellogg away from Morgan Stanley.

It had been determined by this time that the accounts at Morgan Stanley were not stable and that many questions were still unanswered. Immediately, forensic auditors were hired to go over the events at MSDWD. It still took several months for all of the assets to be transferred over to Spear Leeds & Kellogg. In the meantime, the full extent of the damages at Morgan Stanley was still largely unknown. Investors were again immediately notified.

The assets were transferred away from Morgan Stanley due to their errors, and Spear, Leeds and Kellogg ("Spear Leeds & Kellogg") was chosen as they are known for their option trading desk and quality of option executions. The prime brokerage department of Spear Leeds & Kellogg was chosen. Once again, to ensure the safety of all assets an agreement was set up with Spear Leeds & Kellogg, as shown in Exhibit 112, a letter dated July 15, 2001, stating that absolutely no assets could be sent to any location other than to Olympia Capital at State Street Bank. Note how a copy of this letter was sent to the Art Institute of Chicago and Kennedy Capital Advisors as part of the full disclosure of events that Integral gave to its investors, as it is the version of the letter sent to KCA before it was even executed that is intentionally being shown here.

The Fund experienced a loss of 4.4% during the period that included the September 11, 2001 WTC Attacks. This loss of 4.4%, versus 56.6% for the older accounts, shows the effects of the Morgan Stanley errors, and the increased leverage and margin required to address those errors in order to position the GF and IE accounts for break-even in the December 2001

48